## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>    OWENS CORNING, et al.,<br><br>                                    Debtors. | Chapter 11<br>Case No. 00-03837 (JKF)<br>(Jointly Administered) |
| THE OFFICIAL REPRESENTATIVES OF THE BONDHOLDERS AND TRADE CREDITORS OF DEBTORS OWENS CORNING, *et al.*,<br><br>                                    Plaintiffs,<br><br>                    v.<br><br>CREDIT SUISSE FIRST BOSTON, individually and in its capacity as Agent, AG CAPITAL FUNDING PARTNERS, L.P., ARAB BANK PLC, BANKERS TRUST COMPANY, THE BANK OF AMERICA, THE BANK OF NEW YORK, THE BANK OF TOKYO-MITSUBISHI, LTD., BANK ONE, N.A., BARCLAYS BANK, PLC, BEAR, STEARNS & CO. INC., THE CHASE MANHATTAN BANK N.A., JP MORGAN CHASE BANK, CIC-UNION EUROPEENNE, CITIBANK, N.A., CONTINENTAL CASUALTY, CREDIT AGRICOLE INDOSUEZ, CREDIT INDUSTRIEL ET COMMERCIAL, CREDIT LYONNAIS, THE DAI-ICHI KANGYO BANK LIMITED, DEXIA BANK, FLEET NATIONAL BANK, FORTIS (USA) FINANCE LLC, FRANKLIN MUTUAL ADVISERS, LLC, GE CAPITAL COMMERCIAL FINANCE, GOLDMAN SACHS CREDIT PARTNERS L.P., HBK INVESTMENTS, HBK MASTER FUND, INSTITUTO BANCARIO SAN PAOLO, J.P. MORGAN SECURITIES/CHASE SECURITIES, KBC BANK, N.V., KENSINGTON INTERNATIONAL LIMITED, KEYBANK NATIONAL ASSOCIATION, KING STREET CAPITAL MANAGEMENT L.L.C., LEHMAN COMMERCIAL PAPER INC., LONGACRE MASTER FUND LTD., | Adversary Proceeding No. _____ |

MAINSTAY FUNDS, MERRILL LYNCH, PIERCE, FENNER & SMITH INC., THE MITSUBISHI TRUST AND BANKING CORPORATION, MORGAN GUARANTEE TRUST COMPANY OF NEW YORK, NATEXIS BANQUE, NATEXIS BANQUES POPULAIRES, THE NORTHERN TRUST COMPANY, OAKTREE CAPITAL MANAGEMENT, LLC, PERRY PRINCIPALS, OAK HILL SECURITIES FUND, L.P., OAK HILL SECURITIES FUND II, L.P., ROYAL BANK OF CANADA, SALOMON BROTHERS HOLDING COMPANY, INC., SANPAOLO IMI S.P.A., SILVER OAKS & CO. L.P., SOCIETE GENERALE, SPRINGFIELD ASSOCIATES, LLC, SUMITOMO TRUST & BANKING, STB DELAWARE FUNDING TRUST I, SUNTRUST BANK, WELLS FARGO BANK, N.A., BANK OF NOVA SCOTIA, FIRST NATIONAL BANK OF CHICAGO, NATIONSBANC MONTGOMERY SECURITIES LLC, BANCAMERICA ROBERTSON STEPHENS, and JOHN DOES 1-50,

Bank Defendants,

IPM, INC, OWENS-CORNING FIBERGLAS SWEDEN, INC. and VYTEC CORPORATION,

Affiliate Non-Debtor Defendants.

## COMPLAINT OF OFFICIAL REPRESENTATIVES OF THE OWENS CORNING BONDHOLDER AND TRADE CREDITOR CONSTITUENCIES FOR EQUITABLE SUBORDINATION AND TO PIERCE THE CORPORATE VEIL

Plaintiffs are the Official Representatives of the Bondholders and Trade Creditors (the "Official Representatives") of debtors Owens Corning Corporation ("Owens Corning" or "OCD") and certain of its subsidiaries, *et al.* (collectively, the "Debtors"). The Official Representatives, by and through their undersigned counsel, who represent the interests of the bondholder and trade creditor constituencies (the

"Bondholders" and "Trade Creditors," respectively) of the Debtors in these bankruptcy cases to the extent that such interests differ from the interests of the Bank Defendants herein, respectfully allege the following:

## NATURE OF THE ACTION[1]

1.      Official Representatives bring this Complaint pursuant to 11 U.S.C. § 510(c) and applicable state law and seek:  (1) an order equitably subordinating the Bank Defendants' claims against OCD to those of the Bondholders and Trade Creditors as well as equitably subordinating the Bank Defendants' Guarantee claims against certain OCD debtor subsidiaries to the claims of OCD against such subsidiaries, for the benefit of OCD's creditors; (2) an order equitably subordinating the Non-Debtor Guarantors' claims against OCD to those of the Bondholders and Trade Creditors; (3) an order piercing the corporate veil of OCD's alter ego affiliates IPM, OC Sweden and Vytec, together with an order making each alter ego's assets available to the creditors of OCD; and (4) in the event that the Official Representatives' requested relief of corporate veil piercing is granted with respect to any of OCD's Non-Debtor subsidiaries, an order equitably subordinating any and all Bank Defendants' claims against the merged OCD enterprise to those of the Bondholders and Trade Creditors.

2.      Official Representatives' equitable subordination claims seek to subordinate the Banks' claims against OCD to those of the Official Representatives as well as subordinate the Banks' Guarantee claims against certain OCD debtor subsidiaries to those of OCD against such subsidiaries; thereby increasing the amount of assets available for recovery by OCD's creditors, including the Bondholders and

---

[1]      Capitalized terms not defined in this "Nature of the Action" section are defined in the "Definitions" section immediately below.

Trade Creditors. Official Representatives also seek to subordinate the Non-Debtor Guarantors' claims against OCD to those of the Bondholders and Trade Creditors. Equitable subordination in this case is necessary in order to prevent the Banks and the Non-Debtor Guarantors from benefiting from their inequitable conduct in connection with OCD bond offerings and the issuance of OCD financial statements, as described below. In the event this Court issues a veil piercing order as sought by the Official Representatives, the Bank Defendants' claims within the merged enterprise should also be subject to equitable subordination. If the claims of the Bondholders and the Trade Creditors within any merged Owens Corning enterprise are not given priority over those of the Bank Defendants and Non-Debtor Guarantors, such Defendants will benefit from their inequitable conduct described above and the Bondholders and Trade Creditors will suffer substantial harm.

3.     Official Representatives' veil piercing claim seeks to retrieve and make available to OCD's creditors the property of OCD which improperly is in the possession of its alter ego affiliates IPM, OC Sweden and Vytec.

4.     On June 26, 1997, Defendants extended financing to OCD of up to $2 billion pursuant to a credit agreement which created a credit facility (the "Credit Facility"). At or about the same time, certain OCD subsidiaries guaranteed OCD's obligations under the Credit Facility to the Bank Defendants. The Bank Defendants have taken the position in these Bankruptcy Cases that, by virtue of these upstream Guarantees by OCD's subsidiaries, the Banks' claims are structurally senior to, and entitled to priority over, all other unsecured claims against the Debtors. Moreover, the Banks have maintained (and continue to maintain) that in negotiating for the

Guarantees, the Banks *always* intended to obtain such structural seniority over the rest of OCD's general unsecured obligations.

5.      Approximately one year after the creation of the Credit Facility, a number of the Bank Defendants acted as underwriters for certain OCD bond offerings (the "Bank Underwriters"), which they underwrote primarily to generate funds to pay down OCD's indebtedness under the Credit Facility.

6.      Defendant Credit Suisse First Boston ("CSFB"), which was the Agent for the participating banks in the 1997 Credit Facility, also served as the lead underwriter on these bond offerings, and at least two CSFB officers who had participated in the negotiation and creation of the Credit Facility also were involved in the underwriting and sale of bonds on behalf of Owens Corning in 1998.

7.      Despite the Banks' alleged prior knowledge that OCD's indebtedness under the Credit Facility would rank senior to its Bond Debt by virtue of the Guarantees, the Bank Underwriters, OCD and the Guarantors misrepresented in various prospectuses in connection with the bond offerings that OCD's Bond Debt would be unsubordinated and rank equally and ratably with OCD's Bank Debt.

8.      The Bondholders and Trade Creditors reasonably relied on the false public statements of the Bank Underwriters, OCD and the Subsidiary Guarantors before purchasing OCD bonds and extending trade credit to OCD.

9.      If the Banks' and the Non-Debtor Guarantors' claims are not subordinated, their inequitable conduct in connection with the Owens Coring bond offerings and financial statements will confer on them an unfair advantage and substantially harm OCD's Bondholder and Trade Creditor constituents.

10.     Under these circumstances, equity compels that the Banks and Non-Debtor Guarantors be bound by their statements in the prospectuses and that their claims be equitably subordinated as sought below, thereby increasing the amount of assets available for recovery by OCD's creditors, including the Bondholders and Trade Creditors.

## DEFINITIONS

11.     As used in this Complaint, the following terms not elsewhere defined herein have the following meanings:

(a)     "Bankruptcy Cases" means the voluntary petitions for relief under the Code filed by the Debtors on October 5, 2000, and the proceedings subsequently had therein.

(b)     "Banks" or "Bank Group" means the Bank Defendants, who collectively constitute the consortium of lenders, and their respective successors in interest, who participated in the Credit Facility.

(c)     "Bond Debt" means the publicly issued and traded unsecured indebtedness of OCD.

(d)     "Code" means the United States Bankruptcy Code, Title 11 of the United States Code.

(e)     "Credit Facility" or "1997 Credit Agreement" means the Credit Agreement dated as of June 26, 1997 with the Bank Defendants, as subsequently amended, which was provided by a consortium of banks at the time of the Fibreboard Acquisition for the purpose, among others, of providing the funds with which to effectuate the Fibreboard Acquisition.

(f)     "Debtor-In-Possession" means Owens Corning.

(g)     "Debtor Guarantors" means OCD and Integrex, Exterior, and OCFT.

(h)     "Exterior" means Exterior Systems, Inc.

(i)     "Fibreboard" means Fibreboard Corporation.

(j)     "Fibreboard Acquisition" means the acquisition by OCD of all the capital stock of Fibreboard in May 1997.

