# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OWENS CORNING, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 00-03837 (JKF)<br>(Jointly Administered) |
| THE OFFICIAL REPRESENTATIVES OF THE BONDHOLDERS AND TRADE CREDITORS OF DEBTORS OWENS CORNING, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON, individually and in its capacity as Agent, AG CAPITAL FUNDING PARTNERS, L.P., ARAB BANK PLC, BANKERS TRUST COMPANY, THE BANK OF AMERICA, THE BANK OF NEW YORK, THE BANK OF TOKYO-MITSUBISHI, LTD., BANK ONE, N.A., BARCLAYS BANK, PLC, BEAR, STEARNS & CO., INC., THE CHASE MANHATTAN BANK N.A., JP MORGAN CHASE BANK, CIC-UNION EUROPEENNE, CITIBANK, N.A., CONTINENTAL CASUALTY, CREDIT AGRICOLE INDOSUEZ, CREDIT INDUSTRIEL ET COMMERCIAL, CREDIT LYONNAIS, THE DAI-ICHI KANGYO BANK LIMITED, DEXIA BANK, FLEET NATIONAL BANK, FORTIS (USA) FINANCE LLC, FRANKLIN MUTUAL ADVISORS, LLC, GE CAPITAL COMMERCIAL FINANCE, GOLDMAN SACHS CREDIT PARTNERS L.P., HBK INVESTMENTS, HBK MASTER FUND, INSTITUTO BANCARIO SAN PAOLO, J.P. MORGAN SECURITIES/CHASE SECURITIES, KBC BANK, N.V., KENSINGTON INTERNATIONAL LIMITED, KEYBANK NATIONAL ASSOCIATION, KING STREET CAPITAL MANAGEMENT | Adv. Pro. No. 06-50122 (JKF) |

L.L.C., LEHMAN COMMERCIAL PAPER
INC., LONGACRE MASTER FUND LTD.,
MAINSTAY FUNDS, MERRILL LYNCH,
PIERCE, FENNER & SMITH INC., THE
MITSUBISHI TRUST AND BANKING
CORPORATION, MORGAN GUARANTEE
TRUST COMPANY OF NEW YORK,
NATEXIS BANQUE, NATEXIS BANQUES
POPULAIRES, THE NORTHERN TRUST
COMPANY, OAKTREE CAPITAL
MANAGEMENT, LLC, PERRY PRINCIPALS,
OAK HILL SECURITIES FUND, L.P., OAK
HILL SECURITIES FUND II, L.P., ROYAL
BANK OF CANADA, SALOMON BROTHERS
HOLDING COMPANY, INC., SANPAOLO IMI
S.P.A., SILVER OAKS & CO. L.P., SOCIETE
GENERALE, SPRINGFIELD ASSOCIATES,
LLC, SUMITOMO TRUST & BANKING, STB
DELAWARE FUNDING TRUST I, SUNTRUST
BANK, WELLS FARGO BANK, N.A., BANK
OF NOVA SCOTIA, FIRST NATIONAL BANK
OF CHICAGO, NATIONSBANC
MONTGOMERY SECURITIES LLC,
BANCAMERICA ROBERTSON STEPHENS,
and JOHN DOES 1-50,

                        Bank Defendants,

IPM, INC., OWENS-CORNING FIBERGLAS
SWEDEN, INC., and VYTEC CORPORATION,

            Affiliate Non-Debtor Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
CREDIT SUISSE, INDIVIDUALLY AND AS AGENT, AND
CERTAIN NAMED INSTITUTIONAL DEFENDANTS TO
DISMISS COMPLAINT OF OFFICIAL REPRESENTATIVES OF OWENS
CORNING BONDHOLDER AND TRADE CREDITOR CONSTITUENCIES FOR
EQUITABLE SUBORDINATION AND PIERCING OF THE CORPORATE VEIL**

# TABLE OF CONTENTS

I.      Preliminary Statement ................................................................................ 1

II.     Background ............................................................................................... 6

III.    Pursuant To Federal Rule 12(b)(6), John Hancock's Complaint Must Be
        Dismissed ................................................................................................. 6

        A.      Federal Rule 12(b)(6) Requires Dismissal Of The Equitable
                Subordination Counts In The Complaint ................................................ 7

                1.      John Hancock Cannot State A Claim Against The Non-
                        Claimant Defendants And The Non-Underwriter
                        Defendants ................................................................................... 9

                2.      John Hancock Fails To Plead Its Fraud Claims With The
                        Requisite Particularity .................................................................. 13

                3.      John Hancock Fails To Allege Justifiable Reliance
                        Sufficiently ................................................................................. 20

                4.      The Complaint Fails To Allege A Material Omission Or
                        False Statement ........................................................................... 20

                5.      John Hancock Is Overreaching By Asserting Equitable
                        Subordination As A Remedy ........................................................ 28

        B.      Federal Rule 12(b)(6) Requires That The Veil-Piercing Counts In
                The Complaint Be Dismissed ................................................................ 30

                1.      The Veil-Piercing Counts In John Hancock's Complaint
                        Are Barred By Res Judicata ......................................................... 31

                2.      Collateral Estoppel Principles Preclude John Hancock
                        From Relitigating The Same Issues Decided During The
                        Substantive Consolidation Litigation ........................................... 37

IV.     Conclusion .............................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.),* 210 B.R. 508 (Bankr. S.D.N.Y. 1997)............................................... 8, 9

*Allied Tech. Inc. v. R.B. Brunemann & Sons, Inc.,* 25 B.R. 484 (Bankr. S.D. Ohio 1982)........................................................................................................ 9

*Anaconda-Ericsson, Inc., v. Hessen (In re Teltronics Servs., Inc.),* 29 B.R. 139 (Bankr. E.D.N.Y. 1983)......................................................................... 9

*Anthan v. Prof'l Air Traffic Controllers Org.,* 672 F.2d 706 (8th Cir. 1982).................. 39

*Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir. 1977)........................................................................................................ 8, 10, 11

*Blaine-Hays Constr. Co. v. Union Planters Nat'l Bank (In re Edgewater Motel, Inc.),* 121 B.R. 962 (Bankr. E.D. Tenn. 1988) .................................. 13

*Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.-Pension Fund Centra v. Centra,* 983 F.2d 495 (3d Cir. 1992)...................... 31, 37

*Brown v. N. Cent. F.S., Inc.,* 173 F.R.D. 658 (N.D. Iowa 1997) ..................................... 15

*Capitol Bank and Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust),* 968 F.2d 1332 (1st Cir. 1992)........................................ 8

*CareFirst of Maryland, Inc. v. Care First Transp., Inc.,* No. Civ.A. 02-229 (MPT), 2002 AWL 31500927, at *3 (D. Del. Nov. 1, 2002) .................................. 7, 12

*Carter-Waters Okla., Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.),* 266 B.R. 483 (B.A.P. 10th Cir. 2001)................................................. 8, 9

*Century Glove, Inc. v. Iselin (In re Century Glove, Inc.),* 151 B.R. 327 (Bankr. D. Del. 1993) ........................................................................................ 8

*Charal Inv. Co. v. Rockefeller (In re Rockefeller Ctr. Properties, Inc. Sec. Litig.),* 311 F.3d 198 (3d Cir. 2002)........................................................................ 14

*Chase Manhattan Bank v. Iridium Afr. Corp.,* 307 F. Supp. 2d 608 (D. Del. 2004) ...................................................................................................... 25

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3d Cir. 1998) ......................................................... 8, 10, 11, 29

*Cohen v. KB Mezzanine Fund (In re Submicron Sys. Corp.),* 291 B.R. 314 (D. Del. 2003) ........................................................................................................ 8

*Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.),* 432 F.3d 448 (3d Cir. 2006) ................................................................................... 30

*Conley v. Gibson,* 335 U.S. 41 (1957) .......................................................................... 10

*CoreStates Bank, N.A. v. Huls America, Inc.,* 176 F.3d 187 (3d Cir. 1999)......... 31, 32, 33

*De Lage Landen Fin. Services v. Cardservice Int'l, Inc.,* Civil Action No. 00-2355, 2001 U.S. Dist. LEXIS 9692, *9 (E.D. Pa. July 12, 2001) ........................... 18

*Debakey Corp. v. Raytheon Serv. Co.*, C.A. No. 14947, 2000 Del. Ch.
LEXIS 129, at *77 (Del. Ch. Ct., Aug. 25, 2000) ........................................ 17

*Desmond v. ASR Acquisition Corp. (In re Desmond)*, 334 B.R. 78 (Bankr.
D.N.H. 2005) ..................................................................................................... 14

*Diversified Health Assocs., inc. v. Norristown*, No. Civ.A. 00-5702, 2001
WL 632912, at *3 (E.D. Pa. June 5, 2001) .................................................... 31

*Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337 (S.D.N.Y. 2005) ........................ 21

*Eastern Minerals & Chemical Co. v. Mahan*, 225 F.3d 330 (3d Cir. 2000) .................... 34

*Equal Employment Opportunity Comm'n v. U.S. Steel Corp.*, 921 F.2d 489
(3d Cir. 1990) ..................................................................................................... 32

*Erath v. Xidex Corp.*, No. CIV-89-198, 1991 WL 338322, at *11 (D. Ariz.
Feb. 7, 1991) ...................................................................................................... 22

*Estes v. N&D Properties, Inc. (In re N&D Properties, Inc.)*, 799 F.2d 726
(11th Cir. 1986) .................................................................................................... 9

*Federated Dep't Stores v. Moitie*, 452 U.S. 394 (1981) .................................................. 31

*Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001) ......................................... 32, 36

*Hallowell v. State Farm Mutual Auto. Ins. Co.*, 443 A.2d 925 (Del. 1982) .................... 25

*Herbert v. Reinstein*, 976 F. Supp. 331 (E.D. Pa. 1997) .................................................. 31

*Horan v. Danton (In re Prof'l Video Assoc., Inc.)*, No. 95-016 (PJW),
2005 WL 189733, at*4 (D. Del. Jan. 27, 2005) ............................................. 25

*Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132 (3d
Cir. 2001) ............................................................................................................ 32

*In re 80 Nassau Assoc.*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994) ...................................... 29

*In re After Six, Inc.*, 177 B.R. 219 (Bankr. E.D. Pa. 1995) ............................................... 9

*In re All Products Co.*, 32 B.R. 811 (Bankr. E.D. Mich. 1983) ....................................... 38

*In re Autostyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001) ...................................... 22, 23

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ....................... 14

*In re Epic Capital Corp.*, 307 B.R. 767 (D. Del. 2004) ............................................... 9, 10

*In re Genesis Health Ventures, Inc.*, 324 B.R. 510 (Bankr. D. Del. 2005) ................. 33, 34

*In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53 (Bankr. D. Del. 2002) ........................... 8, 30

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) ............................................... 5, 27, 38

*In re Progress Energy, Inc.*, 371 F. Supp. 2d 548 (S.D.N.Y. 2005) ................................. 21