(k)     "Guaranteed Obligations" means all liabilities of each borrower and each Guarantor owing to, or in favor or for the benefit of, each lender under the 1997 Credit Agreement, whether existing on the date of the 1997 Credit Agreement or thereafter and whether or not any such liability is an allowable claim against such borrower or such Guarantor under the Code or is otherwise enforceable against such borrower or such Guarantor.  "Guaranteed Obligations" also includes interest and other liabilities accruing or arising after the filing by or against such borrower or such Guarantor of a petition under the Code or that would have so accrued or arisen but for the filing of such petition.

(l)     "Guarantees" means the obligations under Article 10 of the 1997 Credit Agreement which evidence the respective purported Guarantees of the Credit Facility granted by each of the Debtors party thereto who are direct or indirect subsidiaries of OCD, including IPM, Fibreboard, Exterior, OCFT, and Integrex.

(m)     "Guarantors" or "Subsidiary Guarantors" collectively means all of the subsidiaries of OCD who are party to Article 10 of the 1997 Credit Agreement, including the Non-Debtor Guarantors and the Debtor Guarantors.

(n)     "IPM" means IPM, Inc.

(o) "Non-Debtor Guarantors" means IPM, OC Sweden and Vytec.

(p) "OCFT" means Owens-Corning Fiberglas Technology Inc.

(q) "OC Sweden" means Owens-Corning Fiberglas Sweden, Inc.

(r) "Official Representatives" means John Hancock Life Insurance Company and Wilmington Trust Company as Indenture Trustee, in their capacity as members of the Official Committee of Unsecured Creditors who represent the interests of the holders of the Debtors' Bond Debt and Trade Debt in these Bankruptcy Cases.

(s) "Owens Corning" or "OCD" means Owens Corning Corporation.

(t) "Relevant Period" means January 1, 1997 to October 5, 2000, the date OCD and 17 of its domestic subsidiaries filed voluntary petitions for bankruptcy under chapter 11 of the Code.

(u) "Sham Affiliates" means IPM, OC Sweden and Vytec.

(v) "Significant Subsidiary" refers to the term defined as such in Section 15.01(a) of the 1997 Credit Agreement to mean a subsidiary of Owens Corning "having assets with an aggregate book value in excess of $30,000,000."

(w) "Trade Debt" means the Guarantors' obligations to each of its trade creditors.

(x) "Vytec" means Vytec Corporation.

## JURISDICTION AND VENUE

12.     On October 5, 2000 (the "Petition Date"), Owens Corning filed a voluntary petition in this Court for reorganization relief under Chapter 11 of Title 11 of the Code.  Owens Corning continues to manage and operate its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Code.

13.     This Court has jurisdiction over this adversary proceeding and the Defendants pursuant to 28 U.S.C. §§ 157 and 1334 and Bankruptcy Rule 7004.  This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (H) and (O).

14.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334.

15.     The statutory predicates for the relief requested herein are 11 U.S.C. § 510(c) and Bankruptcy Rule 7001.

16.     Venue lies in this District pursuant to 28 U.S.C. §§ 1391, 1408 and 1409.

## PARTIES

17.     Plaintiff John Hancock Life Insurance Company is a life insurance company organized under the laws of the Commonwealth of Massachusetts.

18.     Plaintiff Wilmington Trust Company, as Indenture Trustee, is a trust company organized under the laws of the State of Delaware.

19.     Defendant IPM, a nondebtor affiliate of OCD, is a corporation organized and existing under the laws of the State of Delaware.

20.     Defendant OC Sweden, a nondebtor affiliate of OCD, is a corporation organized and existing under the laws of both the State of Delaware and the country of Sweden and is a Guarantor.

21.     Defendant Vytec, a nondebtor affiliate of OCD, is a corporation organized and existing under the laws of Canada and is a Guarantor.

22.     The Bank Defendants are banks, lending institutions and lending agents which have provided OCD and certain of its subsidiaries with financing through the 1997 Credit Agreement or are successors or assignees of original lenders under the 1997 Credit Agreement, some of which acted as underwriters for certain OCD bond offerings.

23.     John Does 1-50 are entities, currently unknown to Official Representatives, which are successors or assignees of the original lenders under the 1997 Credit Agreement and which currently hold a portion of the Banks' claims in these Bankruptcy Cases.  Since the closing of the 1997 Credit Agreement, there has been substantial trading of the Bank Debt.  Some trades may have been documented as transfers of record ownership while others may have been transfers of beneficial ownership.  Upon information and belief, a portion of the Bank Debt claims in these Bankruptcy Cases are held by beneficial owners not on record in filings with this Court by CSFB, as agent.  These unknown beneficial owners of the Bank Debt also comprise John Does 1-50.

24.     Upon information and belief, Bank Defendant Credit Suisse First Boston, individually and in its capacity as Agent, is a corporation having a place of business at 11 Madison Avenue, New York, New York 10010.

25. Upon information and belief, the following were the holders of the Banks' claims as of October 31, 2001, as original lenders or assignees under the 1997 Credit Agreement, and are Defendants herein:

(a) AG Capital Funding Partners, L.P., a limited partnership transacting business in the United States and having a place of business at 245 Park Avenue, New York, New York 10167.

(b) Arab Bank PLC, an entity having a place of business at 520 Madison Avenue, New York, New York 10022.

(c) Bankers Trust Company, upon information and belief now known as Deutsche Bank Trust Company Americas, a corporation having a place of business at 130 Liberty Street, New York, New York 10006.

(d) The Bank of America, a corporation with its principal place of business located at 100 N. Tryon Street, Charlotte, North Carolina 28255.

(e) The Bank of New York, a corporation with its principal place of business located at One Wall Street, New York, New York 10286.

(f) The Bank of Tokyo-Mitsubishi, Ltd., an entity having a place of business at 227 West Monroe Street, Chicago, Illinois 60606.

(g) BancAmerica Robertson Stephens, an entity having a place of business at 1633 Broadway, New York, New York 10019.

(h) Bank of Nova Scotia, an entity having a place of business at 67 Wall Street, New York, New York 10005-3101.

(i)     Bank One, N.A., upon information and belief predecessor to Bank One NA, a corporation having a place of business at 611 Woodward Avenue, Detroit, Michigan 48226.

(j)     Barclays Bank, PLC, an entity having a place of business at 222 Broadway, New York, New York 10038.

(k)     Bear Stearns & Co. Inc., a corporation having a place of business at 245 Park Avenue, New York, New York 10167.

(l)     The Chase Manhattan Bank N.A., a corporation having a place of business at 270 Park Avenue, New York, New York 10017.

(m)     JP Morgan Chase Bank, a corporation having a place of business at 270 Park Avenue, New York, New York 10017, upon information and belief successor in interest to The Chase Manhattan Bank N.A. and Morgan Guaranty Trust Company of New York.

(n)     CIC-Union Europeenne, an entity having a place of business at 520 Madison Avenue, New York, New York 10022.

(o)     Citibank, N.A., a corporation having a place of business at 399 Park Avenue, New York, New York 10043.

(p)     Continental Casualty, a corporation having a place of business at 333 South Wabash Avenue, Chicago, Illinois 60685.

(q)     Credit Agricole Indosuez, an entity having a place of business at 666 Third Avenue, New York, New York 10017.

(r)     Credit Industriel et Commercial, an entity having a place of business at 520 Madison Avenue, New York, New York 10022.

(s)     Credit Lyonnais, an entity having a place of business at 1301 Avenue of the Americas, New York, New York 10019.

(t)     The Dai-Ichi Kangyo Bank Limited, New York Branch, upon information and belief now known as Mizuho Bank Ltd., an entity having a place of business at 10 South Wacker Drive, 26th Floor, Chicago, Illinois 60606.

(u)     Dexia Bank, upon information and belief now known as Dexia Bank Belgium SA, an entity having a place of business at 445 Park Avenue, New York, New York 10022.

(v)     First National Bank of Chicago, an entity having a place of business at 38 South Dearborn Street, Chicago, Illinois  60603.

(w)     Fleet National Bank, a corporation with its principal place of business located at 100 Federal Street, Boston, Massachusetts 02110.

(x)     Fortis (USA) Finance LLC, upon information and belief now known as Fortis Finance LLC, a corporation having a place of business at 3 Stamford Plaza, 301 Tresser Boulevard, Stamford, Connecticut 06901.

(y)     Franklin Mutual Advisers, LLC, a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 51 John F. Kennedy Parkway, Short Hills, New Jersey 07078.

(z)     GE Capital Commercial Finance, a corporation having a place of business at 60 Long Ridge Road, Stamford, Connecticut 06927.

(aa)    Goldman Sachs Credit Partners L.P., a limited partnership having a place of business at 85 Broad Street, New York, New York 10004.

(bb)    HBK Investments, upon information and belief a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

(cc)    HBK Master Fund, an entity transacting business in the United States and upon information and belief having a place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

(dd)    Instituto Bancario San Paolo, an entity having a place of business at 245 Park Avenue, New York, New York 10167.

(ee)    J.P. Morgan Securities/Chase Securities, upon information and belief now known as J.P. Morgan Securities, Inc., a corporation having a place of business at 270 Park Avenue, New York, New York 10017-2070.

(ff)    KBC Bank, N.V., an entity having a place of business at 125 West 55th Street, 10th Floor, New York, New York 10019.

(gg)    Kensington International Limited, a corporation with its principal place of business located at 12 East 44th Street, New York, New York 10017.

(hh)    Keybank National Association, a corporation with its principal place of business located at 127 Public Square, Cleveland, Ohio 44114.

(ii)    King Street Capital Management L.L.C., a limited liability company transacting business in the United States and having a place of business at 575 Lexington Avenue, New York, New York 10022.

(jj)    Lehman Commercial Paper Inc., a corporation having a place of business at 745 7th Avenue, New York, New York 10019.

(kk)    Longacre Master Fund Ltd., a corporation transacting business in the United States and having a place of business at 1700 Broadway, New York, New York 10019.

(ll)    Mainstay Funds, an entity having a place of business at 169 Lackawanna Avenue, Parsippany, New Jersey 07054.

(mm)   Merrill Lynch, Pierce, Fenner & Smith Inc., a corporation organized and existing entity under the laws of the State of Delaware, with a place of business located at 4 World Financial Center, 250 Vessey Street, 7th Floor, New York, New York 10080.

(nn)    The Mitsubishi Trust and Banking Corporation, an entity having a place of business at 520 Madison Avenue, 26th Floor, New York, NY 10022.

(oo)    Morgan Guaranty Trust Company of New York, a corporation having a place of business at 60 Wall Street, New York, New York 10260.