*Interpool, Ltd. v. Certain Freights of the M/V/ Ventur Star, Mosman Star,
Fjord Star, Lakes Star*, 102 B.R. 373 (D.N.J. 1988) ...................................... 9

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .............................................. 24

*Lum v. Bank of Am.*, No. 01-4348, 2004 U.S. App. LEXIS 4637, at *9 (3d
  Cir. Mar. 11, 2004) .................................................................................................. 24

*Maldonado v. Flynn*, 417 A.2d 378 (Del. Ch. 1980) .................................................. 32, 34

*MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419 (D. Del. 2004) ........................... 17

*MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204 (3d Cir. 2005) ............................... 25

*McCarter v. Mitcham*, 883 F.2d 196 (3d Cir. 1989) ....................................................... 31

*Merrill v. Crothall-Am., Inc.*, 606 A.2d 96 (Del. 1992) .................................................. 17

*Miskin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520
  (Bankr. S.D.N.Y. 2002) ............................................................................................... 9

*Neitzke v. Williams*, 490 U.S. 319 (1989) ........................................................................ 6

*Oldham v. Pritchett*, 599 F.2d 274 (8th Cir. 1979) ........................................................ 39

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 n. 5 (1979) .............................................. 33

*Playtex Family Prods., Inc. v. St. Paul Surplus Lines Ins. Co.*, 564 A.2d
  681 n.2 (Del. Super. Ct. 1989) .................................................................................... 33

*Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305 (3d Cir. 1999) ...................... 6

*Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192
  (Del. 1992) ................................................................................................................. 25

*Rider v. Pennsylvania*, 850 F.2d 982 (3d Cir. 1988) ....................................................... 31

*Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.*, 243 F.
  Supp. 2d 145 (D. Del. 2003) ................................................................................ 6, 7, 12

*Sanders v. Devine*, No. CIV. A. 14679, 1997 WL 599539, at *8 (Del. Ch.
  Sept. 24, 1997) ........................................................................................................... 19

*Sandvik AB v. Advent Int'l Corp.*, 83 F. Supp. 2d 442 (D. Del. 1999) ............................ 18

*Schell v. Porta Sys. Corp.*, CA No. 12,498, 1994 Del. Ch. LEXIS 47, at
  *11 (Del. Ch. 1994) ................................................................................................... 34

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d
  Cir. 1984) ................................................................................................................... 14

*Shaw v. Digital Entm't Corp.*, 82 F.3d 1194 (1st Cir. 1996) ........................................... 21

*Shellenberger v. United Parcel Serv.*, No. Civ.A. 05-2266, 2006 WL
  208683, at *3 (E.D. Pa. Jan. 25, 2006) ...................................................................... 30

*Smith v. Daimlerchrysler Corp.*, 2002 Del. Super. LEXIS 434, *23 (Del.
  Super. Ct. Nov. 20, 2002) ........................................................................................... 13

*Spiegler v. Wills*, 60 F.R.D. 681 (S.D.N.Y. 1973) .......................................................... 21

*Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069 (Del. 1983) ......................................... 13

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) .......................................... 10

*Toner v. Allstate Ins. Co.,* 821 F. Supp. 276 (D. Del. 1993) ...................................... 14, 15

*Trans World Airlines, Inc. v. Hughes,* 317 A.2d 114 (Del. Ch. 1974) ............................ 31

*United States v. Athlone Indus., Inc.,* 746 F.2d 977 (3d Cir. 1984) .................................. 33

*United States v. Karlen,* 645 F.2d 635 (8th Cir. 1981) ....................................... 39

*Universal Foundry Co. v. First Wis. Fin. Corp.,* 163 B.R. 528 (E.D. Wis. 1993) ................................................................................................................. 14

*Vicom, Inc. v. Harbridge Merch. Services, Inc.,* 20 F.3d 771 (7th Cir. 1994) ................................................................................................................. 18

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),* 161 B.R. 107 (E.D. Pa. 1993) ............................................................................... 9

*Wielgos v. Commonwealth Edison Co.,* 123 F.R.D. 299 (N.D. Ill. 1988) ....................... 22

*Yamaha Corp. of Am. v. United States,* 961 F.2d 245 (D.C. Cir. 1992) .......................... 37

*York Linings v. Roach,* No. 16622-NC, 1999 WL 608850, at *3 (Del. Ch. July 28, 1999) ..................................................................................................... 19

### STATUTES

11 U.S.C. § 510(c)(1) ....................................................................................................... 10

### OTHER AUTHORITIES

1B Moore's Federal Practice § 0.443[2] ........................................................................... 37

*4 Collier on Bankruptcy* ¶ 510.05[1], at 510-17 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005) ............................................................................ 7

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004) ................................................................................. 24

### RULES

Fed. R. Bankr. P. 7009 ..................................................................................................... 14

Fed. R. Civ. P. 9(b) ................................................................................................... 12, 13

TO THE HONORABLE JUDITH K. FITZGERALD,
UNITED STATES BANKRUPTCY JUDGE:

The Movants[1] submit this Memorandum of Law in Support of their Motion to
Dismiss Complaint of Official Representatives of Owens Corning Bondholder and Trade
Creditor Constituencies for Equitable Subordination and Piercing of the Corporate Veil
filed concurrently herewith (the "Motion").[2]

## I.  PRELIMINARY STATEMENT

The Complaint seeks to (i) subordinate the claims of the Named Institutional
Defendants to those of Owens Corning's bondholders and Trade Creditors based on
general and conclusory allegations of fraud and misrepresentation and (ii) pierce the
corporate veil between Owens Corning and the Non-Debtor Guarantors.  The Complaint
should be dismissed as to the equitable subordination claims for relief because it fails the
most basic rules of notice pleading under Rule 8 of the Federal Rules, such as correctly
identifying the particular plaintiffs and defendants and making allegations that
sufficiently advise each defendant as to the conduct complained of.  Moreover, the
Complaint fails to meet the specificity pleading requirements under Rule 9(b) of the
Federal Rules as to its allegations of fraud and misrepresentation.  As an example, the
Complaint is devoid of any allegations that any of the Named Institutional Defendants
currently hold Bank claims against Owens Corning – a critical factor in an action for
equitable subordination.  The Complaint also should be dismissed as to the veil piercing
claims because res judicata and collateral estoppel principles bar the re-litigation of facts
and issues already determined by the Third Circuit in its decision denying the Debtors'
motion for substantive consolidation of their estates.

---

[1] The Movants are identified on Schedule 1 attached hereto.

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to such
terms in the Motion.

1.    *Equitable Subordination.*  As a general matter, a cause of action seeking equitable subordination requires allegations that the defendant (i) is a current holder of a claim against the debtor <u>and</u> (ii) committed some wrongful act against another current claim holder.  It is John Hancock's burden to make these specific allegations as to each and every defendant.  The Complaint fails to do so.

First, the Complaint fails to allege that <u>any</u> of the Named Institutional Defendants currently hold Bank claims against Owens Corning.  In fact, only 10 of the 60 Named Institutional Defendants currently hold Bank claims, a fact John Hancock could have determined easily by limited discovery.[3]  Accordingly, the Complaint must be dismissed as to the 50 Named Institutional Defendants that are not current holders of Bank claims against Owens Corning in these Chapter 11 Cases.

Second, the wrongful actions alleged in the Complaint are that the offering materials for Owens Corning's 1998 public debt contained false statements and omitted material facts.  These are allegations of fraud, which the Federal Rules require to be pled with particularity.  When the gravamen of a complaint is fraud or misrepresentation, each defendant is entitled to know exactly what representation <u>such entity</u> allegedly made, what was wrong with the representation, who relied on the representation, when the reliance occurred, why reliance on the representation was justified, and the specific damage to the plaintiff that resulted.  John Hancock's Complaint fails this test because it lumps together all of the Named Institutional Defendants, making only conclusory

---

[3] Three business days before the filing deadline for responses to the Complaint, and two months after it filed the Equitable Subordination Complaint, John Hancock finally decided to determine which defendants currently hold Bank claims and served interrogatories on counsel for Credit Suisse.  Notably, John Hancock filed the Complaint without even bothering to ascertain this critical information.  For purposes of this motion to dismiss, the Court may take judicial notice of the names of the current holders of Bank claims identified in Credit Suisse's Rule 2019 Statement, which is filed quarterly, under seal.

allegations that the Named Institutional Defendants committed fraud and conclusory allegations that all the current holders of Owens Corning's public debt were damaged.

For example, John Hancock alleges that the underwriters for Owens Corning's public bonds (the "Underwriters") participated in the alleged fraud and that some of the Named Institutional Defendants were Underwriters.[4] Based on those allegations, it then claims that all the Named Institutional Defendants should be held liable for the alleged fraud. However, on the face of the documents referred to in the Complaint, it is apparent that none of the 10 Named Institutional Defendants that currently hold Bank claims was an Underwriter for the Bonds. The only connection between the Underwriters and holders of Bank claims is that five of the Named Institutional Defendants holding Bank claims are affiliates of Underwriters. With the exception of Credit Suisse, John Hancock, however, makes no allegation connecting the affiliated entities to the underwriting.[5] The

---

[4] The offering materials referred to in the Complaint identify the following entities as underwriters for Owens Corning's public debt offerings: Credit Suisse First Boston Corporation, Bancamerica Robertson Stephens, BNY Capital Markets, Inc., Barclays Capital, Inc., Chase Securities, Inc., Citicorp Securities, Inc., First Chicago Capital Markets, Inc., Goldman Sachs & Co., JP Morgan & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Nationsbanc Montgomery Securities LLC, RBC Dominion Securities Corporation, Scotia Capital Markets, and SG Cowen Securities Corporation. *See, e.g.,* April 30, 1998 Supplement at A 612; July 22, 1998 Supplement at A 680.

[5] The only specific allegation in the Complaint that one of the Named Institutional Defendants was an Underwriter relates to Credit Suisse. The Complaint alleges that "CSFB, which was and still is the Agent for the participating banks in the 1997 Credit Facility, also was the lead underwriter for the Bond Offerings, and at least two CSFB officers were deeply involved in both the negotiation and creation of the Credit Facility and the underwriting of Owens Corning's Bond debt." *See* Complaint at ¶¶ 6, 168. However, the Prospectuses referred to in the Complaint identify Credit Suisse First Boston or Credit Suisse First Boston Corporation as one of the Underwriters, while the Credit Agreement clearly identifies the Agent as a different legal entity (a bank) -- Credit Suisse Cayman Islands Branch (f/k/a Credit Suisse First Boston, Cayman Islands Branch). Thus, the allegation is facially insufficient to meet the heightened pleading requirements for fraud. Moreover, the Complaint does not identify the individuals, does not identify what role they played in either the negotiation and creation of the credit facility or the underwriting, and does not even identify the legal entity by which these two officers were employed.

mere fact that one legal entity is an affiliate of another legal entity is insufficient as a matter of law to impute liability between the entities and a pleading that does not allege a basis for such a connection is fatally flawed.