(pp)    Natexis Banque, an entity having a place of business at 1251 Avenue of the Americas, New York, New York 10020.

(qq)    Natexis Banques Populaires, an entity having a place of business at 1251 Avenue of the Americas, New York, New York 10020, upon information and belief successor in interest to Natexis Banque.

(rr)    NationsBanc Montgomery Securities LLC, an entity having a place of business at 111 Eighth Avenue, New York, New York 10011.

(ss)    The Northern Trust Company, a corporation with its principal place of business at 50 South LaSalle Street, Chicago, Illinois 60675.

(tt)     Oaktree Capital Management, LLC, a California limited liability company, with its principal place of business at 333 South Grand Avenue, 28th Floor, Los Angeles, California 90071.

(uu)     Perry Principals, an entity transacting business in the United States and upon information and belief having a place of business c/o Perry Corp. at 599 Lexington Avenue, New York, New York 10022.

(vv)     Oak Hill Securities Fund, L.P., a limited partnership having a place of business c/o Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, New York 10019.

(ww)   Oak Hill Securities Fund II, L.P., a limited partnership having a place of business c/o Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, New York 10019.

(xx)     Royal Bank of Canada, a corporation having a place of business at One Liberty Plaza, New York, New York 10006.

(yy)     Salomon Brothers Holding Company, Inc., a corporation existing under the laws of the State of Delaware, with a place of business located at 333 West 34th Street, New York, New York 10001.

(zz)     Sanpaolo IMI S.p.A., an entity having a place of business at 245 Park Avenue, New York, New York 10167.

(aaa)   Silver Oaks & Co. L.P., a limited partnership transacting business in the United States and having a place of business at 245 Park Avenue, New York, New York 10167.

(bbb)   Societe Generale, an entity having a place of business at 1221 Avenue of the Americas, New York, New York 10020.

(ccc)   Springfield Associates, LLC, a limited liability company transacting business in the United States and having a place of business at 712 Fifth Avenue, New York, New York 10019.

(ddd)   Sumitomo Trust & Banking, an entity having a place of business at 527 Madison Avenue, New York, New York 10022.

(eee)   STB Delaware Funding Trust I, an entity having a place of business at 527 Madison Avenue, New York, New York 10022.

(fff)   Suntrust Bank, a corporation with its principal place of business at 25 Park Place, Atlanta, Georgia 30303.

(ggg)   Wells Fargo Bank N.A., a corporation with its principal place of business at 420 Montgomery Street, San Francisco, California 94104.

<u>FACTUAL ALLEGATIONS</u>

A.   <u>Terms Of The 1997 Credit Agreement</u>

26.   On June 26, 1997, OCD entered into the 1997 Credit Agreement with a syndicate of banks for the purpose, among others, of providing the funds with which to effectuate the acquisition by OCD of the Fibreboard Corporation (the "Fibreboard Acquisition").

27.   The 1997 Credit Agreement initially provided a credit line of up to $2 billion.  All loans outstanding under the 1997 Credit Agreement were to be repaid in full on June 26, 2002.  Amendment No. 1 dated as of February 20, 1998 to the 1997 Credit Agreement reduced the credit available to $1.8 billion.

28.     Section 15.01(a) of the 1997 Credit Agreement provides that the term "Guaranteed Obligations" means all liabilities of each borrower and each Guarantor owing to, or in favor or for the benefit of, each lender under the 1997 Credit Agreement, whether existing on the date of the 1997 Credit Agreement or thereafter and whether or not any such liability is an allowable claim against such borrower or such Guarantor under the Bankruptcy Code or is otherwise enforceable against such borrower or such Guarantor.  "Guaranteed Obligations" also includes interest and other liabilities accruing or arising after the filing by or against such borrower or such Guarantor of a petition under the Bankruptcy Code or that would have so accrued or arisen but for the filing of such petition.

29.     Section 10.01 of the 1997 Credit Agreement provides that the Guarantors each guaranteed the due and punctual payment and performance of all of the Guaranteed Obligations, including without limitation the initial and all subsequent borrowings.

30.     Section 10.07 of the 1997 Credit Agreement provides that each Guarantor's Guarantee obligation is: (a) absolute and unconditional; (b) unlimited in amount, except as provided in Section 10.02; (c) a guaranty of payment and not a guaranty of collection; (d) as primary obligor and not as surety only; (e) a continuing guaranty of all present and future Guarantee obligations; and (f) irrevocable.

31.     Section 10.08 of the 1997 Credit Agreement provides that the Guarantee obligations of each Guarantor could not be reduced, limited, terminated or discharged for any reason, except (a) upon payment in full of the Guaranteed Obligations or (b) if any Guarantor was sold, transferred or otherwise disposed of for fair

value in a transaction otherwise permitted under the 1997 Credit Agreement, then such Guarantor would automatically be released as a Guarantor.

32.    From June 26, 1997 until the Petition Date, aggregate borrowings under the 1997 Credit Agreement, excluding letters of credit, fluctuated from approximately $259 million to $1.322 billion.

33.    In the year prior to the Petition Date, aggregate borrowings under the 1997 Credit Agreement, excluding letters of credit, increased from approximately $475 million to approximately $1.315 billion.

**B.    The Acquisition Of Fibreboard**

34.    As of December 31, 1996, OCD publicly estimated its total liabilities in respect of indemnity and defense costs associated with pending and unasserted asbestos personal injury claims to be $1.197 billion.  At that time, OCD estimated its insurance recoveries in respect of such claims to be $554 million, and its estimated asbestos liabilities net of insurance accordingly were $643 million.

35.    OCD pursued its 1997 acquisition of Fibreboard because Fibreboard had a $1.8 billion insurance trust created for the purpose of compensating persons claiming, or expected to claim, damages from Fibreboard arising out of Fibreboard's use of asbestos in its products.  At that time:  (i) OCD believed that its acquisition of the Fibreboard trust would provide increased negotiating leverage with counsel to the asbestos Official Representatives who had filed claims against both Fibreboard and OCD; and (ii) upon information and belief, OCD believed or had reason to believe that some of the assets of the Fibreboard trust could, directly or indirectly, be made available to pay asbestos claims against OCD as well.

36. OCD financed the Fibreboard Acquisition, at a cost of approximately $640 million, by borrowings under the Credit Facility.

37. The Credit Facility, totaling $2 billion, was expected to provide funds for: (i) the Fibreboard Acquisition and refinancing of Fibreboard debt of $640 million; (ii) refinancing of $682 million of existing OCD debt; (iii) estimated fees and expenses of $35 million; and (iv) retirement of $250 million of outstanding letters of credit, leaving approximately $393 million of the Credit Facility available for additional borrowing.

38. Article 10 of the 1997 Credit Agreement, which was two and one half pages long and embedded in that document beginning at page 57 thereof, provided for the purported guarantee of the Credit Facility by OCD's unnamed "Significant Subsidiaries," who were defined therein at Section 15.01(a) as "[Subsidiaries] having assets with an aggregate book value in excess of $30 million."

39. On June 26, 1997, a number of Guarantors, including IPM and OC Sweden, signed the 1997 Credit Agreement and thereby purportedly agreed to the provisions of Article 10 thereof. Subsequently, on July 31, 1997, Vytec executed an amendment to the 1997 Credit Facility which purportedly constituted its agreement to the provisions of Article 10 thereof.

40. At that time, the only way to ascertain the identity of any of the Guarantors was to refer to the signature pages of the 1997 Credit Agreement or one of its subsequent amendments. The names of the Guarantors were not otherwise set forth in the 1997 Credit Agreement or amendments thereof in any other form.

41.     Throughout the Relevant Period and thereafter, the access of the Debtors' creditors (other than the members of the Bank Group) to information as to who the purported Guarantors were was limited solely to OCD's public filings in the SEC's publicly available EDGAR disclosure system.

42.     The only copy of the 1997 Credit Agreement available on EDGAR during the Relevant Period, however, did not contain the signature pages of any of the Guarantors.

43.     On March 13, 1998, as part of its voluminous annual report for the fiscal year ended December 31, 1997, OCD filed an Amendment No. 1 to the 1997 Credit Agreement ("Amendment No. 1") on EDGAR which identified seven of the Guarantors.

44.     By this time, however, the Bondholders already had purchased $300 million in Bond Debt.  Moreover, nothing in Amendment No. 1 indicated the value, if any, of any of the seven Guarantors listed therein.

45.     The financial reporting covenants contained in the 1997 Credit Agreement did not require OCD or any of the Guarantors to provide consolidating or other separate financial information of any kind with respect to the Guarantors.

46.     At no time during the Relevant Period did anyone, including OCD, know the collective assets and liabilities of the Guarantors, except that the Significant Subsidiaries had assets with an aggregate book value in excess of $30 million.

47.     Thus, prior to March 13, 1998, neither the Official Representatives nor any of the Debtors' other unsecured creditors had any way of learning the purported

Guarantors' identities, and also had no way of knowing, throughout the Relevant Period, the value, if any, of the Guarantors.

### C.    The OCD Enterprise

#### 1.    OCD's Tax Shelters

48.    IPM, OCFT and Integrex were mere alter ego tax shelters of OCD with no economic substance or independent business purpose.

**IPM**

49.    IPM was a common type of tax shelter known as a "Delaware holding company."  Using a holding company subsidiary as the tax shelter vehicle, a corporation transfers the stock of its non-United States subsidiaries to the holding company and then upstreams (dividends) all of the income from its non-United States operations through the holding company subsidiary to the parent.

50.    As long as the holding company has a nexus only with its state of incorporation, the structure provides a state tax benefit in that the repatriated offshore income is not subject to tax in any other state.

51.    On October 25, 1991, IPM was incorporated in Delaware, a state which does not tax the income of a corporation whose only activity in Delaware is the ownership, maintenance, and management of intangible assets.

52.    OCD assigned to IPM all of OCD's stockholdings in the majority of its non-United States subsidiaries and affiliates.  This relationship was a sham.  Funds IPM received as dividends from its foreign subsidiaries were immediately "loaned" to OCD.  As a result, OCD's state income taxes were deferred until OCD repaid the loan in the form of a dividend.  Thus, IPM merely served as a conduit for foreign earnings to flow through to its parent with no state taxes being paid on such earnings.

53. IPM's records were maintained by a Delaware service corporation whose primary business was conducting the activities of similar Delaware holding company tax shelter subsidiaries for a great many businesses, including OCD. Over the years IPM merely served as a conduit for foreign earnings to flow through to its parent with no state taxes being paid on such earnings.