The Complaint is equally defective because it does not specifically identify proper plaintiffs. John Hancock claims to be the "official representative" for the <u>current</u> holders of bonds and trade claims at Owens Corning. (Only current creditors are entitled to the remedy of equitable subordination.) Yet the Complaint fails to allege specifically which (if any) of the <u>current</u> holders purchased Bonds or provided trade credit in 1998 in reliance on the alleged misrepresentations. As noted above, when misrepresentation or fraud is involved, the Federal Rules mandate that plaintiffs identify with particularity the entities harmed. The Complaint fails to do so.

For example, the Complaint alleges that $300 million of the outstanding public debt of Owens Corning was issued in 1992 -- <u>over five years before</u> the alleged fraud occurred. There is no justification for including the holders of this debt as plaintiffs under the Complaint. In addition, the Complaint makes no effort to distinguish between bondholders who relied on the alleged misrepresentations and bondholders who purchased their claims after these allegations became public <u>over five years ago</u>.[6] It is black letter law that creditors that did not rely on, and thus were not injured by, a defendant's alleged inequitable conduct, cannot be beneficiaries of any resulting equitable subordination of the defendant's claim.

Equally important, John Hancock has failed to identify any inaccurate statements or material omissions in the Prospectuses filed by Owens Corning in connection with the offering of the Bonds at issue here. Although in the context of a motion to dismiss the Court must accept well-pled (but not conclusory) allegations as true, that requirement is

---

[6] Even John Hancock agrees that the fact that the Guarantees could be a material factor was first disclosed in OCD's Report on Form 8-K filed with the Securities and Exchange Commission on January 30, 2001. *See* Complaint at ¶ 194.

inapplicable where John Hancock's allegations are patently contradicted by public filings. The facts that the Underwriters purportedly "omitted" were fully disclosed in Owens Corning's public filings with the Securities and Exchange Commission (the "SEC"). Moreover, the contention that public statements were false and misleading is belied by the clear and unambiguous language of the public filings themselves. Absent any misrepresentation or omission in the offering materials -- the gravamen of the equitable subordination portion of the Complaint -- John Hancock's suit must fail as a matter of law.

      2.    *Piercing the Corporate Veil.* Next, John Hancock reiterates in the Complaint essentially the same allegations asserted in the trial on substantive consolidation -- that Owens Corning's Subsidiaries are "sham entities" -- to support its demand that the corporate veil between Owens Corning and the Non-Debtor Guarantors be pierced. John Hancock blatantly ignores the fact that the Third Circuit already has made explicit factual findings rejecting such conclusory allegations and has determined that "[e]ach subsidiary was a separate legal entity that observed governance formalities. Each had a specific reason to exist separately, each maintained its own business records, and intercompany transactions were regularly documented." *In re Owens Corning*, 419 F.3d 195, 200 (3d Cir. 2005). Accordingly, as a matter of law, there can be no claim seeking to pierce the corporate veil.

Under the well-settled doctrine of res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. It cannot be disputed that (i) the Third Circuit's Substantive Consolidation Decision is a final judgment on the merits, (ii) John Hancock and the Defendants were parties to the substantive consolidation litigation, and (iii) John Hancock now seeks to relitigate here the very same issue of corporate separateness that was at the heart of the Substantive Consolidation Decision.

Collateral estoppel, another doctrine that enforces principles of finality, bars John Hancock's attack on the Third Circuit's findings of fact that confirm the corporate separateness of the Non-Debtor Guarantors.  In fact, in pleadings filed with this Court, John Hancock has expressly admitted that it is rearguing in this action the same operative facts initially argued in support of substantive consolidation.

Viewed in a light most favorable to John Hancock, the Complaint simply fails to allege a factual or legal basis for equitable subordination or corporate veil piercing and, accordingly, must be dismissed.

## II.  BACKGROUND

The pertinent facts are set forth in the Motion and are incorporated here by reference as if fully set forth at length.

## III.  PURSUANT TO FEDERAL RULE 12(B)(6), JOHN HANCOCK'S COMPLAINT MUST BE DISMISSED

A motion to dismiss under Federal Rule 12(b)(6) must be granted where, as here, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." [7] *Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.*, 243 F. Supp. 2d 145, 156 (D. Del. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."); *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 311 (3d Cir. 1999) (noting that Federal Rule 12(b)(6) "is designed to screen out cases where 'a complaint states a claim based upon a wrong for which there is clearly no remedy, or a claim which the plaintiff is without right or power to assert and for which no relief could possibly be granted'" (quoting *Melo-Sonics Corp. v. Cropp*, 342 F.2d 856, 859 (3d Cir. 1965))).

---

[7] Rule 12(b)(6) is made applicable here by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

While a court is required to accept well-pled allegations in a complaint as true, "conclusory allegations unsupported by any factual assertions ... cannot withstand a motion to dismiss." *CareFirst of Md., Inc. v. Care First Transp., Inc.*, No. Civ.A. 02-229 (MPT), 2002 WL 31500927, at *3 (D. Del. Nov. 1, 2002). Similarly, "[t]he Court is 'not required to accept legal conclusions either alleged or inferred from the pleaded facts.'" *Rottlund Homes of N.J., Inc.*, 243 F. Supp. 2d at 156 (quoting *Cost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)).

Under this standard, John Hancock's Complaint -- which offers nothing more than conclusory and unsupported allegations of fraud, and veil-piercing claims that are barred by res judicata and collateral estoppel -- must be dismissed.

## A. Federal Rule 12(b)(6) Requires Dismissal Of The Equitable Subordination Counts In The Complaint

John Hancock asserts that the Named Institutional Defendants' claims should be equitably subordinated under section 510(c) of the Bankruptcy Code because such defendants are alleged to have made false statements and material omissions in OCD's Prospectuses. The "principles of equitable subordination," encompassed by section 510, are defined by case law and generally provide that a claim may be subordinated only if the holder of such claim is found to have engaged in some egregious or inequitable misconduct. *See 4 Collier on Bankruptcy* ¶ 510.05[1], at 510-17 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005) (citing S. Rep. No. 95-989, at 74 (1978)). More specifically, equitable subordination is appropriate only where the movant can demonstrate:

    i.     The claimant engaged in some type of inequitable conduct;

    ii.    The misconduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and

    iii.    Equitable subordination is consistent with the provisions of the Bankruptcy Code.

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160

F.3d 982, 986-87 (3d Cir. 1998); *Benjamin v. Diamond (In re Mobile Steel Co.*), 563 F.2d

692, 700 (5th Cir. 1977); *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del.

2002); *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.*), 151 B.R. 327, 333

(Bankr. D. Del. 1993).

Courts have confined equitable subordination principally to situations where there

was fraud, illegality, undercapitalization, or domination and control. *In re Mid-Am.*

*Waste Sys., Inc.*, 284 B.R. at 70; *see also Cohen v. KB Mezzanine Fund (In re Submicron*

*Sys. Corp.*), 291 B.R. 314, 327-28 (D. Del. 2003). In order to survive a motion to

dismiss, "the plaintiff must 'allege facts showing fraud, illegality, or breach of some other

legal duty owing by [the creditor] to the [d]ebtors or their creditors.'" *ABF Capital*

*Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515

(Bankr. S.D.N.Y. 1997) (quoting *In re 80 Nassau Assoc.*, 169 B.R. 832, 841 (Bankr.

S.D.N.Y. 1994)).

"The majority of courts have described the degree of wrongful conduct

warranting equitable subordination of a non-insider's claim as 'gross and egregious,'

'tantamount to fraud, misrepresentation, overreaching or spoliation,' or 'involving moral

turpitude.'" *Carter-Waters Okla., Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus.*

*Auth.)*, 266 B.R. 483, 489 (B.A.P. 10th Cir. 2001) (quotations omitted); *See Capitol Bank*

*and Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*,

968 F.2d 1332, 1360 (1st Cir. 1992).

Where, as here, the defendant is a non-insider, the inequitable conduct must be

pled with even greater particularity.[8] *In re After Six, Inc.*, 177 B.R. 219, 231-32 (Bankr.

---

[8] John Hancock does not allege any facts that would support a conclusion that any Named
Institutional Defendant was an insider. In determining whether a claimant is an insider
for purposes of equitable subordination, courts generally look to section 101(31) of the
Bankruptcy Code. *See, e.g., Estes v. N&D Prop., Inc. (In re N&D Prop., Inc.)*, 799 F.2d

E.D. Pa. 1995); *Anaconda-Ericsson, Inc., v. Hessen (In re Teltronics Servs., Inc.)*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983); *see also In re Eufaula Indus. Auth.*, 266 B.R. at 489 ("[W]here non-insider claims are involved, the level of pleading and proof is significantly higher." (citing *In re N & D Props., Inc.*, 799 F.2d 726, 731-32 (11th Cir. 1986))); *In re Granite Partners, L.P.*, 210 B.R. at 515.

Equitable subordination of non-insider claims, like substantive consolidation, is a remedy rarely applied. *See Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 119 (E.D. Pa. 1993) ("Equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries."), *aff'd*, 37 F.3d 1487 (3d Cir. 1994); *see also In re Epic Capital Corp.*, 307 B.R. 767, 773 (D. Del. 2004) . Equitable subordination is a discretionary remedy to be applied sparingly pursuant to the court's equitable powers. *Allied Tech. Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 499 (Bankr. S.D. Ohio 1982).

### 1. John Hancock Cannot State A Claim Against The Non-Claimant Defendants And The Non-Underwriter Defendants

Of the 60 Named Institutional Defendants, 50 currently hold no Bank claims under the Credit Agreement (the "Non-Claimant Defendants").[9] Of the 10 remaining Named Institutional Defendants who are current holders of Bank claims, none were Underwriters (the "Non-Underwriter Defendants"). The Complaint must be dismissed as to the Non-Claimant Defendants because there can be no cause of action for equitable subordination against entities that are not creditors. The Complaint must be dismissed against the Non-Underwriter Defendants because John Hancock makes no specific allegations that any such defendants participated in any wrongful conduct related to the

---

726, 731 (11th Cir. 1986); *Interpool, Ltd. v. Certain Freights of the M/V/ Ventur Star, Mosman Star, Fjord Star, Lakes Star*, 102 B.R. 373, 379 (D.N.J. 1988); *Miskin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 564 (Bankr. S.D.N.Y. 2002).

[9] The Non-Claimant Defendants are identified on Schedule 1 attached hereto.

issuance of Owens Corning's public debt.[10]  This defect in the Complaint is not just a failure to meet the pleading requirements of Federal Rule 9(b) -- which must be met if asserting fraud -- but is also a failure to meet the most basic notice pleading requirements of Federal Rule 8, because the Non-Underwriter Defendants cannot possibly ascertain the wrongful acts John Hancock asserts they committed. *See Conley v. Gibson*, 335 U.S. 41, 47 (1957) (holding that Federal Rule 8 requires a "'short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests . . . ."); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake.").