## **OCFT**

54. OCFT was a domestic version of another common type of state tax shelter known as an intellectual property holding company. Again, using a holding company subsidiary as the tax shelter vehicle, a corporation transfers intellectual property to a separate subsidiary, which then licenses such property to its operating affiliates. The subsidiary incorporates in a state that does not have a corporate income tax. As long as the holding company has a nexus only with its state of incorporation, this structure provides a twofold state tax benefit: (i) the operating affiliates get a royalty expense deduction; and (ii) the royalty income is not subject to tax in any state.

55. On August 1, 1991, OCD incorporated OCFT in Illinois, which does not tax royalty income generated between affiliates, and, effective October 1, 1991, conveyed to OCFT substantially all of its intellectual property. OCFT then granted an exclusive license to OCD for the use of the intellectual property (the "IP License"). The term of the IP License was twenty years. As "consideration" for the IP License, OCD was to make quarterly royalty payments to OCFT. The approximate annual amount of the royalty payments was anticipated to be $170 million.

56. OCD declared these royalty payments as business expense deductions on its state tax returns. The payments were not, however, paid in cash to OCFT. Rather, OCD and OCFT entered into a revolving loan agreement (the

"Revolving Loans") whereby OCFT made quarterly short term revolving credit loans of the royalty amounts otherwise owed to OCFT by OCD. In essence, OCD did not pay the royalty but rather owed OCFT the royalty amounts through the mechanism of the Revolving Loan agreement, which amounts were annually converted into a five year term loan (the "Term Loans"). Robert Mercola, President, Treasurer, and member of the OCFT Board of Directors, testified that the royalty payments from OCD to OCFT would always "boomerang" back to OCD almost instantaneously.

57.     In substance, OCFT never received the value which ostensibly accrued to its ownership of the IP since the license of the property to its parent allowed the parent the continued use of the property it had contributed to OCFT and since OCFT agreed to forego or return (as dividends) all cash payments it was otherwise entitled to receive as owner of the IP.

### Integrex

58.     Integrex was a variation of a tax shelter that created an artificial loss for United States federal income tax purposes by applying certain rules of the Internal Revenue Code. It has been described by the IRS as a "contingent liability tax shelter" and is characterized as a "listed transaction" (also known as an abusive tax avoidance transaction) by the IRS.

59.     OCD contributed $1.002 billion of intercompany debt in the form of two $501 million debentures issued to OCD by IPM and OCFT, respectively, and a $360 million note issued by Fibreboard, into Integrex, which was incorporated in Delaware on August 25, 1995. As part of this transaction Integrex purportedly assumed $1.367 billion of asbestos-related claims against OCD. The value of those claims reduced the

value of Integrex (since it had contingent liabilities) but not its artificially high tax basis of at least $1.002 billion in the hands of OCD.

60.     On December 29, 1997, OCD sold the stock of Integrex for $40 million.  This sale purportedly resulted in a current capital loss of $962 million, which OCD recognized on its 1997 tax return.

61.     The form of the Integrex transaction did not change OCD's economic position in substance because, despite OCD's transfer of its asbestos liabilities to Integrex, OCD's debt and cash flow remained the sole source of funds used to settle the transferred asbestos tort claims, for which OCD remained liable.

62.     This form of transaction was foreclosed by new Section 358(h) of the IRC.  In its settlement initiative aimed at resolving tax shelter cases involving contingent liability transactions like Integrex, the IRS essentially asserted that the use of certain tax code sections and their application to a structure without any regard for economic substance and without regard to other relevant IRC rules or case law underlies all tax abuse transactions.  Accordingly, the IRS disallowed OCD's initial Integrex deduction and, in doing so, the IRS took the position that under the "economic substance" doctrine the sale of the stock of Integrex should be disregarded for OCD tax purposes and hence the loss created by the stock sale disallowed.  OCD initially contested this IRS determination.  On November 16, 2004, however, pursuant to an IRS amnesty program, the Bankruptcy Court approved a settlement agreement between OCD and the IRS under which, among other things, $240 million of the reported loss of $962 million was allowable to OCD as a short-term capital loss in OCD's consolidated

return for the calendar year 1997.  The $721 million balance of the $962 million capital loss was not allowed as a deduction, loss or basis at any time.

### 2.    The Sham Affiliates Were Alter Egos of OCD

63.    The Sham Affiliates had no economic substance or independent business purposes.  At all relevant times, OCD owned all of the stock of IPM, OC Sweden and Vytec, which were subsidiary corporations with no true independence, and the alter egos of their putative parent, OCD.

64.    Rather than being organized along corporate lines, wherein the corporate separateness of individual subsidiaries was recognized, the OCD subsidiaries were operated by business unit.  Business units were organized so as to align assets, products, markets, customers, and sales and marketing, and this alignment usually crossed corporate lines.

65.    The subsidiaries within the OCD enterprise, together with OCD, operated as a single economic unit.  Planning, operations, management, and finances all were controlled and maintained at the parent level by OCD on behalf of the entire enterprise.  No regard was given to distinct legal entities; rather, operations were managed and executed by business units, with the entire consolidated enterprise in mind.  In accordance with this enterprise-focused outlook, many of OCD's officers and/or directors simultaneously served as officers and/or directors of one or more of its subsidiaries.  Additionally, the directors and officers of the OCD subsidiaries were given no power or legitimate responsibilities outside of their roles as OCD directors or officers.

66.    Subsidiaries within the OCD enterprise had no control over the maintenance of their corporate records, which were prepared and maintained by OCD.

67. Directors of the subsidiary corporations had absolutely no power, rarely met, and merely rubber-stamped the decisions that OCD determined needed to be made by the individual subsidiaries.

68. Administration, planning, and management of the OCD subsidiaries were organized by business units, across subsidiary lines -- and done at the OCD parent level.

69. OCD subsidiaries played no management role within this scheme. Rather, OCD management ran the enterprise, scripting subsidiary matters from OCD's Toledo headquarters.

70. Subsidiary corporate records, while maintained, were not prepared on the subsidiary level, but rather were prepared and drafted by OCD.

71. OCD ensured that its employees constituted a majority of the members of each subsidiary's board of directors.

72. Subsidiary officers played no decision making role. Instead, operational responsibility was vested in business unit presidents, virtually all of whom were employees of OCD.

73. The OCD enterprise did both its planning and its budgeting by business unit as well. The nominal officers of the corporate subsidiaries played no role in either process.

74. Information utilized to formulate planning and budgeting forecasts were solicited from the heads of the business units. These heads made presentations to the senior leaders of OCD, concerning each business unit's performance, potential growth, direction, and forecast. The nominal officers of the subsidiaries had no role in

this process and were not asked to provide information upon which planning and budgeting decisions were based.

75.     The operation of the OCD enterprise along business lines as opposed to along legal corporate entity lines was effectuated with no regard as to which legal entity nominally held title to assets involved in the business.

76.     Finances were recorded and maintained solely on a consolidated basis at the parent level.  Money was transferred across company lines with no regard for the separate financial integrity of individual subsidiaries.

77.     Financial reporting, monitoring, and maintenance on a consolidated basis was accomplished through OCD's use of an enterprise-wide, SAP-based accounting system, maintained and controlled at its headquarters, into which virtually all financial transactions of the enterprise were recorded.  OCD publicly reported financial results on a consolidated basis only, without regard to legal entity distinctions.

78.     In measuring the performance of business units, for planning and reporting purposes, OCD relied on the consolidated information contained in the SAP system, in which OCD habitually ignored and did not record inter-company or intra-enterprise payments.

79.     When cash was moved from a subsidiary's account to the parent's account, the book entry documenting the transaction would typically not categorize the payment, but would simply record the transaction as funds moving from the subsidiary to an inter-company clearing account.  Typically, no effort was made to document whether the transfer was a dividend, a loan, or payment of a debt.

80.     OCD's financial management centrally controlled all funds and funding decisions for the OCD enterprise without regard to legal entity distinctions.  All significant capital expenditures and investment decisions (i) were made in accordance with business unit needs, without regard to the interests or needs of subsidiary entities; and (ii) were submitted to OCD's senior management for approval and, thereafter, to OCD's board of directors for ratification.

81.     The assets which were held by each individual OCD subsidiary were not that subsidiary's own to manage or utilize in its interest.  OCD subsidiaries did not control their own cash management, and their nominal officers were not involved in deciding on capital investments.

82.     OCD established a cash management system run by OCD's treasury department, which had responsibility for all banking transactions among OCD and its subsidiaries, both foreign and domestic.  OCD's treasury department managed and controlled all cash and other liquid investments of OCD and its subsidiaries.

83.     OCD maintained concentration accounts that received funds from other accounts and disbursed funds to other accounts.  The principal concentration account, held at the Bank of New York, collected all funds of OCD and its domestic subsidiaries in daily cash sweeps.  All receipts were swept into this account from every domestic source -- from customer receipts to inter-company transfers.  OCD did not pay interest to its subsidiaries on these cash sweeps.

84.     All domestic hourly employees of the OCD enterprise were paid from a particular bank account, while all salaried employees of the enterprise were paid

from another. Both accounts were owned and funded by OCD. Payment was done without consultation with, or direction from, the OCD subsidiaries.

85.     The subsidiaries of OCD took no actions of any importance that were not directed by OCD.

86.     OCD so dominated and controlled its subsidiaries that it was able to direct them to guarantee repayment of the 1997 Credit Agreement.

## **IPM**

87.     IPM was a mere alter ego of OCD possessing no independent business purpose. As described above, OCD assigned to IPM all of OCD's stockholdings in foreign subsidiaries and affiliates. Again, this relationship was a sham. Like OCFT, funds IPM received as dividends from its foreign subsidiaries were immediately "loaned" to OCD. As a result, OCD's state income taxes were deferred until OCD repaid the loan in the form of a dividend. Thus, IPM merely served as a conduit for foreign earnings to flow through to its parent with no state taxes being paid on such earnings.

88.     IPM's board of directors had no role in the management of its "investment" in the OCD foreign subsidiaries whose ownership had been transferred to IPM by OCD for tax purposes.

89.     IPM's first board meeting did not last more than one minute.

90.     Any decisions concerning any dividend payments received by IPM from OCD foreign subsidiaries were made by OCD personnel. Owens Corning instructed IPM to forward such dividends as fast as possible to OCD in the form of loans.