### a.   The Complaint Must Be Dismissed Against Any Defendant That Does Not Hold Bank Claims

The Complaint's equitable subordination counts are defective on their face because John Hancock fails to state which entities currently hold claims that can be equitably subordinated.  It is axiomatic that there is nothing to equitably subordinate if the defendant does not hold a claim.  Indeed, the case law addressing equitable subordination presupposes that the defendant is a "claimant."  *See Citicorp Venture Capital*, 160 F.3d at 986-87; *In re Mobile Steel Corp.*, 563 F.2d at 700-01; *In re Epic Capital Corp.*, 307 B.R. at 772.  Moreover, section 510(c) of the Bankruptcy Code specifically states that principles of equitable subordination can be invoked to subordinate "all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c)(1).

Incredibly, although claiming that it is not seeking to delay confirmation of the Fifth Plan, John Hancock waited until March 17, 2006 -- more than two months after

---

[10] *See supra* note 4 for the names of the Underwriters.

filing the Complaint and just three business days prior to the deadline for responding to the Equitable Subordination Complaint -- to serve its first set of interrogatories on Credit Suisse seeking the names of the current holders of Bank claims. If John Hancock had conducted even the barest minimum of diligence prior to filing the Complaint, such as seeking a limited Bankruptcy Rule 2004 examination, it could have determined that 50 of the Named Institutional Defendants do not hold Bank claims and its Complaint would not have this significant pleading defect.[11] The Complaint is devoid of any specific allegations regarding which Named Institutional Defendants are current creditors of OCD. The Complaint, therefore, must be dismissed against the Non-Claimant Defendants.

### b. The Complaint Fails To State A Claim Against Any Defendant That Was Not An Underwriter

The first element of the standard for equitable subordination, and the fundamental premise for application of the doctrine, requires the existence of a claimant who engaged in some type of inequitable conduct. *See Citicorp Venture Capital*, 160 F.3d at 986-87; *In re Mobile Steel Corp.*, 563 F.2d at 700. Here, the equitable subordination portion of the Complaint is premised on the allegedly fraudulent statements and omissions by Owens Corning and the Underwriters in connection with the sale of the Bonds. With the exception of Credit Suisse, the Complaint contains no specific allegations that any of the Named Institutional Defendants that were not Underwriters had any connection to the underwriting or the sale of the Bonds.[12]

---

[11] For purposes of this motion to dismiss, the Court may take judicial notice of the names of the current holders of Bank claims identified in Credit Suisse's Rule 2019 Statement, which is filed quarterly, under seal.

[12] The only allegation made as to Credit Suisse was that two unidentified employees had some involvement in both the Credit Agreement and the underwriting. *See* Complaint at ¶¶ 6, 168.

Even John Hancock recognizes the distinction between the Underwriters and the Non-Underwriter Defendants by specifically defining "Bank Underwriters" separately from "Bank Defendants." *See* Complaint at ¶ 5 (defining "Bank Underwriters" as the subgroup of "Bank Defendants [who] acted as underwriters for certain OCD Bond Offerings"). Moreover, the Complaint alleges that only the Underwriters (not the Banks) owed a duty to ensure the accuracy of the Prospectuses, *see* Complaint at ¶¶ 154, 173, and that only the Underwriters (not the Banks) failed to make accurate disclosures in the Prospectuses. *See* Complaint at ¶ 173.

Notwithstanding the fact that John Hancock admits the distinction between the Underwriters and the Non-Underwriter Defendants, it nonetheless lumps the Named Institutional Defendants together as a group and seeks the same remedy against all of these innocent third parties.[13] These are classic conclusory allegations unsupported by any specific factual assertions, that under governing law cannot form the basis for liability. *See Rottlund Homes of N.J., Inc.*, 243 F. Supp. 2d at 156 ("The Court is 'not required to accept legal conclusions either alleged or inferred from the pleaded facts.'" (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993))); *CareFirst of Md.*, 2002 WL 31500927, at *3 (noting that while a court is required to accept well-pled allegations in a complaint as true, "conclusory allegations unsupported by any factual assertions . . . cannot withstand a motion to dismiss")

---

[13] Such conclusory allegations are contained in paragraphs 2, 9, 10, 171, 184, 200, 205, 208, 212, and 214 of the Complaint. In those paragraphs John Hancock baldly alleges that the "Banks" or "Bank Defendants" made statements in the Prospectuses. At other places in the Complaint, John Hancock identifies the Underwriters (defined in the Complaint as "Bank Underwriters") as being involved with the Prospectuses. *See, e.g.*, Complaint at ¶¶ 5, 7, 8, 154, 168-70, 173, 176. As discussed below, where allegations of fraud are made, the plaintiff must plead with particularity as to each defendant. It is insufficient to lump defendants into a single group for these purposes. *See* Fed. R. Civ. P. 9(b); *infra* Section III.A.2.b.

**2.    John Hancock Fails To Plead Its Fraud
        Claims With The Requisite Particularity**

**a.    John Hancock Fails To Plead The Well-
        Established Elements Of Common Law Fraud**

John Hancock attempts to plead a common law fraud/intentional
misrepresentation case to establish the predicate of inequitable conduct warranting
equitable subordination.  *See supra* at III.A; *see also Blaine-Hays Constr. Co. v. Union
Planters Nat'l Bank (In re Edgewater Motel, Inc.*), 121 B.R. 962, 973 (Bankr. E.D. Tenn.
1988) (holding that negligent conduct does not justify resorting to equitable
subordination).  To prevail on a fraud or deceit claim under the common law of
Delaware, a plaintiff must establish:  (i) a false representation, usually one of fact, or
material omission made by the defendant; (ii) the defendant's knowledge or belief that
the representation was false (or omission was material) or was made with reckless
indifference to the truth; (iii) an intent to induce the plaintiff to act or to refrain from
acting; (iv) the plaintiff's action or inaction taken in justifiable reliance upon the
representation or omission; and (v) damage to the plaintiff as a result of such reliance.
*Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del. 1983); *see also Smith v.
Daimlerchrysler Corp.*, CA No. 94C-12-002-JEB, 2002 Del. Super. LEXIS 434, *23
(Del. Super. Ct. Nov. 20, 2002) (discussing factors to establish intentional
misrepresentation under Delaware common law).  As discussed below, John Hancock's
pleading is deficient as to all of these elements.

**b.    John Hancock Fails To Satisfy The
        Heightened Pleading Requirements For Fraud**

The Complaint fails to meet the heightened pleading requirements of Federal Rule
9(b), which mandates that, "[i]n all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The
requirements of Federal Rule 9(b) are applicable to equitable subordination claims when

such claims are based on allegations of fraud or intentional misrepresentation. *See* Fed. R. Bankr. P. 7009; *see also Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993) ("Although the language of Rule 9(b) confines its requirements to claims of mistake and fraud, the requirements of the rule apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically fraud.") (citation omitted); *Universal Foundry Co. v. First Wis. Fin. Corp.*, 163 B.R. 528, 541 (E.D. Wis. 1993) (upholding a lower court's finding that a trustee did not adequately plead circumstances constituting fraud in connection with its equitable subordination claim as required under Federal Rule 9(b)); *Desmond v. ASR Acquisition Corp. (In re Desmond)*, 334 B.R. 78, 85-86 (Bankr. D.N.H. 2005) (dismissing an equitable subordination count because the complaint was devoid of any material fact to support a claim for fraud as required by Federal Rule 9(b)).

Federal Rule 9(b) requires "at a minimum, that plaintiffs support their allegations of securities fraud with all the essential factual background that would accompany 'the first paragraph of any newspaper story'-- that is, the 'who, what, when, where and how' of the events at issue." *Charal Inv. Co. v. Rockefeller (In re Rockefeller Ctr. Prop., Inc. Sec. Litig.)*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)). This requirement is to be "rigorously" applied. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417.

The purpose of Federal Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). Specifically, the particularity requirement is critical to: (i) protecting defendants from frivolous suits; (ii) providing defendants an opportunity to form an adequate defense by putting them on notice; (iii) preventing plaintiffs from filing fraud actions and learning all of the facts afterwards by

way of the discovery process; and (iv) protecting defendants from damage to their reputation and goodwill. *See Toner*, 821 F. Supp. at 284.

The only misrepresentation/omission that John Hancock identifies is in the Prospectuses. As set forth in Sections III.A.4.a-b below, the information that is allegedly omitted is clearly disclosed in the Prospectuses (which the Court can consider in the context of a motion to dismiss) and the misrepresentation is nothing more than John Hancock's intentional misreading of the Prospectuses (which this Court can interpret as a matter of law). There are no other misrepresentations or omissions pleaded at all -- not in the 1997 Indenture, not in the Bond certificates, not in the SEC filings -- much less with particularity.

### c. John Hancock Fails To Properly Identify The Plaintiffs

John Hancock seeks equitable subordination of the claims of the Named Institutional Defendants to the claims held by its constituents -- the "bondholders" (broadly defined as all holders of Owens Corning's publicly issued debt) and the entire body of Trade Creditors. However, because this is a suit based on theories of common law fraud and misrepresentation, conclusory "group" allegations are not sufficient. On the contrary, John Hancock must identify the specific parties that suffered harm by relying on the Prospectuses, and when and how those purportedly injured parties relied on the Prospectuses. By failing to do so, John Hancock has deprived the Named Institutional Defendants of their opportunity to form an adequate defense to these claims.[14] *See Brown v. N. Cent. F.S., Inc.*, 173 F.R.D. 658, 665-66 (N.D. Iowa 1997) ("[I]n a case involving more than one defendant or more than one agent of a defendant and multiple plaintiffs bringing suit [for fraud] on the basis of different transactions . . .

---

[14] Unlike the Massachusetts Action, defined herein, in which John Hancock sued the Underwriters based on strict liability under Sections 11 and 12 of the Securities Act of 1933, here the Complaint embodies common law fraud, which must meet the requirements of Federal Rule 9(b).

each plaintiff must allege that he or she was the victim of specific materially false statements in relation to the transaction in which he or she was involved.") (emphasis added).

Aside from failing to identify individual plaintiffs with particularity, there are major flaws in the "group" allegations as well. For example, John Hancock alleges in the Complaint that, by March 13, 1998, "the Bondholders already had purchased $300 million in Bond Debt."[15] *See* Complaint at ¶ 44. Because none of the Bonds were sold before April 30, 1998, John Hancock must be referring to the 1992 Debentures. However, because the 1992 Debentures were issued well before the June 1997 Credit Agreement existed and the Prospectuses had no connection to the 1992 Debentures, the holders of the 1992 Debentures could not plead (much less prove) fraud against the Underwriters. It is clear that the Complaint must be dismissed as it relates to holders of the 1992 Debentures.