91.     IPM board minutes were fabricated, often in advance of board meetings.  Much of the activity described in IPM board minutes never actually occurred.

92.     There was never any discussion at IPM board meetings of any alternative to transferring all dividends received by IPM from the foreign subsidiaries to OCD in the form of "loans."

93.     All transfers of funds from OCD to the foreign subsidiaries were directed by OCD, often without instructions as to how the funds funneled by OCD to the foreign subsidiaries through IPM were to be characterized by IPM on its books.

94.     After Mr. Faulkner learned that IPM had characterized these payments by OCD as loan repayments to IPM, thereby inadvertently reducing the tax benefits which were IPM's sole raison d'etre, OCD's tax department arranged for the retroactive recharacterization of millions of dollars in payments as "capital contributions" on IPM's books.

95.     The decision as to how all payments from OCD to IPM were to be characterized on IPM's books was made solely by OCD.

96.     Mr. Faulkner stated in a memorandum to his superior in OCD's tax department that IPM's sole purpose was "to shelter foreign income taxes and to provide [OCD] a state income tax benefit."

97.     John Garniewski, IPM's part-time titular president, was a Delaware accountant who served in a similar capacity for dozens of other corporations which had created Delaware holding companies to avoid state and local taxes.  He was never paid more than $6,000 per year as IPM's "president."

98.     Garniewski was a mere figurehead who carried out instructions from OCD personnel.

99.     Garniewski had no authority to decline loan "requests" from OCD, and no such "request" had ever been declined.

100.     The only "office" IPM had was "shared" with numerous other tax-avoidance Delaware corporations for which Garniewski served as titular president, and consisted of a single conference room.

101.     IPM's lack of any real substance and OCD's determination to conceal its status as an alter ego was demonstrated by two OCD memoranda.  In one 1993 memorandum from OCD's treasury department to the operating officer of one of OCD's foreign subsidiaries which was "owned," on paper, by IPM, a system was devised to create the appearance that IPM was "in the loop" on business decisions regarding European operations that actually emanated from OCD's corporate headquarters in Toledo.  The memorandum concludes with the admonition to "destroy this memo or at the very least do not keep it in your IPM file."

102.     At the direction of OCD, and without discussion of the OCFT or IPM boards of directors, OCFT and IPM simultaneously declared $501 million in dividends to OCD, in the form of debentures, which OCD used to capitalize Integrex.

## OCFT

103.     As descried above, OCFT was created to hold title to OCD's domestic intellectual property ("IP") and then to enter royalty agreements by which OCD would pay OCFT for the right to use the IP.  This arrangement was a sham.  OCD's royalty payments to OCFT would always "boomerang" back to OCD almost instantaneously in the form of loans which were either not paid or, if paid, immediately

returned to OCD in the form of a dividend. The purpose of this arrangement, and OCFT's existence, was to permit OCD to maximize state income tax deductions in certain states.

104. Directors and Officers of OCFT had no real responsibilities or decision-making power.

105. OCFT's part-time titular president, Robert Mercola, was paid only $5,000 per year. As "president" of OCFT, Mercola (i) never made any investment recommendations to OCFT's Directors; (ii) never authorized the transfer of funds from OCFT to OCD or directed the expenditure of any funds by OCFT; (iii) never was involved in any discussions regarding the interest rate that OCD and another OCD subsidiary would pay OCFT on "loans;" (iv) never received IP reports from OCD's R&D and engineering departments; (v) worked out of his home when performing his nominal duties for OCD; (vi) never had anyone report to him; and (vii) never exercised any discretion or decision-making authority.

106. One of OCFT's handful of employees, Elizabeth Reid, routinely performed administrative functions for OCD, with no compensation paid by OCD to OCFT.

107. For many years after OCFT's creation, a pilot plant which was transferred to OCFT's ownership tested OCD's products, with no compensation paid by OCD to OCFT. Mark Faulkner, a lawyer in OCD's tax department and officer and director of both OCFT and IPM, attempted to remedy this lapse. But, ultimately, OCFT only billed OCD for this service on a couple of occasions, and even the decision to

attempt to create this appearance of "separation" was made by OCD without input from OCFT personnel.

108.　Another of the handful of OCD employees technically transferred to OCFT after its creation, Michael Franzen, continued to report to his former boss at OCD, who had no position with OCFT, but who continued to supervise the pilot plant, evaluate Mr. Franzen's performance, and set his salary, promotion and bonuses.

109.　OCFT did not have the power to negotiate the interest rate on term notes for loans it made to OCD.

110.　Not all of the loans made by OCFT to OCD were actually documented with notes.

111.　Alternatives to making term loans to OCD with all of the funds OCFT received from OCD as "royalty payments" were never discussed at OCFT board meetings.

112.　OCFT's bank account was structured in such a way that OCFT was incapable of wiring money to any entity other than OCD.

113.　No discussion or voting took place at OCFT board meetings with respect to the appointment of officers, who were in all cases nominated by Mr. Faulkner acting as an employee of OCD.

114.　There was never even any discussion at OCFT board meetings concerning the policy adopted by OCFT at the direction of OCD, whereby any funds OCFT received as royalty payments immediately were loaned to OCD.

115.   OCFT board minutes were fabricated, often in advance of board meetings.  Much of the activity described in OCFT board minutes never actually occurred.

116.   Prior to 1997, no budgets ever were prepared for OCFT, and even when budgets were prepared in order to give OCFT a semblance of "substance" for tax purposes, those budgets were prepared by OCD personnel, with no input from OCFT.

117.   OCD actually owned the plant where OCFT had its figure-head offices, but OCFT never paid any rent to OCD.

118.   After Mr. Faulkner identified "weak links" in OCFT's tax-based claim to having "substance," he proposed adding up to 10 employees to its staff, but this proposal was rejected by OCD personnel, with no input from anyone at OCFT.

119.   OCD and OCFT largely ignored provisions in their intellectual property licensing agreement which required OCFT to police any infringements. Arranged by OCD, this police function was performed by outside lawyers who reported to OCD, without any involvement or compensation from OCFT.

120.   In order to create the appearance of "substance" for OCFT, a form was created whereby OCD could "inform" OCFT of potential IP infringements, with two boxes whereby OCFT could direct OCD whether or not to pursue enforcement.  OCD instructed OCFT personnel that the box authorizing enforcement of its rights was in all cases to be checked.

121.   When Mr. Faulkner joined OCD in 1996 -- some five years after OCFT's creation -- he identified "glaring holes" in OCD's attempts to create an

appearance of substance for OCFT, but his proposal to close these "glaring holes" ultimately was rejected by OCD's tax department, with no involvement from OCFT.

122. For many years after its creation, OCFT continued to utilize OCD's logo on its stationery.

123. OCFT's handful of employees participated in OCD's health and pension plans.

### Integrex

124. Integrex, another alter ego of OCD, was capitalized, on paper, through the use of two $501 million debentures issued to OCD by IPM and OCFT, respectively, along with a $360 million note issued to OCD from Fibreboard.

125. As described above, Integrex was a tax shelter vehicle established in 1997 to accelerate OCD's ability to recognize tax losses associated with its asbestos liabilities. Consistent with that purpose, OCD transferred to Integrex $1.002 billion of intercompany debt in the form of two $501 million debentures issued by IPM and OCFT, along with a $360 million note from OCD issued by Fibreboard.

126. OCD's economic position did not change, however, because despite OCD's transfer of its asbestos liabilities to Integrex, OCD's debt and cash flow remained the sole source of funds used to settle the transferred asbestos tort claims, for which OCD remained liable.

127. Integrex was never operationally autonomous.

128. Integrex board members had no authority independent of their status as OCD employees, and saw the Integrex Board itself merely as an advisory group.

129. OCD, not Integrex, controlled all decisions regarding employee benefits, and the appointment of management.

130. Both before and after the creation of Integrex, approval for any capital expenditure followed the same approval chain within OCD, and the Integrex board was not part of that approval process.

## Exterior

131. Exterior was created as a result of a merger in 1999 among several Fibreboard subsidiaries. (Fibreboard was a subsidiary of OCD.) Exterior was never operated as a separate business.

132. Exterior was a sham corporate entity, whose primary purpose was to be the repository of some of the assets that were employed by OCD in its Exterior Systems Business line.

133. Upon information and belief, assets belonging to Owens Corning which were transferred either directly or indirectly to Exterior included AmeriMark Building Products, Inc. ("AmeriMark"), Reynolds Building Products, Inc. ("Reynolds"), Fabwel, and Norandex.

134. On October 1, 1997, Owens Corning purchased the assets of AmeriMark for $319 million. Prior to its purchase by Owens Corning, AmeriMark had purchased Reynolds for an amount unknown.

135. The assets of both AmeriMark and Reynolds ended up in Exterior.

136. Prior to its purchase by Owens Corning, Fibreboard acquired the outstanding stock of Norandex for approximately $120 million.

137. Prior to its purchase by Owens Corning, Fibreboard purchased the stock of Fabwel for $120 million.

138.    The assets of both Norandex and Fabwel ended up in Exterior.

139.    As a first step in the formation of Exterior, AmeriMark transferred the assets of Reynolds to Norandex.

140.    Subsequently, Owens Corning merged Fabwel and AmeriMark into Norandex.  The combined company was renamed "Exterior Systems, Inc."

141.    Exterior had no distinct corporate headquarters.

142.    Exterior did not do its own corporate planning or have a separate budget.  OCD's management did all planning for the Exterior Systems Business line, which included Exterior's assets and the assets of Owens Corning and other subsidiaries engaged in the manufacture and sale of the exterior product line.

143.    OCD's management recommended and approved all capital expenditures that might affect assets nominally housed within Exterior.

144.    OCD set the compensation for personnel technically employed by Exterior.

145.    Exterior did not have a separate budget and its nominal officers were not judged on Exterior's performance.

146.    Exterior did not maintain corporate formalities.

147.    Exterior did not have an active board of directors.  Exterior's nominal board, consisting exclusively of OCD management personnel, neither met nor voted on anything.

## D. The Interlocking Relationship Between OCD And The Sham Affiliates

148.    During the Relevant Period, many of OCD's officers and/or directors simultaneously served as officers and/or directors of one or more of the Sham Affiliates.

149.    The diagrams attached hereto as Exhibit "A" illustrate the Interlocking Officers and Directors of OCD, OCFT, IPM, and Integrex.

## E. The OCD Bond Offerings

150.    In 1998, one year after the closing of the 1997 Credit Agreement, Owens Corning sold $1.5 billion of Bond Debt pursuant to Registration Statements filed with the Securities and Exchange Commission ("SEC") under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (2000).