John Hancock also includes in its definition of "bondholders" all current holders of the Bonds. However, current Bondholders that purchased Bonds <u>after</u> the filing of OCD's January 1, 2001 8-K (which John Hancock admits properly disclosed the Guarantee Obligations, *see id.* at ¶ 194) cannot maintain a fraud action in connection with

---

[15] The Complaint is not only lacking in particularity, it is lacking in consistency. For example, paragraph 44 of the Complaint states that "by [March 13, 1998], the Bondholders had already purchased $300 million in Bond Debt." Paragraph 165 of the Complaint states that "[o]n or about April 30, 1998, the Bondholder constituents purchased the Bond Debt in connection with the initial offering of the Bond Debt to the public." These two "facts" are irreconcilable. The Complaint continues this internal inconsistency at paragraphs 163 and 164, where John Hancock discusses purported false statements in the April 21, 1999 Prospectus and the June 15, 1999 Amendment, but fails to explain how Bondholders that purchased Bond debt "on or about April 30, 1998" relied on two 1999 Prospectuses. This internal inconsistency is attributable to John Hancock's overly broad definition of "Bonds" and "Bondholders," which includes publicly issued debt -- for example, the 1992 Debentures -- that John Hancock knows has no connection to the Prospectuses. Although for purposes of a motion to dismiss the Court is required to accept a plaintiff's allegations as true, it is impossible to do where the allegations are patently inconsistent.

the issuance of the Bonds because they cannot even plead (let alone prove) the necessary reliance as a matter of law. *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 100 (Del. 1992) (holding that a plaintiff cannot recover for alleged fraud if the plaintiff was aware of the "true facts which are [allegedly] misrepresented"); *Debakey Corp. v. Raytheon Serv. Co.*, C.A. No. 14947, 2000 Del. Ch. LEXIS 129, at *77 (Del. Ch. Aug. 25, 2000) (noting that "[a]n essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented").

John Hancock also asserts that all Trade Creditors relied on the Prospectuses in determining the creditworthiness of the Debtors. *See* Complaint at ¶¶ 211, 224. The Complaint is devoid, however, of any allegations identifying any particular Trade Creditors who actually reviewed and relied on one or more of the Prospectuses prior to extending credit to OCD. It strains the bounds of credulity to suggest as John Hancock does that all Trade Creditors reviewed and relied on the Prospectuses before extending credit to OCD. In the unlikely event any current Trade Creditor actually relied on the Prospectuses prior to extending credit, John Hancock must plead all such specific facts to survive a motion to dismiss by the Named Institutional Defendants.

### d. John Hancock Must Plead Facts Separately Against Each Named Institutional Defendant

As noted above, the Complaint fails to state a claim against Named Institutional Defendants that were not Underwriters and Named Institutional Defendants that currently do not hold Bank claims. John Hancock cannot cure that deficiency simply by lumping those Named Institutional Defendants together with separate entities that acted as Underwriters. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004) ("Collective allegations of fraud against a group of defendants generally do not satisfy Federal Rule 9(b) because the rule is intended to ensure that each defendant has adequate notice of the charges against it, thereby permitting each defendant to mount a defense and not just deny that they did anything wrong."); *Sandvik AB v. Advent Int'l*

*Corp.*, 83 F. Supp. 2d 442, 448 (D. Del. 1999) ("Under Rule 9(b), a plaintiff generally cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant."), *aff'd*, 220 F.3d 99 (3d Cir. 2000); *see also Vicom, Inc. v. Harbridge Merch. Services, Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994) (holding that blanket allegations "lump[ing] together multiple defendants" and failing to specify the nature of each defendant's alleged fraudulent conduct fell short of the requirements of Federal Rule 9(b)); *De Lage Landen Fin. Servs. v. Cardservice Int'l, Inc.*, Civil Action No. 00-2355, 2001 U.S. Dist. LEXIS 9692, *9 (E.D. Pa. July 12, 2001) ("It is insufficient to attribute individual acts of fraud to all defendants generally.").

The Complaint is replete with general allegations that "the Banks" made false statements or material omissions. The following allegations, which are characteristic of the allegations of fraud throughout the Complaint, do not distinguish among defendants.

- [A]pproximately one year after the Credit Facility closed, the Banks falsely stated, in Prospectuses in connection with the Bond Offerings, that OCD's Bond Debt would 'rank equally with other unsecured and unsubordinated obligations of the Company.' Complaint at ¶ 206.

- Upon information and belief, the Banks knowingly and intentionally made the false statements of material fact contained in the Prospectuses, and omitted material facts regarding the existence of the Guarantees, in order to induce prospective investors, including the Bondholders, to purchase the Bonds. *Id.* at ¶ 208.

- Upon information and belief, the Banks knowingly and intentionally made the false statements of material fact contained in the Prospectuses, and omitted material facts regarding the existence of the Guarantees, in order to induce the Trade Creditors to extend credit to the Debtors. *Id.* at ¶ 212.

The Complaint lacks specific allegations identifying which Named Institutional Defendants were involved in the preparation and review of the Prospectuses and how such Named Institutional Defendants were involved in the alleged fraud. This catch-all approach to pleading does not comply with the requirements of Federal Rule 9(b) and places the Named Institutional Defendants in a precarious position of having to defend themselves without knowing the specific allegations of fraud asserted against them.

### e. John Hancock Fails To Allege Intent Adequately

In order to maintain a fraud claim, John Hancock must allege facts demonstrating that the Named Institutional Defendants intended to defraud the Plaintiffs. John Hancock asserts that the "primary purpose of underwriting the Bond offerings was to generate funds to pay down the Bank Debt," *see id.* at ¶ 182, but has not explained how a disclosed intention to use proceeds for a perfectly conventional corporate use should be seen as an intent to defraud. The full disclosure in certain other Prospectuses that OCD "intended" to use the proceeds to pay down some portion of Bank claims (in OCD's discretion - not the Banks') is inconsistent with an allegation that the Banks intended to defraud investors. Even if such allegation is taken as "true" on its face, it hardly establishes with particularity an intent to defraud on the part of any specifically identified Named Institutional Defendant. Unsupported, conclusory allegations of intent cannot sustain a fraud claim. *See Sanders v. Devine*, No. CIV. A. 14679, 1997 WL 599539, at *8 (Del. Ch. Sept. 24, 1997) (dismissing a complaint where plaintiffs "[did not] allege that the defendants acted with scienter and fail[ed] even to set forth facts from which it could reasonably be inferred that the defendants acted with such requisite knowledge"); *see also York Linings v. Roach*, No. 16622-NC, 1999 WL 608850, at *3 (Del. Ch. July 28, 1999) (rejecting insufficiently pled allegations that defendants acted "intentionally, fraudulently and wrongfully").

### 3. John Hancock Fails To Allege Justifiable Reliance Sufficiently

Having failed to plead with particularity which specific Named Institutional Defendants purportedly engaged in the allegedly fraudulent conduct, and which specific bondholders were harmed by such conduct, John Hancock also has failed to plead that it, or any specific bondholder or Trade Creditor it claims to represent, justifiably relied on the alleged inaccurate statements or omissions. To prevail, John Hancock must establish that, had it or any other specific bondholder known about the Guarantee Obligations, it

would not have purchased the Bonds. The specific terms of the Prospectuses demonstrate that John Hancock cannot successfully make this argument as a matter of law.

Each of the Prospectuses provides that the offered Bonds will constitute an obligation of OCD, and that "the Indenture will not restrict the incurring of unsecured Debt by the Company or its Subsidiaries."[16] This provision expressly permits, without restriction in amount, any Subsidiary to incur unsecured debt at any time after issuance of the Bonds. The day after John Hancock purchased Bonds, the Banks (or other lenders) could have obtained unsecured guarantees from any Subsidiary without violating any covenant or triggering an event of default under the Indenture. John Hancock knowingly purchased the Bonds without any protection from future structural subordination. John Hancock, therefore, cannot credibly demonstrate any expectation that the Bonds would always rank equally with all other unsecured creditors of <u>both</u> OCD and the Subsidiaries.

### 4. The Complaint Fails To Allege A Material Omission Or False Statement

John Hancock's allegations of fraud are based on (i) a purported material omission -- the lack of disclosure of the Guarantee Obligations in the Prospectuses -- and (ii) a purported false or misleading statement of material fact -- the statement in the Prospectuses disclosing that the Bonds will rank equally with all unsecured, unsubordinated obligations of the "Company." As a matter of law, neither allegation supports a claim for fraud.

---

[16] *See* April 3, 1997 Prospectus at A 315; May 1, 1997 Amendment at A 493; March 13, 1998 Prospectus at A 553; April 16, 1998 Amendment at A 590; April 30, 1998 Prospectus Supplement at A 673; July 22, 1998 Prospectus Supplement at A 697; April 21, 1999 Prospectus at A 718; June 15, 1999 Amendment at A 816.

a.    **The Guarantee Obligations Were Properly Disclosed**

In this case, the existence of the Subsidiary guarantees was fully disclosed in

OCD's public filings. Potential purchasers of the Bonds were on notice of such

information.

A plaintiff's claims for fraud or misrepresentation cannot succeed where public

filings "disclosed facts sufficient for Plaintiff to have ascertained the allegedly concealed

information." *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 348 (S.D.N.Y.

2005) (dismissing a plaintiff's federal securities law and common law fraud claims in

connection with certain acquisition and merger agreements where allegedly omitted

information was disclosed in public filings made available prior to the execution of such

agreements); *see also In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y.

2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted

facts are disclosed."); *Spiegler v. Wills*, 60 F.R.D. 681, 683 (S.D.N.Y. 1973) ("[T]he

naked assertion of concealment of material facts which is contradicted by published

documents which expressly set forth the very facts allegedly concealed is insufficient to

constitute actionable fraud.").

Each of the Prospectuses at issue here, which were filed with the SEC using Form

S-3, incorporate by reference the 1997 10-K or the 1998 10-K.[17] The 1997 10-K

incorporates by reference the Credit Agreement as filed in the July 1997 10-Q.[18]

---

[17] *See, e.g.*, April 16, 1998 Amendment at A 581 ("The following document filed by the
Company with the Commission pursuant to the Exchange Act is incorporated herein by
reference: (1) the Company's Annual Report on Form 10-K (File No. 1-3660) for the
fiscal year ended December 31, 1997, filed on March 13, 1998 (the '1997 Form 10-
K')."); April 21, 1999 Prospectus at A 708 ("We incorporate by reference the documents
listed below . . . Annual Report on Form 10-K for the year ended December 31, 1998.").
A Form S-3 is a streamlined registration form available for companies, like OCD, that
generally are well-capitalized and about which a significant amount of public information
is already available and "accomplishes disclosure in part by incorporating in the
prospectus by reference its most recent Form 10-K and Forms 10-Q filed pursuant to the
Exchange Act." *Shaw v. Digital Entm't Corp.*, 82 F.3d 1194, 1205 (1st Cir. 1996),

Courts consistently hold that where allegedly undisclosed facts were incorporated by reference, plaintiffs cannot maintain a claim for a material omission. *See Erath v. Xidex Corp.*, No. CIV-89-198, 1991 WL 338322, at *11 (D. Ariz. Feb. 7, 1991) ("Defendants state that to the extent that plaintiff claims to have relied on the Form 10-K reports, there was in fact no omission of the terms of the Warrant Agreement since the Warrant Agreement itself was incorporated therein. This Court agrees with defendants."), *aff'd*, 963 F.2d 378 (9th Cir. 1992) (Table); *Wielgos v. Commonwealth Edison Co.*, 123 F.R.D. 299, 303 (N.D. Ill. 1988) (finding no merit to a plaintiff's claims for fraud based on purported omissions in a Registration Statement where the alleged omissions were found nearly verbatim in "documents incorporated by reference into the Registration Statement").