### 1. Disclosure Requirements

151.    Under 17 C.F.R. §§ 229.202(b) ("Item 202(b)"), promulgated by the SEC, entities filing Registration Statements with the SEC regarding debt securities must include in their Registration Statement filed with the SEC under Section 6 of the Securities Act of 1933, as amended, certain information regarding the subordination of the debt securities to other security holders or creditors of the registrant.  Specifically, Item 202(b)(3) (SEC Regulation S-K) promulgated under the 1933 Act thereafter directs registrants to outline briefly:

> "*Provisions with respect to the subordination of the rights of holders of the securities to other security holders or creditors of the registrant*, where debt securities are designated as subordinated in accordance with Instruction 1 to this Item, set forth the aggregate amount of outstanding indebtedness as of the most recent practicable date that by the terms of such debt securities would be senior to such subordinated debt and describe briefly any limitation

on the issuance of such additional senior indebtedness or state that there is no such limitation."

17 C.F.R. § 229.202(b)(3) (emphasis added).

152.    Instruction 1 to Item 202(b) also provides in relevant part:

"Wherever the title of securities is required to be stated, there shall be given such information as will indicate the type and general character of the securities, including the following: . . .

   B.  In the case of debt, . . . *a brief indication of the priority of the issue . . .* "

17 C.F.R. § 229.202 (Instruction 1) (emphasis added).

153.    By their express terms, Item 202(b)(3) and Instruction 1 of Item 202 impose affirmative duties on persons and entities participating in the preparation of any prospectus relating to a debt securities offering to ensure that all material information relating to the subordination of the offered debt securities is disclosed.

154.    As underwriters of certain Owens Corning bond offerings, the Bank Underwriters owed such a duty to the Bondholders to ensure the accuracy of the statements made in publicly filed bond offering materials, including any prospectuses.

**2.  Defendants' Repeated Representations That The Guaranteed Obligations Were Pari Passu With Debtors' Other Obligations**

155.    On April 3, 1997, Owens Corning filed with the SEC a Form S-3 Registration Statement No. 333 (the "April 3, 1997 Prospectus") for the sale of $300 million in Bond Debt.   The April 3, 1997 Prospectus stated:

"Unless otherwise specified in a Prospectus Supplement, the Debt Securities, when issued, *will be unsecured and will rank equally with all other unsecured and unsubordinated indebtedness of the Company*."

April 3, 1997 Prospectus at p. 5 (emphasis added).  The April 3, 1997 Prospectus further represented:

> "Unless the context indicates otherwise, references in this Prospectus to the 'Company' include *Owens Corning and its consolidated subsidiaries.*"

April 3, 1997 Prospectus at p. 6 (emphasis added).

156.    On May 1, 1997, Owens Corning filed with the SEC an amendment to the April 3, 1997 Prospectus (the "May 1, 1997 Amendment").  The May 1, 1997 Amendment contained a Prospectus Supplement for $300 million in medium term notes (the "May 1, 1997 Note Prospectus").  The May 1, 1997 Note Prospectus stated:

> "All Notes issued and to be issued under the Indenture will be unsecured obligations of the Company and *will rank pari passu with all other unsecured and unsubordinated indebtedness of the Company from time to time outstanding.*"

May 1, 1997 Note Prospectus at p. 5 (emphasis added).

157.    The May 1, 1997 Amendment also contained a Prospectus for $300 million in Owens Corning Bond Debt (the "May 1, 1997 Debt Prospectus").  The May 1, 1997 Debt Prospectus reiterated the statements quoted in ¶¶ 155 and 156 above.

158.    On March 13, 1998, Owens Corning filed with the SEC a Form S-3 Registration Statement No. 333 (the "March 13, 1998 Prospectus") for the sale of $1 billion in Bond Debt.  The March 1998 Prospectus reiterated the statements quoted in ¶155 above.

159.    According to the March 13, 1998 Prospectus, the Bond Debt was to be issued under an Indenture (the "Indenture") dated May 5, 1997, between Owens Corning and The Bank of New York.  A copy of the Indenture was filed as an Exhibit to the March 13, 1998 Prospectus.

160.    On April 16, 1998, Owens Corning filed with the SEC an amendment to Form S-3 Registration Statement (the "April 16, 1998 Amendment") for the sale of $550 million in Bond Debt.  The April 16, 1998 Amendment reiterated the statements quoted in ¶155 above.

161.    On April 30, 1998, Owens Corning filed with the SEC under Rule 424(b)(2) a Prospectus Supplement (the "April 30, 1998 Supplement") for the sale of $550 million in Bond Debt.  The April 30, 1998 Supplement reiterated the statements quoted in ¶155 above.

162.    On July 22, 1998, Owens Corning filed with the SEC under Rule 424(b)(2) a Prospectus Supplement (the "July 22, 1998 Supplement") for the sale of $400 million in Bond Debt.  The July 22, 1998 Supplement reiterated the statements quoted in ¶155 above.

163.    On April 21, 1999, Owens Corning filed with the SEC a Form S-3 Registration Statement No. 333 (the "April 21, 1999 Prospectus") for the sale of $500 million in Bond Debt.  The April 21, 1999 Prospectus stated:

> "Unless the context indicates otherwise, references in this prospectus to 'we' or 'Owens Corning' *include Owens Corning and its consolidated subsidiaries*."

April 21, 1999 Prospectus at p. 4 (emphasis added).  The April 21, 1999 Prospectus further represented:

> "The Debt Securities will be unsecured and unsubordinated obligations of Owens Corning and *will rank equally with all of our other unsecured and unsubordinated indebtedness*."

April 21, 1999 Prospectus at p. 11 (emphasis added).

164.    On June 15, 1999, Owens Corning filed with the SEC a Pre-Effective Amendment to the April 21, 1999 Prospectus (the "June 15, 1999

Amendment").  The June 15, 1999 Amendment reiterated the statements quoted in ¶163 above.

165.    On or about April 30, 1998, the Bondholder constituents purchased the Bond Debt in connection with the initial offering of the Bond Debt to the public.

166.    The above prospectuses filed with SEC (collectively, the "Prospectuses") contain no statements specifying that the Bond Debt will not rank equally and ratably with other unsecured and unsubordinated obligations of the Company.

167.    Eleven of the Bank Defendants and/or their affiliates acted as statutory underwriters for $1.5 billion of OCD's public bond offerings made during 1998, approximately one year after the 1997 Credit Agreement was put into place (the "Bond Offerings").

168.    CSFB, which was and still is the Agent for the participating banks in the 1997 Credit Facility, also was the lead underwriter for the Bond Offerings, and at least two CSFB officers were deeply involved in both the negotiation and creation of the Credit Facility and the underwriting of Owens Corning's Bond Debt.

169.    Moreover, three of the five other co-lead underwriters -- BNY Capital Markets, Inc., RBC Dominion Securities Corporation, and Scotia Capital Markets -- also were affiliates of Bank Defendants Bank of New York, Royal Bank of Canada, and Bank of Nova Scotia, original lenders under the 1997 Credit Agreement.

170.    A total of eleven Banks or their affiliates participated in the Bond Offering underwriting syndicate:  (i) CSFB; (ii) Bank of New York;  (iii) Royal Bank of Canada; (iv) Bank of Nova Scotia; (v) Societe Generale; (vi) Barclays Bank PLC; (vii)

Chase Manhattan Bank; (viii) Citibank, N.A.; (ix) First National Bank of Chicago; (x) NationsBanc Montgomery Securities LLC; and (xi) BancAmerica Robertson Stephens.

171.    As such, the Banks had knowledge of the undisclosed Guarantees but failed to disclose them or their financial import to the purchasers and holders of the Bond Debt.

172.    As recited above, in June 1997, prior to the issuances of the outstanding Bond Debt, OCD had entered into the Credit Facility with Defendants. Owens Corning's indebtedness under the Credit Facility was guaranteed by several of OCD's subsidiaries.  These Guarantees rendered OCD's indebtedness under the Bond Debt structurally subordinate to the Bank Debt.  Accordingly, the statements in the Prospectuses that the Bond Debt was "unsubordinated" and would "rank equally with other unsecured and unsubordinated obligations of the Company," were untrue at the time they were made and were materially false and misleading.

173.    As statutory underwriters with affirmative due diligence obligations, CSFB and the other Bank Underwriters face strict liability under the Securities Act of 1933 for material misstatements and omissions in the Prospectuses.  Also, under the securities laws and regulations, the Bank Underwriters had an express affirmative duty to disclose any subordination risk which pertained to the Bonds, including the structural subordination of which the Banks now seek to claim the benefit.  Not only did the Bank Underwriters fail to make such subordination disclosure, but the Prospectuses expressly stated the opposite, *i.e.*, that the Bond Debt would "rank equally and ratably" with the Bank Debt.

174.    Because the Prospectuses state, "[u]nless the context indicates otherwise, references in this Prospectus to the 'Company' include Owens Corning and its consolidated subsidiaries," these material misrepresentations and omissions are binding on the Subsidiary Guarantors.

175.    OCD so dominated and controlled its Subsidiary Guarantors that the Subsidiary Guarantors should be deemed to have shared in any and all misrepresentations.

176.    The joint disclosures of the Bank Underwriters, OCD and the Guarantor Subsidiaries in the Prospectuses expressly were intended to represent that the Bonds were not "structurally subordinated."

177.    The purchasers of the Bonds were induced to rely on the credit of the consolidated OCD enterprise "equally and ratably" with all other unsecured debt, including the Bank Debt.

178.    When corporate debt securities like the Bonds expressly are intended to be subject and subordinate to the "structural seniority" of other unsecured obligations, that circumstance is a material risk factor which must be disclosed to prospective investors.  During the same month CSFB failed to disclose the priority of a $400 million OCD bond offering in the July 22, 1998 Supplement, CSFB made just such a risk factor disclosure of structural seniority while acting as an underwriter for other public debt offerings.  For example, the July 30, 1998 prospectus for the 1998 bond debt offering of Northeast Optic Network, for which CSFB was also the lead underwriter, contained the following structural subordination risk disclosure:

> The Notes will be senior unsecured obligations of the
> Company. The Notes will rank senior in right of payment to

> all subordinated indebtedness of the Company and will rank pari passu in right of payment with all existing and future indebtedness of the Company that is not by its terms subordinated in right and priority to the Notes. *In addition, claims of holders of the Notes will be structurally subordinated to claims of holders of existing and future indebtedness of the Company's subsidiaries.* (emphasis added).