The reasoning of the United States Court of Appeals for the Sixth Circuit in *In re Autostyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001), is instructive. There, the plaintiff sought equitable subordination of an insider-shareholder's secured claim based on the shareholder's failure to disclose its right to participate in the senior secured credit facility. *See id.* at 746. Specifically, the plaintiff alleged that the debtor's financial statements were inadequate to provide notice of the shareholder's senior lien position because the financial statements did not make specific reference to the participation agreement. *Id.* In rejecting the plaintiff's argument, the Sixth Circuit noted that the credit facility was a publicly filed document and that the participation agreement was attached thereto. *Id.*

---

*superseded in part on other grounds by statute*, 15 U.S.C. § 78u-4(b)(1), *as recognized in Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999).

[18] *See* 1997 10-K at A 246 (listing as an exhibit "Credit Agreement, dated as of June 26, 1997, among Owens Corning, other Borrowers and Guarantors, the Banks listed on Annex A thereto, and Credit Suisse First Boston, as Agent (incorporated herein by reference to Exhibit (4) to the Company's quarterly report on Form 10-Q (File No. 1-3660) for the quarter ended June 30, 1997), as amended by Amendment No. 1 thereto (filed herewith)").

Upon review of the credit facility, plaintiff could have discovered the insider-shareholders' participation rights in the credit facility. *Id.* Accordingly, the Sixth Circuit held that plaintiff's failure to conduct adequate due diligence did not justify equitable subordination. *Id.*

Like the participation rights agreement in *Autostyle*, the Guarantee Obligations here were disclosed. Indeed, John Hancock does not dispute that the Guarantee Obligations were disclosed -- it admits they were. *See* Complaint at ¶ 43 ("On March 13, 1998, as part of its voluminous annual report for the fiscal year ended December 31, 1997, OCD filed an Amendment No. 1 to the 1997 Credit Agreement ("Amendment No. 1") on EDGAR which identified seven of the Guarantors.") (emphasis added). Rather, it is evident from the Complaint that John Hancock takes issue not with OCD's incorporation by reference of previous public filings, but the voluminous size of the documents publicly filed. *See id.* at ¶ 38 ("Article 10 of the 1997 Credit Agreement, which was two and one half pages long and embedded in that document beginning at page 57 thereof, . . . ."). This issue, however, is not actionable.

There is no dispute that OCD complied with the SEC Form S-3 filing requirements when it incorporated by reference into the Prospectuses the Credit Agreement and the First Amendment. There is also no dispute that the First Amendment attached to the 1997 10-K contained the signature pages for seven Subsidiary Guarantors. The March 13, 1998 Prospectus -- the very first Prospectus filed after the execution of the Credit Agreement -- incorporated the 1997 10-K (including the First Amendment) by reference. Therefore, the Credit Agreement and the First Amendment (which identified the Subsidiary Guarantors) were available as public records to any Bondholder who conducted even minimal due diligence at the time the Bonds were issued.

John Hancock's allegation that the Guarantee Obligations were not readily apparent on review of the public filings is contradicted by the public filings themselves.

It is well-settled that when documents deemed incorporated into a complaint contradict allegations in the complaint, the court should disregard the erroneous allegations in the complaint. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004) (noting that courts "will not accept as true allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading"); *see also Lum v. Bank of Am.*, No. 01-4348, 2004 U.S. App. LEXIS 4637, at *9 (3d Cir. Mar. 11, 2004) (noting that courts may properly look to "exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim"); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (concluding that district court did not err in taking judicial notice of SEC filings in securities fraud case and noting that "the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist").

As noted above, the cover page and preamble of the Credit Agreement and the First Amendment highlight that OCD's obligations under the Credit Agreement were guaranteed by other entities. *See* Credit Agreement at A 29, A 36; First Amendment at A 249. Section 8.06 of the Credit Agreement sets forth requirements for when new Subsidiaries must become Subsidiary Guarantors. *See* Credit Agreement at A 81. All of Article 10 of the Credit Agreement discusses the Guarantee Obligations. *See id.* at A 93-95. Section 15.01 of the Credit Agreement sets forth definitions for "Guaranteed Obligations," "Guaranteed Person," "Guarantor," "Guarantors Guarantee," and "Guarantor Supplement." *See id.* at A 141. Finally, the First Amendment attached the signature pages of the Subsidiary Guarantors. *See* First Amendment at A 260. No reasonable investor could review the Prospectuses and the incorporated public filings and not understand that the Subsidiary Guarantors guaranteed the Banks' claims under the Credit Agreement.

### b. The Prospectuses On Their Face Do Not Contain False Or Misleading Statements

Under Delaware law, the proper construction of an unambiguous contract is purely a question of law. *Horan v. Danton (In re Prof'l Video Assoc., Inc.)*, No. 95-016 (PJW), 2005 WL 189733, at *4 (D. Del. Jan. 27, 2005); *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A plaintiff's unreasonable interpretation of language in a contract does not create an ambiguity. *See Chase Manhattan Bank v. Iridium Afr. Corp.*, 307 F. Supp. 2d 608, 613 (D. Del. 2004) (finding a contract unambiguous because language was not "'reasonably susceptible' to different interpretations"); *see also MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005) ("A contract is not ambiguous merely because the parties disagree about its proper interpretation."); *Rhone-Poulenc*, 616 A.2d at 1196 ("Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends.'" quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983))).

Where one party's interpretation is unreasonable, the Court should accord the language its plain meaning. *See Hallowell v. State Farm Mutual Auto. Ins. Co.*, 443 A.2d 925, 927 (Del. 1982) ("[I]f the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them."). The standard for interpretation is "what a reasonable person in the position of the parties would have thought [the language] meant." *Rhone-Poulenc*, 616 A.2d at 1196.

To support its allegation of fraud and misrepresentation, John Hancock relies heavily on the following statement from the Prospectuses:

> Unless otherwise specified in a Prospectus Supplement, the Debt Securities, when issued, will be unsecured and will rank equally with all other unsecured and unsubordinated indebtedness of the Company.[19]

---

[19] One of two variations of this statement appear in certain of the Prospectuses:

*See, e.g.*, March 13, 1998 Prospectus at A 541. This statement is referred to herein as the "ranks equally" statement.

John Hancock alleges that the "ranks equally" statement is false and misleading because it is a representation that the Bonds would rank equally with all other unsecured debt of Owens Corning <u>and</u> all other unsecured debt of each and every Subsidiary of Owens Corning. This is a blatant misreading of the clause because (i) the fact that the Bonds were to be obligations of Owens Corning alone is apparent from the face of the 1997 Indenture, (ii) in many of the Prospectuses, the very paragraph containing the "ranks equally" statement defines the term "Company" to mean Owens Corning (and not its Subsidiaries), and (iii) the other definition of "Company" appearing in the Prospectuses, which includes both Owens Corning and its Subsidiaries, clearly states that its use in the Prospectuses <u>depends on the context</u>.

First, it is absolutely clear that the Bonds are obligations of Owens Corning only. The 1997 Indenture[20] under which OCD issued the Bonds contains no provisions creating any obligation on the part of the Subsidiaries to do anything with respect to the Bonds.[21]

---

"All notes issued and to be issued under the Indenture will be unsecured obligations of the Company and will rank *pari passu* with all other unsecured and unsubordinated indebtedness of the Company from time to time outstanding."

*See, e.g.*, May 1, 1997 Amendment at A 346.

"The Debt Securities will be unsecured and unsubordinated obligations of Owens Corning and will rank equally with all of our other unsecured and unsubordinated indebtedness."

*See, e.g.*, April 21, 1999 Prospectus at A 717.

[20] The "1997 Indenture" means that certain Indenture, dated as of May 5, 1997, between Owens Corning and the Bank of New York as Trustee.

[21] Wilmington's and John Hancock's own actions in these Chapter 11 Cases demonstrate that the bondholders knew they did not have direct claims against the Subsidiaries. If John Hancock thought it had claims against the Subsidiaries, it would not have

No Subsidiary is a signatory. *See* 1997 Indenture at A 901-91. To adopt as true John Hancock's allegation that the term "Company" in the "rates equally" statement means the Subsidiaries, as well as Owens Corning, would itself lead to a patently false statement – that the Bonds rank equally with the unsecured obligations of the Subsidiaries.[22] Moreover, the statement provides that the Bonds will rank equally with "all other unsecured and unsubordinated indebtedness of the Company." March 13, 1998 Prospectus at A 541 (emphasis added). The plain meaning of the words "other" and "indebtedness" necessarily refer to different debt of the same entity. It simply is not plausible to interpret the sentence to mean that the OCD Bonds will rank equally with "other indebtedness" of an entire group of affiliated entities. In other words, how can the debt of two (or more) distinct legal entities, with separate assets and liabilities, rank equally?

Second, in several of the Prospectuses, the definition of the "Company" as meaning solely OCD (and not its Subsidiaries) resides in the very paragraph that contains the "ranks equally" statement. In that context (and in that paragraph), it is crystal clear that the "ranks equally" statement refers to OCD and OCD alone. The Complaint fails to mention this definition, much less the context in which it is defined.

Finally, John Hancock ignores the fact that the very definition of "Company" on which it relies states that it is not to be used out of context. In other words, the statement in the Prospectuses that define "Company" to mean both Owens Corning and the Subsidiaries includes its own rule of interpretation:

---

vigorously supported substantive consolidation, the effects of which would have included elimination of any direct claims it had against the Subsidiaries, and a sharing of the assets of the Subsidiaries with asbestos claims at OCD that the District Court estimated at $7 billion.

[22] The Third Circuit has found that the Subsidiaries are separate legal entities. *See In re Owens Corning*, 419 F.3d 195.

> Unless the context indicates otherwise, references in this prospectus to the "Company" include Owens Corning and its consolidated subsidiaries.

*See, e.g., id.* at A 545 (emphasis added). For the reasons discussed above -- the inconsistent and factually incorrect implication that the Bonds are obligations of the Subsidiaries and the fact that many of the Prospectuses clearly define "Company" as meaning only Owens Corning in the same paragraph as the "rates equally" statement -- using the broader definition of "Company" cannot be correct in the context of the "rates equally" statement. Indeed, examples abound in the Prospectuses in which indiscriminate substitution of "Owens Corning and its consolidated subsidiaries" in place of "the Company" would lead to a redundant and/or unreasonable reading of the resulting language. For example:

- "'Restricted Subsidiary' will be defined as a Subsidiary of the Company which owns any Principal Property." *Id.* at A 547.