Northeast Optic Network's Amendment No. 6 to Form S-1 Registration Statement at 6, as filed with the Securities and Exchange Commission on July 30, 1998, *available at* http://sec.gov/Archives/edgar/data/1062233/0001029869-98-000977.txt (emphasis added).

179.    Despite CSFB's contemporaneous familiarity with, and use of, subordination disclosures, no such disclosure was present in the Prospectuses.

180.    CSFB was intimately familiar with OCD's finances and affairs by the time of the Bond Offerings.  CSFB had for years sought to lead and/or underwrite OCD's financings and other transactions, and the Bond Offerings were the fourth major OCD financing which CSFB had led or underwritten since 1993.

181.    CSFB was the primary financial advisor and investment bank for OCD and had been for some time and thereby was an insider.

182.    The primary purpose of underwriting the Bond Offerings was to generate funds to pay down the Bank Debt.  The "Use of Proceeds" description in the April 30, 1998 Supplement for the Bond Offerings expressly stated that the proceeds from the sale of the Bond Debt could be used "to repay a portion of [OCD's] outstanding borrowings under its revolving credit agreement . . . ."

183.    More than $500 million of the Bond Debt proceeds were used to substantially pay down the 1997 Credit Agreement.

184.     As underwriters of the Bond Offerings and participants in the 1997 Credit Agreement, the Bank Defendants allege that they knew, both prepetition and postpetition, that the Bond Debt was subordinated to the Bank Debt by virtue of the undisclosed Guarantees.  Notwithstanding, as described above, the Bank Defendants falsely represented in Prospectuses that the Bond Debt would "rank equally with other unsecured and unsubordinated obligations of the Company."

185.     To their detriment, the Bondholders relied on the false statements contained in the Prospectuses in connection with the purchase and sale of the Bond Debt.

186.     The misleading statements regarding the Credit Facility, coupled with the omitted information regarding the Guarantees, were material and misleading to prospective investors, including the Bondholders, because they misled potential investors about the priority of the Bond Debt vis-á-vis OCD's indebtedness under the Credit Facility.

187.     These representations continued until the time of OCD's bankruptcy filing with this Court.

### 3.     Further Assurances of Pari Passu Status

188.     Leading credit reporting agencies such as Standard & Poors regularly reviewed the Prospectuses to evaluate the creditworthiness of OCD.  For instance, in a Standard & Poors report dated July 3, 1997, Standard & Poors, in rating the Credit Facility noted that "[s]ince the facility is unsecured, the bankers will fare the same as other senior creditors in the event of a default."

189.     Both the Bondholders and the Trade Creditors regularly relied on both the Prospectuses and publicly disseminated credit reports and ratings, and upon

OCD's financial statements, in connection with determining the creditworthiness of the Debtor. These reports reflected the misinformation regarding the unsubordinated debt set forth in the Prospectuses described above as exemplified by the Standard & Poors' Report cited in ¶188 above.

190. The Trade Creditors relied on such public reports to extend credit to OCD.

191. Because of the material misrepresentations and omissions in the Prospectuses, which were reflected in publicly disseminated reports such as the one in ¶188 above, the Trade Creditors were unaware of OCD's true financial condition.

192. The Trade Creditors reasonably believed that Trade Debt would rate equally to other classes of unsecured debt, including the Guaranteed Obligations.

### 4.  Bankruptcy and Subsequent Disclosures

193. On or about October 5, 2000, OCD and 17 of its domestic subsidiaries filed voluntary petitions for bankruptcy under Chapter 11 of the Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy filing was necessitated by the large number of claims that have been asserted against Owens for asbestos-related personal injuries.

194. More than three months after the bankruptcy filing, on January 30, 2001, OCD filed a Report on Form 8-K with the SEC. That 8-K Report references the Bankruptcy Reports filed in the Bankruptcy Court and contains the following comments, which constitute the first reliable disclosure of the possibility that the guarantees could be a material factor in these Bankruptcy Cases:

> "The Company is furnishing the information set forth above for convenience of reference only. The Company cautions that the Reports are unaudited and subject to change, and were not

prepared for the purpose of providing the basis for an investment decision relating to any of the securities of the Company or other Debtor, or any other affiliate of the Company. *For example, the Reports include certain information concerning inter-company arrangements that were entered into prior to the filing of the Bankruptcy Cases. Certain of these arrangements may be challenged by various parties in the Bankruptcy Cases, and payments in respect of certain of these arrangements may be restricted by order of, or subject to review and approval by, the Bankruptcy Court. Such arrangements, and the manner in which they are ultimately treated in the Bankruptcy Cases, may have a material impact on the respective assets, liabilities and results of operations of the Company and its subsidiaries.* In view of the inherent complexity and uncertainty of the ultimate resolution of the numerous claims that may be involved in the Bankruptcy Cases, the Company and its subsidiaries do not undertake any obligation to make any further public announcement with respect to the Reports or the matters referred to therein" (emphasis added).

195. On or about February 26, 2001, Lehman Brothers issued a Report (the "Lehman Brothers Report") relating to OCD's January 30, 2001 Form 8-K and its significance to holders of OCD Bond Debt. The Lehman Brothers Report states in part: "[t]he implications for the bank debt [*i.e.*, the indebtedness under the Credit Facility] are obvious: the bank debt garners significant value solely from the guarantee from [the Guarantors] *and* is effectively insulated from dilution by the asbestos claimants." (emphasis added) The Lehman Brothers Report concludes that the "banks' recoveries should be priced at a lower discount rate than the bonds [*i.e.*, the debt under the Debt Securities], as the banks' profile shifts away from valuation and dilution to one of simply timing and deal risk." Accordingly, the Lehman Brothers Report concludes that "*[t]he increased likelihood of a debt recovery should also, in our opinion, result in a lower discount rate on bank debt recoveries (and higher discount rates for the bonds which we think will receive more equity)*" (emphasis added).

196.    Most recently, the Banks have made various admissions that from the time they obtained the Guarantees, the Banks intended for their claims to rank senior to those of all other unsecured claims against the Debtors, including the Bond and Trade Debt.

197.    For example, in connection with the Debtors' motion for substantive consolidation, the Banks stated in their appellate brief to the United States Court of Appeals for the Third Circuit:

- "It is undisputed that the guarantees, by their very operation, provide 'structural seniority' over other unsecured creditors of OCD through the ability to access the guarantors' assets directly and immediately in the event of a parent company default."

- "As every CSFB witness explained . . . the banks insisted on subsidiary guarantees as a necessary 'credit enhancement' when lending money to OCD . . . and this credit enhancement – not mere protection from structural subordination – is what made the guarantees a *sine qua non* of an unsecured loan to OCD."

- "[S]ubsidiary guarantees gave the banks direct claims against the guarantor subsidiaries if OCD defaulted, independent of their claims against the parent/borrower, thus placing them in a structurally senior position to other unsecured creditors of OCD who did not bargain for that protection."

- "The purpose of the guarantees was to have a claim, a direct claim on the guarantor" "to be able to assess as much of the claim . . . [at] as low a level in the capital structure as possible where the assets are, and . . . to take advantage of the ability to be structurally senior to any and all liabilities that are not at that level."

198.    In the same appellate brief, the Banks maintained that OCD's counsel, Mr. Rodney Nowland, "understood [that the Guarantees provided structural seniority] in 1997, [and] that *he knew the banks understood it as well. . . .*"

199.    Moreover, in their limited objection to a further extension of exclusivity, dated October 14, 2005, the Banks continue to assert that they are the only

creditor constituency with the ability to propose a consensual Chapter 11 plan of reorganization of the Owens Corning enterprise because any such plan involving the Sham Affiliates would be contingent upon the Banks' consent. The Banks further assert that Owens Corning "can only file a confirmable Chapter 11 plan with respect to each of the Debtor Guarantor Subsidiaries, if that plan (i) pays the Banks claims in full or (ii) gives the Banks a majority of the equity in the Debtor Guarantor Subsidiaries." (emphasis in original). Consistent with their ongoing claim to seniority by virtue of the Guarantees, the Banks' threatened that: "If the Banks are not paid in full, they will contest any plan that permits Owens Corning to retain the equity of the Debtor Guarantor Subsidiaries."

200. Despite their knowledge, since at least June 1997, of the structural seniority of the Bank Debt, the Banks and Subsidiary Guarantors falsely stated in the Prospectuses that the Bond Debt "will rank equally with all other unsecured and unsubordinated indebtedness of the Company."

201. In its substantive consolidation opinion in this case, after explaining that fraudulent conveyance and equitable subordination typically are the mechanisms through which harms caused by creditors are remedied, the Third Circuit Court of Appeals stated, with reference to the Bondholders, that "[i]f the bondholders have a valid claim" that "the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks," they will have to prove it in the District Court. *In re Owens Corning*, 419 F.3d 195, 215 n.27 (3d Cir. 2005). The allegations of this Complaint establish that the Bondholders and the Trade Creditors indeed have a valid claim against the Banks.

202.    Because OCD is now in bankruptcy, the ability of the Bondholders and other holders of the Bond Debt to recover the amount owed under the Bond Debt is significantly impaired by the undisclosed Guarantees, which render the Bond Debt and Trade Debt structurally subordinate to the indebtedness under the Credit Facility.

**Count I**
**(Equitable Subordination of Banks' Claims, Pursuant to 11 U.S.C. 510(c))**

203.    Official Representatives incorporate and reallege the allegations in paragraphs 1 through 202 of the Complaint.

204.    Under section 510(c) of the Code, after notice and a hearing, the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(1).

205.    As participants in the Credit Facility, the Banks knew that the Guarantees rendered the Bond Debt structurally subordinate to the Bank Debt.

206.    Notwithstanding, approximately one year after the Credit Facility closed, the Banks falsely stated, in Prospectuses in connection with the Bond Offerings, that OCD's Bond Debt would "rank equally with other unsecured and unsubordinated obligations of the Company."

207.    The Prospectuses contain no statements that directly or indirectly disclose that the Bond Debt will not rank equally and ratably with other unsecured and unsubordinated obligations of the Company, and the existence of the Guarantees were not otherwise properly disclosed to the Bondholders before they purchased the bonds issued in the Bond Offerings (the "Bonds").

208. Upon information and belief, the Banks knowingly and intentionally made the false statements of material fact contained in the Prospectuses, and omitted material facts regarding the existence of the Guarantees, in order to induce prospective investors, including the Bondholders, to purchase the Bonds.