- "'Subsidiary' will be defined as a corporation at least a majority of the outstanding voting stock of which is owned, directly or indirectly, by the Company and/or one or more Subsidiaries of the Company." *Id.*

As these examples demonstrate, context is paramount and John Hancock's allegation that an inapplicable definition created an expectation that the Bonds would rank equally with the debt of the Subsidiaries simply is not reasonable.

### 5. John Hancock Is Overreaching By Asserting Equitable Subordination As A Remedy

Not only does John Hancock fail to allege a sustainable claim for fraud, but the remedy it requests is wholly inappropriate. John Hancock seeks to subordinate all the Named Institutional Defendants' claims to all the bond and Trade Creditor claims at OCD. This use of equitable subordination is fundamentally wrong for two reasons. First, the $300 million of 1992 Debentures was issued five years before Owens Corning

entered into the Credit Agreement.[23] The holders of these pre-Credit Agreement bonds cannot assert an action based on alleged fraud which supposedly occurred long after their decision to purchase them. Similarly, current Bondholders that purchased with full knowledge of the allegations of misrepresentations and material omissions cannot credibly assert that they relied on the Prospectuses. Application here of equitable subordination would result in a windfall to such holders, and would contravene Third Circuit precedent. *Citicorp Venture Capital*, 160 F.3d at 991 ("Inherent in what we have just said is the equitable principle that any subordination should not result in a windfall to those benefited by it based upon injury to others outside the benefited class."); *see also In re 80 Nassau Assoc.*, 169 B.R. at 840 (Bankr. S.D.N.Y. 1994) (noting that equitable subordination "empowers and requires the Bankruptcy Court to tailor the remedy to fit the harm. If the injury or unfair advantage affects only a specific creditor or segment of creditors, the court should subordinate the offending claimant only to the more limited class of claims rather than the claims of all creditors.").

The appropriate remedy for an alleged misrepresentation is not categorical subordination of claims held by defendants that did not engage in the alleged wrongful conduct to the claims held by putative beneficiaries that did not and could not have relied on the alleged misrepresentation. Rather, the appropriate remedy is an action narrowly tailored to address proper plaintiffs and defendants. Here, such an action is not hypothetical -- it already exists. In 2001, John Hancock, on behalf of a class of original purchasers of certain of the public debt that Owens Corning issued in 1998 (and excluding holders that purchased after the commencement of the Debtors' chapter 11 cases), sued Owens Corning's officers and directors and the Underwriters for violations of sections 11 and 12 of the Securities Act of 1933 (the "Massachusetts Action") based

---

[23] The two series of 1992 Debentures consisted of (i) $150 million of 8.875% Debentures due June 1, 2002 and (ii) $150 million of 9.375% Debentures due June 1, 2012.

on the same set of factual allegations it puts forth in this action. John Hancock's recasting of the Massachusetts Action into the instant adversary proceeding captures "plaintiffs" that suffered no harm and "defendants" that were not involved in the Bond offerings, and results in an overly broad application of equitable subordination in violation of Third Circuit precedent.

Second, the very conduct that John Hancock alleges to be false and misleading was a statement that the Bonds (the public debt issued in 1998 and 1999) would be *pari passu* with all other OCD debt. Yet, the remedy John Hancock seeks here would <u>elevate</u> such Bonds over the claims of the Named Institutional Defendants, a result unsupported by any authority. To the contrary, the cases are clear that "the doctrine of equitable subordination 'is remedial and not penal and should only be applied to offset specific harm suffered on account of inequitable conduct.'" *Cohen v. KB Mezzanine Fund (In re Submicron Sys. Corp.*), 432 F.3d 448, 462 (3d Cir. 2006) (citations omitted); *In re Mobile Steel Co.*, 563 F.2d at 701 (holding that equitable subordination is remedial as opposed to penal, and therefore, claims should be subordinated only to the extent necessary to offset the harm that the bankrupt and its creditors suffered on account of the inequitable conduct); *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 72 ("Equitable subordination is remedial not penal.").

**B.     Federal Rule 12(b)(6) Requires That The
         Veil-Piercing Counts In The Complaint Be Dismissed**

In order to survive a motion to dismiss under Federal Rule 12(b)(6), John Hancock must plead facts to support its corporate veil-piercing claims. However, each of the key allegations necessary to support this theory has been determined conclusively by the Third Circuit to be false. As a matter of law, John Hancock's veil-piercing counts are barred by res judicata and collateral estoppel and should be dismissed under Federal Rule 12(b)(6). *See Shellenberger v. United Parcel Serv.*, No. Civ.A. 05-2266, 2006 WL 208683, at *3 (E.D. Pa. Jan. 25, 2006) ("Defendants' Motion to Dismiss will be granted

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because Plaintiff's claims are barred by res judicata or claim preclusion."); *Diversified Health Assocs., Inc. v. Norristown*, No. Civ.A. 00-5702, 2001 WL 632912, at *3 (E.D. Pa. June 5, 2001); *see also McCarter v. Mitcham*, 883 F.2d 196 (3d Cir. 1989) (affirming a dismissal of plaintiffs' claims based on part on the fact that such claims were barred by res judicata); *Herbert v. Reinstein*, 976 F. Supp. 331, 341 (E.D. Pa. 1997) ("[F]or the purposes of Rule 12(b)(6), it appears to a certainty that the . . . doctrines of *res judicata* and collateral estoppel . . . do not permit [plaintiff] to recover on any of claims [sic] in his Amended Complaint. Therefore, the Court grants defendants' motion . . . for dismissal pursuant to Rule 12(b)(6)."), *aff'd*, 162 F.3d 1151 (3d Cir. 1998); *Rider v. Pennsylvania*, 850 F.2d 982 (3d Cir. 1988) (affirming a dismissal of plaintiffs' claim pursuant to Federal Rule 12(b)(6) on the ground that it was barred by res judicata).

### 1. The Veil-Piercing Counts In John Hancock's Complaint Are Barred By Res Judicata

The doctrine of res judicata, also known as claim preclusion, provides that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 398 (1981) (citations omitted); *see also CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 191 (3d Cir. 1999) ("Claim preclusion bars a party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another claim based on the same cause of action."); *Bd. of Trs. of Trucking Employees of North Jersey Welfare Fund, Inc.-Pension Fund Centra v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) (noting that claim preclusion "gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding"); *Trans World Airlines, Inc. v. Hughes*, 317 A.2d 114, 118-19 (Del. Ch. 1974) (noting that preclusion extends to all grounds for and defenses to recovery that

were available to parties, regardless of whether they were asserted or determined in a prior proceeding).

In evaluating whether a later-asserted claim is barred by res judicata, the Court must determine whether (i) there was a final judgment on the merits; (ii) the parties or their privies were involved in both proceedings; and (iii) both claims are based on the same cause of action so that the claim should have or could have been litigated in the previous case. *See CoreStates Bank, N.A.*, 176 F.3d at 194.

Res judicata avoids the "expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Equal Employment Opportunity Comm'n v. U.S. Steel Corp.*, 921 F.2d 489, 492 (3d Cir. 1990) (quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979)); *see also Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 157-58 (3d Cir. 2001) ("Res judicata or claim preclusion is designed to avoid piecemeal litigation of claims arising from the same event.").

### a. The Third Circuit's Substantive Consolidation Decision Is A Final Judgment On The Merits

Courts generally hold that a judgment is final for res judicata purposes notwithstanding the pendency of an appeal of such judgment. *See Maldonado v. Flynn*, 417 A.2d 378, 384 (Del. Ch. 1980) (noting that the "better view" is that judgments on appeal are final for res judicata purposes); *see also Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 147 (3d Cir. 2001) (applying New York law and holding that New York law does not prohibit the application of collateral estoppel during the pendency of appellate proceedings). Indeed, if judgments on appeal were not considered to be final for res judicata purposes, "the incentive would be for the losing party in one suit to simultaneously appeal and file suit in another jurisdiction hoping for an inconsistent judgment." *Playtex Family Prods., Inc. v. St. Paul Surplus Lines Ins. Co.*,

564 A.2d 681, 683 n.2 (Del. Super. Ct. 1989) (citation omitted). Therefore, the Third

Circuit's Substantive Consolidation Decision is a final judgment on the merits.

> **b.** **Each Of The Defendants And John Hancock Was
> A Party To The Substantive Consolidation Litigation**

Res judicata applies where, among other things, the parties in the prior litigation

are the same parties to the current litigation. *See Parklane Hosiery Co. v. Shore*, 439

U.S. 322, 326 n.5 (1979) ("Under the doctrine of res judicata, a judgment on the merits in

a prior suit bars a second suit involving the same parties or their privies based on the

same cause of action."); *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir.

1984). In the context of chapter 11, the "same parties" requirement of res judicata is

construed broadly to include all parties to the chapter 11 case. *See CoreStates, N.A.*, 176

F.3d at 195 (noting that a bankruptcy case is fundamentally different from the typical

civil action and concluding that claim preclusion should apply . . . between all parties to a

bankruptcy case"); *In re Genesis Health Ventures, Inc.*, 324 B.R. 510 (Bankr. D. Del.

2005) (finding the "same parties" element of res judicata satisfied where all of the

plaintiffs in a subsequent action were creditors in the bankruptcy case and the defendants

were the debtors' lead senior lenders).

OCD and each of its Subsidiaries was a party to the litigation surrounding the

Substantive Consolidation Motion (the "Substantive Consolidation Litigation") and, in

fact, they commenced and prosecuted such litigation. Likewise, John Hancock

participated fully in the Substantive Consolidation Litigation. John Hancock took part in

the extensive discovery process, filed multiple briefs in support of the Substantive

Consolidation Motion, examined and cross-examined witnesses, introduced documents

into evidence, and argued at numerous hearings regarding substantive consolidation,

including the hearing before the Third Circuit. Credit Suisse, as Agent, was a party to the

Substantive Consolidation Litigation, and indeed, was the primary opponent of the

Substantive Consolidation Motion.

c. **The Same Cause Of Action**
**Was Or Could Have Been Litigated**

Res judicata bars a subsequent litigation if the claims arise from the "same transaction" or "common nucleus of operative fact[s]" as a prior litigation. *Maldonado*, 417 A.2d at 381-83; *see also Schell v. Porta Sys. Corp.*, CA No. 12,498, 1994 Del. Ch. LEXIS 47, at *11 (Del. Ch. 1994) (noting that "transaction" refers to a "common nucleus of operative facts"). A court must focus on the underlying transaction and not on the substantive legal theories or types of relief which are sought. *Maldonado*, 417 A.2d at 381.

The Third Circuit in *Eastern Minerals & Chemical Co. v. Mahan* explained that res judicata applies if:

> the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.