209. To their detriment, the Bondholders reasonably believed and justifiably relied on the false statements contained in the Prospectuses in connection with the purchase and sale of the Bond Debt.

210. The misleading statements in the Prospectuses regarding the Credit Facility, coupled with the omitted information regarding the Guarantees, were material and misleading to prospective investors, including the Bondholders, because they misled potential investors about the priority of the Bond Debt vis-á-vis the Company's indebtedness under the Credit Facility.

211. In determining the creditworthiness of the Debtor, the Trade Creditors reasonably relied, to their detriment, on the false Prospectuses and publicly disseminated reports based on the false Prospectuses.

212. Upon information and belief, the Banks knowingly and intentionally made the false statements of material fact contained in the Prospectuses, and omitted material facts regarding the existence of the Guarantees, in order to induce the Trade Creditors to extend credit to the Debtors.

213. The Bondholders and Trade Creditors have been injured by the Banks' inequitable conduct described above because, contrary to their reasonable expectation that their claims would rank equally and ratably with those of the Banks, the Banks have taken the position in these Bankruptcy Cases that the Guaranteed

Obligations are structurally senior to, and entitled to priority over, all other unsecured claims against the Debtors. For the same reason, the Banks' inequitable conduct has conferred on the Banks an unfair advantage in these Bankruptcy Cases.

214. The Banks' misstatements and omissions in connection with the Bond Offerings constitutes inequitable conduct warranting that the Banks' claims against OCD be subordinated to those of the Official Representatives and also that the Banks' Guarantee claims in these Bankruptcy Cases be subordinated to OCD's claims in those Bankruptcy Cases; thereby increasing the amount of assets available for recovery by OCD's creditors, including the Bondholders and Trade Creditors, who were harmed by the Banks' inequitable conduct.

215. Equitably subordinating the Banks' claims in these Bankruptcy Cases to those of the Bondholders, Trade Creditors, and OCD is not inconsistent with the provisions of the Code.

**WHEREFORE**, Official Representatives respectfully request the following relief:

(a) That this Court enter an order equitably subordinating the Bank Defendants' claims against OCD to those of the Bondholders.

(b) That this Court enter an order equitably subordinating the Bank Defendants' claims against OCD to those of the Trade Creditors;

(c) That this Court enter an order equitably subordinating the Bank Defendants' Guarantee claims in these Bankruptcy Cases to the claims of Owens Corning against the Guarantors;

(d)     That this Court award Official Representatives, if and as appropriate, their attorneys' fees and other costs of this action; and

(e)     That this Court grant Official Representatives such other relief as justice may require.

## Count II
### (Equitable Subordination of Non-Debtor
### Guarantors' Claims, Pursuant To 11 U.S.C. 510(c))

216.     Official Representatives incorporate and reallege the allegations in paragraphs 1 through 215 of the Complaint.

217.     Under section 510(c) of the Code, after notice and a hearing, the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1).

218.     As guarantors under the Credit Facility, the Non-Debtor Guarantors knew that the Guarantees rendered the Bond Debt structurally subordinate to the Bank Debt.

219.     Approximately one year after the Credit Facility closed, the Non-Debtor Guarantors falsely stated, in Prospectuses in connection with the Bond Offerings, that OCD's Bond Debt would "rank equally with other unsecured and unsubordinated obligations of the Company."

220.     The Prospectuses contain no statements that directly or indirectly disclose that the Bond Debt will not rank equally and ratably with other unsecured and unsubordinated obligations of the Company, and the existence of the Guarantees were not otherwise properly disclosed to the Bondholders before they purchased the Bonds.

221. Upon information and belief, the Non-Debtor Guarantors knowingly and intentionally made the false statements of material fact contained in the Prospectuses, and omitted material facts regarding the existence of the Guarantees, in order to induce prospective investors, including the Bondholders, to purchase the Bonds.

222. To their detriment, the Bondholders reasonably believed and justifiably relied on the false statements contained in the Prospectuses in connection with the purchase and sale of the Bond Debt.

223. The misleading statements in the Prospectuses regarding the Credit Facility, coupled with the omitted information regarding the Guarantees, were material and misleading to prospective investors, including the Bondholders, because they misled potential investors about the priority of the Bond Debt vis-á-vis the Company's indebtedness under the Credit Facility.

224. In determining the creditworthiness of the Debtor, the Trade Creditors reasonably relied, to their detriment, on the false Prospectuses and publicly disseminated reports based on the false Prospectuses.

225. Upon information and belief, the Non-Debtor Guarantors knowingly and intentionally made the false statements of material fact contained in the Prospectuses, and omitted material facts regarding the existence of the Guarantees, in order to induce the Trade Creditors to extend credit to the Debtors.

226. The Bondholders and Trade Creditors have been injured by the Non-Debtor Guarantors' inequitable conduct described above because, contrary to their reasonable expectation that their claims would rank equally and ratably with those of the

Banks, the Banks have taken the position in these Bankruptcy Cases that the Guaranteed Obligations are structurally senior to, and entitled to priority over, all other unsecured claims against the Debtors.

227. The Non-Debtor Guarantors' misstatements and omissions in connection with the Bond Offerings constitutes inequitable conduct warranting that their claims against OCD be subordinated to those of the Official Representatives thereby increasing the amount of assets available for recovery by OCD's creditors, including the Bondholders and Trade Creditors, who were harmed by the Non-Debtor Guarantors' inequitable conduct.

228. Equitably subordinating the Non-Debtor Gurantors' claims in these Bankruptcy Cases to those of the Bondholders, Trade Creditors, and other creditors of OCD is not inconsistent with the provisions of the Code.

**WHEREFORE**, Official Representatives respectfully request the following relief:

(a) That this Court enter an order equitably subordinating the Non-Debtor Guarantors' claims against OCD to those of the Bondholders.

(b) That this Court enter an order equitably subordinating the Non-Debtor Guarantors' claims against OCD to those of the Trade Creditors;

(c) That this Court award Official Representatives, if and as appropriate, their attorneys' fees and other costs of this action; and

(d) That this Court grant Official Representatives such other relief as justice may require.

## COUNT III
## (Piercing the Corporate Veils
## of IPM, OC Sweden and Vytec)

229.    Official Representatives incorporate and reallege the allegations in paragraphs 1 through 228 of the Complaint.

230.    As described above, the Sham Affiliates are alter egos of OCD.

231.    Moreover, OCD exhibited complete domination and control over the Sham Subsidiaries.

232.    As such, all property in the possession, custody or control of the Sham Affiliates rightfully belongs to OCD to be shared by the creditors of OCD, including but not limited to: (i) Owens Corning's stock ownership of its foreign subsidiaries held by IPM; and (ii) all assets of OC Sweden and Vytec (collectively, the "Property").

233.    As set forth above, as a result of the OCD enterprise's abuse of its corporate form, the Bondholders and Trade Creditors were deceived into believing that the Bond Debt and Trade Debt would rank equally and ratably with the Bank Debt.

234.    The sham nature of the operation of the OCD enterprise also falsely led the Bondholders and Trade Creditors to believe that OCD possessed more assets than it did.

235.    Piercing the corporate veils of the Sham Affiliates and making the assets which they nominally hold available to the creditors of OCD thus is necessary in order to prevent the unjust result of the Banks sustaining a greater recovery than the Bondholders and Trade Creditors in these Bankruptcy Cases by virtue of the Banks obtaining Guarantees from the Sham Affiliates -- OCD alter egos which deceived the Bondholders and Trade Creditors.

**WHEREFORE**, Official Representatives respectfully request the following relief:

(a)    That this Court enter an order piercing the corporate veils of OCD's alter ego corporations IPM, OC Sweden and Vytec, together with an order making each alter ego's assets available to the creditors of OCD, including but not limited to the Property;

(b)    That this Court award Official Representatives, if and as appropriate, their attorneys' fees and other costs of this action; and

(c)    That this Court grant Official Representatives such other relief as justice may require.

## COUNT IV
## (Equitable Subordination, Pursuant To 11 U.S.C. 510(c))

236.    Official Representatives incorporate and reallege the allegations in paragraphs 1 through 235 of the Complaint.

237.    In the event this Court grants the relief requested in Count III of this Complaint, *i.e.*, corporate veil piercing, with the result that Owens Corning and its Sham Affiliates are treated as one enterprise in these Bankruptcy Cases, the claims of the Bank Defendants within the merged enterprise should be subordinated to those of the Bondholders and Trade Creditors.

238.    As set forth above, the Bondholders and the Trade Creditors have been harmed by the inequitable conduct of the Bank Defendants.

239.    As further set forth above, the Banks' misstatements and omissions in connection with the Bond Offerings constitute inequitable conduct warranting that, in any treatment of OCD and its Sham Affiliates as a joint enterprise, all of the Banks'

claims against that enterprise be subordinated to those of the Bondholders and the Trade Creditors.

240. Equitably subordinating the Banks' clams in a merged Owens Corning enterprise to those of the Bondholders and Trade Creditors is not inconsistent with the provisions of the code.

**WHEREFORE**, Official Representatives respectfully request the following relief:

(a) That this Court enter an order equitably subordinating the Bank Defendants' claims against any merged Owens Corning enterprise to those of the Bondholders.

(b) That this Court enter an order equitably subordinating the Bank Defendants' claims against any merged Owens Corning enterprise to those of the Trade Creditors;

(c) That this Court award Official Representatives, if and as appropriate, their attorneys' fees and other costs of this action; and

(d)     That this Court grant Official Representatives such other

relief as justice may require.

Respectfully submitted,

Dated:  January 6, 2006            By:     /s/ Francis A. Monaco Jr.
                                           Francis A. Monaco, Jr. (#2078)
                                           MONZACK & MONACO, P.A.
                                           1201 Orange Street, Suite 400
                                           Wilmington, Delaware 19801
                                           Telephone:  302-656-8162

                                           J. Andrew Rahl, Jr.
                                           John B. Berringer
                                           Howard D. Ressler
                                           Mark Weldon
                                           Dennis J. Artese
                                           ANDERSON KILL & OLICK, P.C.
                                           1251 Avenue of the Americas
                                           New York, NY  10020
                                           Telephone:  212-278-1000

                                           Attorneys for Official Representatives
                                           The Official Representatives of the
                                           Bondholders and Trade Creditors of
                                           Debtors Owens Corning, *et al.*

# EXHIBIT A