225 F.3d 330, 337-38 (3d Cir. 2000); *see also In re Genesis Health Ventures, Inc.*, 324 B.R. at 522-23 (finding the factual underpinnings of a complaint alleging undervaluation of the debtors' enterprise were so close to the claim actually litigated at the confirmation hearing that it "would be unreasonable not to have brought them both at the same time in the bankruptcy forum"). Substantive consolidation and veil piercing are very similar remedies. Here, John Hancock's request to pierce the corporate veils of the Non-Debtor Guarantors is based on the same facts as the Substantive Consolidation Motion it previously litigated, and both remedies seek essentially the same result -- enhancing John Hancock's recovery by providing it with access to the assets of affiliated corporate entities.

The Substantive Consolidation Motion (and John Hancock's pleadings in support thereof) was based on the factual allegations set forth in the extensive record before the

District Court. The proponents of the Substantive Consolidation Motion relied on the evidentiary record of that proceeding in their attempt to demonstrate that OCD dominated the affairs, and disregarded the corporate form, of the Subsidiaries. John Hancock alleges the same operative facts in its veil-piercing claims.[24] In fact, John Hancock's brief in support of the Substantive Consolidation Motion at the Third Circuit argued that the evidence before the District Court would satisfy "the stringent standards for veil piercing..." Hancock Circuit Brief at 4.

Here, it is so clear that the factual underpinnings, theory of the case, and result sought in the Substantive Consolidation Motion are the same as those in the underlying veil-piercing counts in the instant Complaint, that John Hancock could do nothing but concede this point. Specifically, in several of its recent pleadings John Hancock has stated:

- "[T]he Subordination Adversary Action and the Bank Adversary Action (collectively, the "Adversary Actions") both pertain to the same facts and circumstances, and also most of the same evidentiary record, which surrounded the substantive consolidation dispute. Further, the goal of the Adversary Actions is to achieve the same result -- by means of different, yet conventional and long standing legal theories -- that would have obtained had the Third Circuit sustained this Court's substantive consolidation ruling." Equitable Subordination Withdrawal Motion at 3 (Equit. Sub. D.I. No. 8).

- "Virtually all of the facts supporting the Official Representatives' veil piercing claims already have been developed during this Court's hearing on the Substantive Consolidation Motion." *Id.* at 12.

---

[24] John Hancock offers <u>over 100 paragraphs</u> of factual allegations about IPM, OCFT, Integrex, and Exterior. *See* Complaint at ¶¶ 48-149. Based on these allegations (and only these allegations) John Hancock concludes that IPM, OC Sweden, and Vytec are alter-egos of OCD. The Complaint contains <u>no</u> factual allegations that either OC Sweden or Vytec is an alter-ego of OCD. Without any allegations whatsoever regarding OC Sweden and Vytec, John Hancock falls woefully short of the burden of pleading a cause of action to pierce the corporate veil of those two subsidiaries.

- "[M]ost of the facts needed to support the claims asserted in the Adversary Actions already have been developed in the evidentiary record that was before the District Court when it considered the substantive consolidation motion. The goal of the Adversary Actions is to achieve essentially the same result -- by means of different, yet conventional and long recognized legal theories -- that would have obtained had the Third Circuit sustained the District Court's substantive consolidation ruling." Report of John Hancock Regarding Recent Activities, dated February 17, 2006, at 5 (Bankr. D.I. No. 16980).

Apparently anticipating the assertion of res judicata principles, John Hancock attempts to explain its failure to assert its veil-piercing claims in conjunction with the Substantive Consolidation Litigation as follows: "Since substantive consolidation also would have mooted the equitable subordination and veil piercing claims asserted in [the Complaint], it would not have made any sense for the Official Representatives to bring those claims any earlier than they did -- shortly after the Third Circuit's substantive consolidation ruling." *See* Memorandum of Law of the Official Representatives of the Bondholders and Trade Creditors in Reply to Debtors' and Banks' Opposition to Motion to Withdraw Reference of Subordination Adversary Action (No. 06-50122 (JKF)) From the Bankruptcy Court, dated February 28, 2006 at 9 (Equit. Sub. D.I. No. 25). In other words, John Hancock pursued what it believed was its best chance to pool the assets and liabilities of OCD and its Subsidiaries (i.e., substantive consolidation) and, when that failed, it commenced what it now believes is its next best chance to achieve the same result (i.e., veil piercing). This piecemeal litigation arising from the same nucleus of operative facts is precisely what res judicata prohibits. *See Gen. Elec. Co.*, 270 F.3d at 157-58 ("[R]es judicata or claim preclusion is designed to avoid piecemeal litigation of claims arising from the same event.").

### 2. Collateral Estoppel Principles Preclude John Hancock From Relitigating The Same Issues Decided During The Substantive Consolidation Litigation

Collateral estoppel proscribes relitigation where, as here: (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the

party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question. *Bd. of Trs. of Trucking Employees Welfare Fund,* 983 F.2d at 505. It is well-settled that "once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (citation omitted).[25] All four elements are fully satisfied here.

**a.**     **The Issue of Whether The Non-Debtor Guarantors Are Alter Egos Of OCD Has Already Been <u>Litigated Before And Decided By The Third Circuit</u>**

In the Substantive Consolidation Litigation, John Hancock asserted a litany of factual allegations to support the conclusion that the Subsidiaries were alter egos of OCD.[26] Based on this conclusion, John Hancock argued that substantive consolidation was appropriate. The Third Circuit considered these factual allegations, and specifically found that the allegations were false and determined that the Subsidiaries are not alter egos of OCD.

In blatant disregard of the Substantive Consolidation Decision, John Hancock now restates the same factual allegations to support the same conclusion that the Non-Debtor Guarantors are mere alter egos of OCD.[27] This time, however, instead of using

---

[25] *See also* 1B Moore's Federal Practice § 0.443[2] ("Any contention that is necessarily inconsistent with a prior adjudication of a material and litigated issue . . . is subsumed in that issue and precluded by the effect of the prior judgment as collateral estoppel.").

[26] As noted in footnote 24 *supra*, there are no factual allegations in the Complaint regarding OC Sweden or Vytec. Nevertheless, every Subsidiary's status as an alter ego (i) arises from the same operative facts relied upon in the Substantive Consolidation Litigation and (ii) has been rejected by the Third Circuit. Under the doctrines of res judicata and collateral estoppel, John Hancock is now barred from arguing that either OC Sweden or Vytec is an alter ego of OCD.

[27] With respect to IPM, OC Sweden, and Vytec, domination is all John Hancock is able to allege in its pleading. *See* Complaint at ¶¶ 63-86. As discussed in Section III.B. *supra*, this allegation has already been rejected by the Third Circuit. *See In re Owens Corning,*

the alter ego conclusion to support the remedy of substantive consolidation, John

Hancock asserts that its remedy should be the piercing of the corporate veils of the Non-

Debtor Guarantors. For example, in the Complaint, John Hancock asserts that IPM was a

mere alter ego of OCD possessing no independent business purpose and that funds IPM

received as dividends from its foreign subsidiaries were immediately "loaned" to OCD.

*See* Complaint at ¶ 87. This allegation was specifically rejected by the Third Circuit,

which held

> [e]ach subsidiary was a separate legal entity that had a specific reason to exist
> separately. . . . IPM was incorporated as a passive Delaware investment holding
> company by OCD to consolidate the investments of its foreign subsidiaries. IPM
> shielded the foreign subsidiaries' investment from OCD liability and likewise
> shielded OCD from the liability of the foreign subsidiaries. OCD paid interest on
> the revolving loan between it and IPM. IPM entered into agreements with parties
> unaffiliated with the OCD group and operated as an autonomous entity. IPM
> even had its own company logo and trade name.

*In re Owens Corning,* 419 F.3d at 200 n.3. The chart annexed hereto as Exhibit A

matches each of John Hancock's allegations in this suit regarding the Non-Debtor

Guarantors to the specific determinations made by the Third Circuit rejecting such

allegations in the Substantive Consolidation Decision.

The Third Circuit previously held that OCD's Subsidiaries are <u>not</u> alter egos of

OCD. This premise underlying John Hancock's corporate veil-piercing counts cannot be

relitigated here.

---

419 F.3d at 200. Therefore, even if John Hancock could demonstrate inequitable conduct
by OCD (which it cannot), there is no factual or legal basis to impute that conduct to
IPM, OC Sweden, or Vytec. The *All Products* court noted that domination of a
subsidiary by a parent standing alone is not enough to invoke equitable subordination.
*See In re All Prod. Co.*, 32 B.R. 811, 816 (Bankr. E.D. Mich. 1983). The fraud counts in
the Complaint should be dismissed against the Non-Debtor Guarantors.

### b. The Substantive Consolidation
#### Decision Is A Final Judgment On The Merits

For the same reasons discussed in Section III.B.1.a above, the Substantive Consolidation Decision is a final judgment on the merits.

### c. John Hancock Was Party To
#### The Substantive Consolidation Litigation

For the reasons set forth in Section III.B.1.b above, this element is satisfied as well.

### d. John Hancock Had A Full And
#### Fair Opportunity To Demonstrate That
#### The Subsidiaries Are Alter Egos of OCD

Whether a party has had a "full and fair opportunity" to litigate an issue depends on whether the party was denied procedural, substantive, or evidentiary opportunities to be heard on the issue in the first action. *See Anthan v. Prof'l Air Traffic Controllers Org.*, 672 F.2d 706, 710 (8th Cir. 1982); *see also United States v. Karlen*, 645 F.2d 635, 640 (8th Cir. 1981) (finding an adequate opportunity to litigate the same issue in the first case where (i) the party was represented by counsel who presented documentary evidence and (ii) damages gave the party a strong incentive to litigate); *Oldham v. Pritchett*, 599 F.2d 274, 279-80 (8th Cir. 1979) (concluding plaintiff enjoyed a full and fair opportunity to be heard on negligence issue in the first proceeding where plaintiff was not procedurally restricted from asserting claims and separate causes of actions against the various parties, but failed to introduce evidence relating to negligence defenses).

John Hancock was an active participant at every step of the Substantive Consolidation Litigation. John Hancock was (and still is) represented by sophisticated counsel with bankruptcy-litigation experience. John Hancock filed numerous pleadings in connection with the Substantive Consolidation Litigation, participated fully in the discovery process and appeared at numerous hearings in connection with the Substantive Consolidation Litigation, including both at the District Court and Third Circuit. Far from

having been denied any procedural, substantive, or evidentiary opportunities to be heard in connection with the Substantive Consolidation Litigation, John Hancock essentially co-prosecuted the Substantive Consolidation Litigation with the Debtors.

## IV. **CONCLUSION**

For the foregoing reasons, Movants request an order dismissing the Complaint, together with such other and further relief as this Court deems just and proper.

Dated: Wilmington, Delaware
March 21, 2006

WEIL, GOTSHAL & MANGES LLP
Michael F. Walsh
Judy G.Z. Liu
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Ellen R. Nadler
Jeffrey S. Trachtman
919 Third Avenue
New York, NY 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

ATTORNEYS FOR MOVANTS

LANDIS RATH & COBB LLP

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450