IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>  OWENS CORNING, et al.,<br><br>  Debtors. | Chapter 11<br>Case No. 00-03837 (JKF)<br>(Jointly Administered) |
| THE OFFICIAL REPRESENTATIVES OF THE BONDHOLDERS AND TRADE CREDITORS OF DEBTORS OWENS CORNING, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>CREDIT SUISSE FIRST BOSTON, individually and in its capacity as Agent, *et al.*<br><br>  Bank Defendants. | Adv. Pro. No. 06-50122 (JKF)<br><br><br>**Related to Doc. Nos. 35-37, 39, 42, 43, and 61** |

**OFFICIAL REPRESENTATIVES' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS OF (i) AFFILIATE NON-DEBTOR DEFENDANTS, JOINED BY OWENS CORNING, TO DISMISS OR, ALTERNATIVELY, STAY OFFICIAL REPRESENTATIVES' COMPLAINT FOR EQUITABLE SUBORDINATION AND PIERCING THE CORPORATE VEIL; AND (ii) CERTAIN BANK DEFENDANTS TO DISMISS OFFICIAL REPRESENTATIVES' COMPLAINT FOR EQUITABLE SUBORDINATION AND PIERCING THE CORPORATE VEIL**

Dated: April 17, 2006

**MONZACK & MONACO, P.A.**

By:  Francis A. Monaco, Jr.
1201 Orange Street, Suite 400
Wilmington, DE 19811
Telephone: 302-656-8162
Fax: 302-656-2769

**ANDERSON KILL & OLICK, P.C.**

By:  J. Andrew Rahl, Jr.
John B. Berringer
Howard D. Ressler
Mark Weldon
Dennis J. Artese
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-278-1000
Fax: 212-278-1233

Counsel for the Official Representatives of the
Bondholders and Trade Creditors of Debtors Owens Corning, *et al.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

I.  THE EQUITABLE SUBORDINATION CLAIMS ARE PROPERLY
    PLEADED AND THUS SHOULD NOT BE DISMISSED ............................................. 5

    A.  Plaintiffs Have Pleaded "Inequitable Conduct" With The Requisite
        Particularity Under The Lenient Standard Applicable Here ................................... 5

    B.  Plaintiffs Are Not Required To Identify Each Bondholder And
        Trade Creditor Who Relied On Defendants' Misrepresentations In
        The Prospectuses And Were Harmed Thereby ...................................................... 8

    C.  The Complaint Sufficiently Alleges Justifiable Reliance ..................................... 12

    D.  The Complaint Alleges That The Affiliate Non-Debtors And Banks
        Made Material Misrepresentations or Omissions ................................................. 17

    E.  Each Current Bank Debt Holders' Claims Can And Should Be
        Equitably Subordinated ........................................................................................ 18

    F.  The Complaint States A Claim For Equitable Subordination Of The
        Affiliate Non-Debtors' Claims To The Claims Of The Bonds/Trade ................. 22

    G.  Plaintiffs' Claim For Equitable Subordination Of The Affiliate Non-
        Debtors' Claims Is Ripe ....................................................................................... 23

    H.  Plaintiffs Have Standing To Subordinate The Banks' Claims
        Against The Subsidiary Guarantors To Those Of OCD ...................................... 24

II. THE VEIL PIERCING AND EQUITABLE SUBORDINATION CLAIMS
    ARE NOT SUBJECT TO *RES JUDICATA* OR COLLATERAL
    ESTOPPEL .................................................................................................................. 25

    A.  The Veil Piercing And Equitable Subordination Claims Are Not
        Subject To *Res Judicata* .................................................................................... 27

    B.  The Veil Piercing And Equitable Subordination Claims Are Not
        Subject To Collateral Estoppel ............................................................................ 33

III.   THE CLAIMS ASSERTED IN THE EQUITABLE SUBORDINATION
       ACTION MUST PROCEED AS A SEPARATE ADVERSARY
       PROCEEDING THAT SHOULD BE FULLY ADJUDICATED ON ITS
       MERITS AND SHOULD NOT BE CONSOLIDATED INTO
       CONFIRMATION HEARINGS...........................................................................................35

CONCLUSION..................................................................................................................................38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*80 Nassau Assocs. v. Crossland Federal Sav. Bank (In re 80 Nassau Associates)*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) .................................................................................... 9

*In re APF Co.*,
274 B.R. 634 (Bankr. D. Del. 2001) ....................................................................................... 8

*In re Beard*,
112 B.R. 951 (Bankr. N.D. Ind. 1990) ................................................................................ 37

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*,
85 F.3d 970 (2d Cir. 1996) ................................................................................................... 12

*Brody v. Stone & Webster, Inc., (In re Stone & Webster, Inc.)*,
414 F.3d 187 (1st Cir. 2005) ................................................................................................ 14

*Brown v. General Electric Capital Corp. (In re Foxmeyer Corp.)*,
290 B.R. 229 (Bankr. D. Del. 2003) .................................................................................... 29

*Brown v. N. Central F.S., Inc.*,
173 F.R.D. 658 (N.D. Iowa 1997) ............................................................................ 9, 10, 11

*Burden v. U.S.*,
917 F.2d 115 (3d Cir. 1990) ................................................................................................... 8

*Coffin v. Malvern Federal Sav. Bank*,
90 F.3d 851 (3d Cir. 1996) ................................................................................................... 35

*In re Cooper*,
147 B.R. 678 (Bankr. D.N.J. 1992) ..................................................................................... 30

*Eastern Minerals & Chemicals Co. v. Mahan*,
225 F.3d 330 (3d Cir. 2000) ........................................................................................... 27, 31

*Enron Corp. v. Bear, Stearns, & Co., (In re Enron Corp.)*, Adv. No. 05-01105,
2005 WL 3832053 (Bankr. S.D.N.Y. Nov. 28, 2005) ........................................................ 20

*In re Enron Corp. Sec. Deriv. & "ERISA" Litig., Civ.A.H-01-3624, Civ.A.H-01-3645,
Civ.A.H-03-862*, 2005 WL 2230169 (S.D. Tex. Sept. 12, 2005) ...................................... 25

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) .............................................................................................................. 13

*Federal Deposit Insurance Corp. v. Colonial Realty Co.,*
966 F.2d 57 (2d Cir. 1992) .................................................................................. 29

*In re Gluckin Co., Ltd.,*
457 F. Supp. 379 (S.D.N.Y.1978) ........................................................................ 29

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.,*
530 U.S. 1 (2000) ................................................................................................. 24

*Hayes v. Gross,*
982 F.2d 104 (3d Cir. 1992) ................................................................................ 11

*Holloway v. Monaco Coach Corp., No. Civ.A. 03-095-SLR,*
2003 WL 21146720 (D. Del. May 14, 2003) ........................................................ 5

*In re Huntco Inc.,*
302 B.R. 35 (Bankr. E.D. Mo. 2003) ................................................................... 29

*In re Indri,*
126 B.R. 443 (Bankr. D.N.J. 1991) ...................................................................... 38

*Irby v. Mr. Money Finance Co. (In re Irby),*
321 B.R. 468 (Bankr. N.D. Ohio 2005) ............................................................... 36

*Joubert v. ABN AMRO Mortgage Group, Inc. (In re Joubert),*
411 F.3d 452 (3d Cir. 2005) ................................................................................ 36

*Kroh Brothers Development Co. v. Kroh Brothers Management Co. (In re Kroh Brothers Development Co.),*
117 B.R. 499 (W.D. Mo. 1989) ........................................................................... 29

*Mass v. Bell Atlantic Tricon Leasing Corp. (In re Mass),*
178 B.R. 626 (M.D. Pa. 1995) ............................................................................. 29

*In re McKay,*
732 F.2d 44 (3d Cir. 1984) .................................................................................. 37

*In re Mid-American Waste System, Inc.,*
284 B.R. 53 (Bankr. D. Del. 2002) .............................................................. 6, 8, 9

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),*
247 B.R. 51 (Bankr. S.D.N.Y. 1999) ................................................................... 21

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.),*
 277 B.R. 520 (Bankr. S.D.N.Y. 2002) (citation omitted) ........................................... 19-22

*Mobil Oil Corp. v. Linear Films, Inc.,*
 718 F. Supp. 260 (D. Del. 1989) ..................................................................................... 29

*In re Momentum Manufacturing Corp.,*
 25 F.3d 1132 (2d Cir.1994)............................................................................................. 36

*Morse v. Lower Merion Sch. District,*
 132 F.3d 902 (3d Cir. 1997).............................................................................................. 5

*Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),*
 Nos. 01-30135, 01-3065, 2001 WL 1598178 (Bankr. D.N.J. April 6, 2001) ................... 30

*Official Committee of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.),*
 326 B.R. 301 (Bankr. D. Del. 2005) ................................................................................. 6

*Official Committee of Unsecured Creditors v. Young's Medical Equip., Inc. (In re Coram Resources Network, Inc.),*
 305 B.R. 386 (Bankr. D. Del. 2004) ............................................................................. 5, 21

*In re OODC, LLC,*
 321 B.R. 128 (Bankr. D. Del. 2005) ................................................................................. 8

*Oran v. Stafford,*
 226 F.3d 275 (3d Cir. 2000)............................................................................................. 17

*In re Owens Corning,*
 419 F.3d 195 (3d Cir. 2005)........................................................................................ passim

*Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.),*
 280 B.R. 573 (Bankr. D. Del. 2002) ................................................................................ 37

*Pepper v. Litton,*
 308 U.S. 295 (1939) ......................................................................................................... 8

*Pic, Inc. v. Prescon Corp.,*
 485 F. Supp. 1302 (D. Del. 1980) .................................................................................... 26

*In re Rath Packing Co.,*
 38 B.R. 552 (Bankr. N.D. Iowa 1984) ......................................................................... 23, 24

*Reider v. Federal Deposit Insurance Corp. (In re Reider),*
   31 F.3d 1102 (11th Cir. 1994) ........................................................................... 29

*Securities Investor Prot. Corp. v. Stratton Oakmont,*
   234 B.R. 293 (Bankr. S.D.N.Y. 1999) ............................................................ 34

*Shaw v. Digital Equip. Corp.,*
   82 F.3d 1194 (1st Cir. 1996) ..................................................................... 14, 16

*In re Submicron Systems Corp.,*
   432 F.3d 448 (3d Cir. 2006) ............................................................................... 6

*Sunrise Energy Co. v. Maxus Gas Marketing (In re Sunpacific Energy Management, Inc.),*
   216 B.R. 776 (Bankr. N.D. Tex. 1997) ........................................................... 37

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,*
   140 F.3d 478 (3d Cir. 1998) ............................................................................... 5

*White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.),*
   195 B.R. 680 (Bankr. S.D. Ohio 1996) ........................................................... 30

*Wolstein v. Docteroff (In re Dockteroff),*
   133 F.3d 210 (3d Cir. 1997) ............................................................................. 34

**STATE CASES**

*Albert v. Alex. Brown Management Serv., Inc., Nos. Civ A 762-N, Civ. A 763-N,*
   2005 WL 2130607 (Del. Ch. Aug. 26, 2005) .................................................. 25

*Gatz v. Ponsoldt, No. Civ.A. 174- N,*
   2004 WL 3029868 (Del. Ch. Nov. 5, 2004) ................................................ 24-25

*Geyer v. Ingersoll Publ'ns Co.,*
   621 A.2d 784 (Del. Ch. 1992) .................................................................... 28, 34

*Mabon, Nugent & Co. v. Texas American Energy Corp., Civ. A. No. 8578,*
   1990 WL 44267 (Del. Ch. Apr. 12, 1990) ................................................. 28, 34

*Tooley v. Donaldson, Lufkin, Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) .......................................................................... 24, 25

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) ............................................................................................ 29

## STATUTES

11 U.S.C. §105(a) .................................................................................................................... 26

11 U.S.C. §502(a) .................................................................................................................... 23

11 U.S.C. § 510(c)(1) ............................................................................................................... 6

15 U.S.C. §§ 78aaa ................................................................................................................. 21

17 C.F.R. § 229.200 ................................................................................................................ 16

17 C.F.R. Section 229.202 .............................................................................................. 14, 15, 16

17 C.F.R. § 229.300 ................................................................................................................ 16

17 C.F.R. § 230.41(a) .............................................................................................................. 15

17 C.F.R. § 230.408 ................................................................................................................ 15

17 C.F.R. § 230.411 ........................................................................................................ 15, 16, 17

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 5

Plaintiffs the Official Representatives ("Plaintiffs" or the "Official Representatives") of the bondholder and trade creditor constituencies (the "Bonds/Trade") of debtors Owens Corning Corporation ("Owens Corning" or "OCD") and certain of its subsidiaries (collectively, the "Debtors") respectfully submit this Memorandum of Law in Opposition to the Motions of (i) Affiliate Non-Debtor Defendants ("Affiliate Non-Debtors"), Joined By Owens Corning, To Dismiss Or, Alternatively, Stay Official Representatives' Complaint For Equitable Subordination And Piercing The Corporate Veil; and (ii) Certain Bank Defendants (the "Banks")[1] To Dismiss Official Representatives' Complaint For Equitable Subordination And Piercing The Corporate Veil.

## PRELIMINARY STATEMENT

This adversary proceeding seeks to equitably subordinate the bankruptcy claims of the Affiliate Non-Debtors and Banks (the "Equitable Subordination Claims"), and also seeks to "reverse" pierce the corporate veils of the Affiliate Non-Debtors in order to hold them liable for the debts of their parent company, OCD (the "Veil Piercing Claims").

As alleged in the Complaint, the Equitable Subordination Claims arise out of the inequitable conduct of the Affiliate Non-Debtors and Banks (collectively, "Defendants") in connection with the sale of certain OCD debt securities from April 1998 through March 1999 totaling $1.2 billion (the "Bonds").[2] Specifically, Defendants stated in the Prospectuses[3] in

---

[1] The Banks which have moved to dismiss the complaint in this adversary proceeding (the "Complaint") are listed on "Schedule 1" to their motion. This opposition also applies to any Bank Defendants who have or may join in the Banks' motion to dismiss, including Sumitomo Trust and Banking, who joined in the Banks' motion on April 13, 2006 (D.I. 61).

[2] The Banks mistakenly contend that Plaintiffs' claims relate in part to OCD's 1992 bond offering. *See* Memorandum Of Law In Support Of Motion Of Credit Suisse, Individually And As Agent, And Certain Named Institutional Defendants To Dismiss Complaint Of Official Representatives Of Owens Corning Bondholder And Trade Creditor Constituencies For Equitable Subordination And Piercing Of The Corporate Veil, dated March 21, 2006 ("Banks' Br.") at 16. That is not the case.

[3] "Prospectuses" collectively refers the "Shelf" Registration Statement and various prospectus supplements and amendments referenced in the Complaint at paragraphs 155 through 167.

connection with the sale of the Bonds that OCD's Bond debt (the "Bond Debt") "will be unsecured and unsubordinated" and "will *rank equally with all other unsecured and unsubordinated indebtedness of the Company*." "Company" was defined in the Prospectuses to include OCD and its consolidated subsidiaries, including the Affiliate Non-Debtors, unless the context indicated otherwise. Based on these representations, investors reasonably understood that, should OCD suffer any financial difficulties, the assets of the OCD enterprise would be equally available to the holders of the Bond Debt (the "Bondholders") and the holders of any of OCD's other unsubordinated indebtedness.

Unbeknownst to the investing public, however, the Banks now claim that the Bonds were not "unsubordinated" and did not "rank equally" with OCD's other unsubordinated debt either at the time they were sold or today. In truth, in June 1997, less than a year before most of the Prospectuses were filed with the SEC, several "significant" subsidiaries of OCD, including the Affiliate Non-Debtors, guaranteed OCD's obligations under a $1.8 billion credit agreement (the "Credit Facility") with the Banks. These subsidiary guarantees (the "Guarantees") have permitted the Banks to assert direct claims against the OCD subsidiary guarantors (the "Subsidiary Guarantors") in these bankruptcy cases while the Bonds/Trade are relegated to a fractional recovery from the assets of OCD.[4] Accordingly, because the Banks now assert that they bargained for "structural seniority" when they secured the Guarantees, the statements in the Prospectuses that the Bond Debt was "unsubordinated" and would "rank equally with other unsecured and unsubordinated obligations of the Company," were untrue at the time they were made and were materially false and misleading.

---

[4] Plaintiffs argued in the substantive consolidation hearing, and continue to assert, that the Banks did not bargain for "structural seniority" when they sought the Guarantees. In their opposition to substantive consolidation, the Banks asserted that they indeed bargained for "structural seniority." In light of the Third Circuit's decision, this is now "law of the case," and Plaintiffs' Complaint was drafted accordingly.

Eleven of the Banks and/or their affiliates acted as statutory underwriters for OCD's 1998 and 1999 Bond offerings (the "Bond Offerings"). Credit Suisse First Boston ("CSFB"), which was and still is the Agent for the participating banks in the Credit Facility, also was the lead underwriter for the Bond Offerings, and at least two CSFB officers were deeply involved in both the negotiation and creation of the Credit Facility *and* the underwriting of the Bonds. These Banks and the Affiliate Non-Debtors had knowledge of the undisclosed Guarantees and the purported "structural seniority" they conferred upon the Banks, but failed to disclose them or their financial import to the Bonds/Trade. Moreover, either directly themselves or through their agents who underwrote the Bond Offerings (the "Underwriters"),[5] the Banks -- who now assert that they are structurally senior to the Bonds/Trade on account of the Guarantees -- intentionally misrepresented that the Bond Debt would "rank equally" with OCD's indebtedness under the Credit Facility (the "Bank Debt").

Aside from their role as Underwriters, the Banks had a powerful incentive for ensuring the success of the Bond Offerings. In fact, the primary purpose of underwriting the Bond Offerings was to generate funds to pay down the Bank Debt, and the Bond Offerings underwriting generated more than $500 million which did just that.

These circumstances, all of which are pleaded in the Complaint, properly state a cause of action for equitable subordination. Defendants' arguments to the contrary are misplaced because:

---

[5]     The Underwriters include: BankAmerica Robertson Stephens; Barclays Capital Inc.; BNY Capital Markets, Inc.; Citicorp Securities Inc.; Chase Securities, Inc.; Credit Suisse First Boston; Credit Suisse First Boston Corp.; Dillon Read & Co. Inc.; First Chicago Capital Markets, Inc.; Goldman, Sachs & Co.; J.P. Morgan & Co.; J.P. Morgan Securities, Inc.; Merrill Lynch & Co.; Merrill Lynch, Pierce Fenner & Smith, Inc.; NationsBanc Montgomery Securities, LLC; RBC Dominion Securities Corp.; Scotia Capital Markets (USA) Inc.; Scotia Capital Markets; and SG Cowen.

- Plaintiffs are not required to identify each Bondholder and Trade Creditor who relied on Defendants' misrepresentations and were harmed thereby;

- The Complaint sufficiently alleges justifiable reliance and that Defendants made material misrepresentations or omissions;

- Each current Bank Debt holders' claims can and should be equitably subordinated;

- The Complaint more than adequately states and supports a claim for equitable subordination of the Affiliate Non-Debtors' claims to the claims of the Bonds/Trade;

- Plaintiffs' claim for equitable subordination of the Affiliate Non-Debtors' bankruptcy claims is ripe; and

- Plaintiffs have standing to subordinate the Banks' claims against the Subsidiary Guarantors to those of OCD.

Plaintiffs' Veil Piercing Claims allege that the Affiliate Non-Debtors were sham affiliates that were so dominated by OCD as to be mere alter egos of OCD and that OCD's corporate structure resulted in a fraud. Defendants do not challenge the sufficiency of Plaintiffs' veil piercing allegations. Rather, they assert that a finding of alter ego liability is precluded here under the doctrines of *res judicata* and collateral estoppel. Because, among other things, the issues of veil piercing and equitable subordination were neither litigated nor determined by the Third Circuit, and because the Third Circuit's observations on corporate separateness were not essential to its substantive consolidation decision, Defendants' *res judicata* and collateral estoppel defenses fail.

Finally, consolidation of these substantial adversary claims into confirmation hearings on the Debtors' Fifth Amended Joint Plan of Reorganization (the "Fifth Amended Plan") would contravene other provisions of the Bankruptcy Code and established law and thus is impermissible.

## STATEMENT OF FACTS

The facts relevant to a determination of these motions to dismiss are stated in the Complaint and are incorporated fully herein.

## LEGAL STANDARD

In analyzing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Official Comm. of Unsecured Creditors v. Young's Med. Equip., Inc. (In re Coram Res. Network, Inc.)*, 305 B.R. 386, 388 (Bankr. D. Del. 2004) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). The moving party has the burden of persuasion on a motion to dismiss for failure to state a claim, which should be granted "only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Holloway v. Monaco Coach Corp.*, No. Civ.A. 03-095-SLR, 2003 WL 21146720, at *1 (D. Del. May 14, 2003) (quoting *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998)).

## ARGUMENT

### I. THE EQUITABLE SUBORDINATION CLAIMS ARE PROPERLY PLEADED AND THUS SHOULD NOT BE DISMISSED

#### A. Plaintiffs Have Pleaded "Inequitable Conduct" With The Requisite Particularity Under The Lenient Standard Applicable Here

Defendants contend that Plaintiffs' complaint should be dismissed due to their failure to allege sufficiently their Equitable Subordination Claims. Specifically, Defendants argue that Plaintiffs have failed to plead with particularity "inequitable conduct" on the part of the Banks and Affiliate Non-Debtors. (Non-Debtors' Br.[6] at 10-12, 18-20; Banks' Br. at 15). For the reasons stated below, Defendants' arguments must fail.

---

[6] "Non-Debtors' Br." refers to the Opening Brief of the Affiliate Non-Debtors, Joined By Owens Corning, dated March 28, 2006.

Under Section 510(c) of the Bankruptcy Code, after notice and a hearing, the court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1). As this Court has explained, "[t]he essential purpose of equitable subordination is to undo any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of distribution of the estate." *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 68 (Bankr. D. Del. 2002) ("*Mid-American*") (citations omitted). To state a claim for equitable subordination, a plaintiff must plead three elements: (i) the defendant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the defendant; and (iii) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code. *See In re Submicron Systems Corp.*, 432 F.3d 448, 462 (3d Cir. 2006). In addition, this Court has noted that "section 510(c) of the Bankruptcy Code gives bankruptcy courts broad equitable powers to subordinate a claim on equitable grounds." *Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 310 (Bankr. D. Del. 2005).

Applying the above concepts, Plaintiffs have clearly and sufficiently alleged inequitable conduct on the part of Defendants. With regards to the Affiliate Non-Debtors, in the Complaint, Plaintiffs thoroughly have laid a foundation for their Equitable Subordination Claims, establishing first and foremost that the Affiliate Non-Debtors were not only insiders but mere alter egos of OCD. (Complaint ¶¶ 22-38). As such, "the standard for finding inequitable conduct is **much lower**." *Mid-American*, 284 B.R. at 70 (citations omitted) (emphasis added). Moreover, contrary to the allegations of the Affiliate Non-Debtors, the Complaint does not seek to equitably subordinate their claims "on the sole basis that they are insiders . . . ." (Non-Debtors' Br. at 19). The Complaint specifically describes the inequitable conduct affirmatively carried out by the

Affiliate Non-Debtors, namely their (i) intentional making of false statements of material fact contained in the Prospectuses, (ii) omissions of material facts regarding the existence of the Guarantees, and (iii) contributions to the misleading consolidated financial statements of the OCD enterprise, in order to induce the Bondholders to purchase the Bonds and the Trade Creditors to extend credit to the Debtors. (Complaint ¶¶ 62, 65, 76-78, 177, 216-25).

Similarly, the Banks' argument that Plaintiffs have not sufficiently averred inequitable conduct on the part of the Banks must fail. (Banks' Br. at 9-12). The Complaint thoroughly explains how the Banks, possessing knowledge of the Guarantees, knowingly and intentionally made false statements of material fact in the Prospectuses, and omitted material facts regarding the existence of the Guarantees. (Complaint ¶¶ 167-87, 205-08). Moreover, the Complaint explicitly describes how the Bonds/Trade reasonably believed and justifiably relied to their detriment on the false statements and material omissions contained in the Prospectuses and other publicly filed reports. (Complaint ¶¶ 63-86, 177, 185-92, 209-13).

Further, as stated in the Complaint, "CSFB was intimately familiar with OCD's finances and affairs by the time of the Bond Offerings. CSFB had for years sought to lead and/or underwrite OCD's financings and other transactions, and the Bond Offerings were the fourth major OCD financing which CSFB had led or underwritten since 1993. CSFB was the primary financial advisor and investment bank for OCD and had been for some time and thereby was an insider."[7] (Complaint ¶¶ 180-81). In light of the law that "where the claimant is an insider, the standard for finding inequitable conduct is much lower," surely the Official Representative's claim for equitable

---

[7] The Banks maintain that Plaintiffs "do[] not allege any facts that would support a conclusion that any [Bank] was an insider" (Banks' Br. at 8 n.8). Much like many of their other arguments, the Banks here are attempting to try the merits of this case at the motion to dismiss stage. Of course, for purposes of determining these motions to dismiss, this Court must accept as true that CSFB is an "insider."

subordination of CSFB's (or their successors and assigns) claims is sufficient to withstand a motion to dismiss. *Mid-American*, 284 B.R. at 70 (citations omitted).

Where, as here, the plaintiff or trustee is acting on behalf of a group of creditors, Third Circuit case law instructs that courts must "take a lenient approach" and apply Rule 9(b) with "greater flexibility." Plaintiff need only "inform the defendant of the particular conduct which is alleged to have been fraudulent" in order to satisfy this more relaxed requirement. *In re OODC, LLC,* 321 B.R. 128, 140 (Bankr. D. Del. 2005); *In re APF Co.*, 274 B.R. 634, 638 (Bankr. D. Del. 2001). The Official Representatives are fiduciaries who represent the interests of OCD's Bondholders and Trade Creditors, whose claims in the aggregate total approximately $1.8 billion. The members of these creditor constituencies are countless and largely unidentifiable. The Official Representatives thus constitute a third party representative plaintiff with limited, secondhand information upon which to base their fraud allegations, and the *OODC* standard applies.

In the end, "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate." *Burden v. U.S.*, 917 F.2d 115, 117 (3d Cir. 1990) (quoting *Pepper v. Litton*, 308 U.S. 295, 307-08 (1939)). The case at bar presents such a circumstance requiring equitable subordination of the Banks' and Affiliate Non-Debtors' claims in the interests of justice, and Plaintiffs sufficiently have pleaded their Equitable Subordination Claims in the Complaint. As such, Defendants' motions to dismiss must be denied.

**B.** **Plaintiffs Are Not Required To Identify Each Bondholder And Trade Creditor Who Relied On Defendants' Misrepresentations In The Prospectuses And Were Harmed Thereby**

Defendants assert that Plaintiffs have failed sufficiently to plead allegations of fraud and misrepresentation with particularity because such allegations do not specifically identify each

Bondholder and Trade Creditor who relied on, and was harmed by, their fraudulent conduct. (Non-Debtors' Br. at 12; Banks' Br. at 15-17, 19). There is no such requirement.

In *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53 (Bankr. D. Del. 2002), former-Chief Judge Walsh made clear that harm to an entire class of creditors could satisfy the "unfair advantage or harm" prong of the traditional equitable subordination analysis. There, the Chapter 11 plan administrator sought to equitably subordinate the claim of debtor's former president and chief executive officer. *Id.* at 57. After noting that the second prong of the traditional equitable subordination analysis involved a determination of "whether the claimant's inequitable conduct either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors," Judge Walsh held that: "*If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct.*" *Mid-American*, 284 B.R. at 71-72 (citations omitted). As stated in *80 Nassau Assocs. v. Crossland Federal Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994):

> *If the misconduct results in harm to the entire creditor body, the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner. Thus, it is sufficient to allege that the general creditors are less likely to collect their debts.* In that event, the claim will be subordinated to the payment of all other claims.

Here, Plaintiffs have alleged and stand ready to prove precisely the same type of harm discussed in the above passages from *Mid-American* and *80 Nassau Assocs.* -- that *all* Bondholders and Trade Creditors were harmed in their ability to collect their debts as a result of Defendants' inequitable conduct. (Complaint ¶¶ 202, 209, 211, 213, 222, 224, 226).

The only case Defendants cite to the contrary is *Brown v. N. Cent. F.S., Inc.*, 173 F.R.D. 658 (N.D. Iowa 1997). The facts and circumstances in *Brown*, however, cannot be further

from those presented here. In *Brown*, roughly 10 grain producers brought two separate actions against a grain elevator company alleging that they were fraudulently induced to enter into a number of so-called "hedge-to-arrive" ("HTA") contracts for the sale and purchase of grain, which they claimed were illegal futures contracts under the Commodity Exchange Act ("CEA"). *Id.* at 661, 666.

The court stressed that the degree of particularity required "depends upon the nature of the transaction or transactions in question" and found that "in a case involving more than one defendant or more than one agent of a defendant and multiple plaintiffs bringing suit *on the basis of different transactions*," each plaintiff must allege specifics "in relation to the transaction in which he or she was involved." *Id.* at 665 (emphasis added).

As Defendants point out, the *Brown* court took issue with plaintiffs' pleadings regarding the speaker and recipient of the alleged misrepresentations. But plaintiffs' pleading deficiencies in *Brown* resulted from their failure to plead that *anyone* received the misrepresentation:

> [T]he allegations of fraud here ... are based on conclusory allegations that an agent of a defendant made misrepresentations *to unidentified persons, possibly including the plaintiffs or some of the plaintiffs.* In [a prior, unrelated decision], this court found such uncertainty, not only as to who made the alleged misrepresentations, but to whom they were made when multiple plaintiffs were involved, made the allegations of fraud insufficient under Rule 9(b).

*Id.* at 666. The Official Representatives have identified precisely who of the Bonds/Trade received the misrepresentations -- each of them. (Complaint ¶¶ 177, 185-92, 209-13). Similarly, although roughly related in subject matter, each of the 10 plaintiffs in *Brown* (or their agents) was the recipient of different alleged *oral* misrepresentations, made at different times, in different places, by different defendants (or their agents). *See id.* at 666-68. The court found that, in most instances, plaintiffs had failed to allege enough specifics regarding these circumstances in order for defendant

to "reasonably identify against what it must defend." *Id.* at 668. Defendants here suffer from no such harm.

Plaintiffs properly have pleaded that each of the Bonds/Trade were the recipients of the same *written* misrepresentations, the times they were made, the manner in which they were made, and by whom they were made -- each of the Defendants. (Complaint ¶¶ 155-92, 200, 205-14, 218-27). Moreover, *Brown* is not a bankruptcy case, it does not involve the equitable remedy of equitable subordination, and there is no representative plaintiff in *Brown*. The circumstances presented in *Brown* simply cannot be compared to the situation here, where Plaintiffs are before this Court on behalf of countless creditors, each of whom was harmed by the identical inequitable conduct of each of the Defendants.

There is no case law support -- not even *Brown* -- for Defendants' argument that Plaintiffs must identify each Bondholder and Trade Creditor who relied on the particularized misrepresentations. Were an analogy required to defeat Defendants' naked argument, one would point to securities class action litigations in which the entire class of defrauded securities purchasers are afforded a presumption of reliance "where[, like the Bonds here,] the security is traded in an open and efficient market." *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992).

Similarly, Defendants erroneously argue that Bondholders who purchased their Bonds (and Trade Creditors who extended trade credit) after revelation of the previously concealed Guarantees could not show reliance and thus lack standing to assert a claim for equitable subordination. (Non-Debtors' Br. at 13; Banks' Br. at 4, 16-17). First, Defendants have clearly lost sight of the fact that Plaintiffs have indeed averred that all Bondholders and Trade Creditors, including those who purchased the Bonds and extended Trade Credit postpetition, relied on the misrepresentations in the Prospectuses, and reasonably so at least until the Third Circuit's substantive consolidation decision in August 2005. Furthermore, Defendants apparently rely upon

case law holding that there are no automatic assignments of federal securities law claims to a subsequent purchaser upon the sale of the underlying security. *Bluebird Partners, L.P. v. First Fid. Bank, N.A. New Jersey*, 85 F.3d 970, 974 (2d Cir. 1996) (citations omitted). Such case law has little application to this case, for Plaintiffs do not seek remedies under federal securities law but rather seek an *equitable bankruptcy remedy*, namely equitable subordination of the Defendants' claims. Moreover, even if federal securities law applied to this case, a question of fact would exist as to whether the subsequent purchasing Bondholders received an express assignment of claims in connection with their purchases of the Bonds. And, of course, dismissal in any event would be improper as (i) Plaintiffs alleged that "[o]n or about April 30, 1998, the Bondholder constituents purchased the Bond Debt . . . .;" and (ii) at a minimum, representative plaintiff John Hancock Life Insurance Company is an original purchaser of the Bonds. (Complaint ¶ 165).

## C. The Complaint Sufficiently Alleges Justifiable Reliance

Defendants argue that Plaintiffs have failed to plead that they justifiably relied on Defendants' material misrepresentations and omissions made in the Prospectuses. (Banks' Br. at 20; Non-Debtors' Br. at 15).

Specifically, the Banks allege that, assuming the Guarantees had not been obtained prior to the purchase of the Bonds, the Banks would have been able to acquire guarantees from the subsidiaries after the bond purchase without violating the covenants of the Indenture relating to the Bonds (the "Indenture"). (Banks' Br. at 20). The Banks therefore propound that any reliance on the "ranks equally" language in the Prospectuses (or variations thereof, such as "equal and ratable" or "rank *pari passu*") was not justified.

Whether the Bonds'/Trade's reliance was reasonable, however, is a question of fact not properly before the Court on Defendants' motions to dismiss. In fact, this argument is one of many similar arguments "thrown at the wall" in the Banks' "kitchen sink" brief and serves only to

underscore their desperation to find some credible argument to dismiss the Complaint. The entire premise of the Banks' argument lies in an unfounded hypothetical that is completely outside the scope of relevant inquiry and contrary to facts pleaded in the Complaint, which this Court must accept as true.

Musings on the various scenarios that *could* have transpired bear no relevance to what actually *did* transpire and represent nothing more than a red herring used by Defendants in an attempt to divert the Court's attention away from the actual facts pleaded in this case: that the Banks, *in fact*, had obtained the Guarantees *prior* to underwriting the Bond Offering materials, which *failed* to disclose the existence of the Guarantees or the Banks' purported "structural seniority," and affirmatively represented that the Bond Debt would be on equal footing with the Bank Debt. Of course, Plaintiffs do not agree with the Banks' interpretation of the Indenture and, certainly, if the Banks or some other creditor would have obtained guarantees from the OCD subsidiaries sometime after the Bondholders purchased the Bonds, thereby subordinating the Bond Debt which was promised to be unsubordinated, that circumstance too likely would be the subject of litigation.

In any event, the Banks' argument misstates the law of reliance. Implicit in the Banks' argument is the contention that the purchasers of the Bonds had the duty to ensure that the statements and information contained in the Prospectuses were accurate, *i.e.*, by looking to the Indenture, before they could justifiably rely on the Prospectus disclosures. This argument inappropriately attempts to shift the burden (of full and complete disclosure) away from the Defendants and impose it on Plaintiffs (by recharacterizing the burden as one of diligent inquiry). Such burden shifting offends the very nature of securities law and the fundamental premise behind the Securities Acts, specifically the duty to avoid making false or misleading public disclosures. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (fundamental purpose of Securities Act

is to ensure investors "full disclosure of material information concerning public offerings"); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 (1st Cir. 1996), *superceded by statue on other grounds, as noted in Brody v. Stone & Webster, Inc., (In re Stone & Webster, Inc.)* 414 F.3d 187, 213 (1st Cir. 2005) ("obligations that attend the preparation of a [Registration Statement] embody nothing if not an affirmative duty to disclose a broad range of material information. Indeed in the context of a public offering, there is a strong affirmative duty of disclosure.") (citations omitted).

Accordingly, federal regulations explicitly place the burden of full disclosure on the Defendants in situations where debt securities offerings are subject to subordination. In fact, 17 C.F.R. Section 229.202(b) (SEC Regulation S-K) ("Item 202(b)") imposes an affirmative duty on persons and entities participating in the preparation of any prospectus relating to a debt securities offering to ensure that all material information concerning the subordination of the offered debt securities is disclosed and further that all statements made in the offering materials are accurate. *See also* 17 C.F.R. § 229.202 (Instruction 1); *and* Complaint at ¶¶ 151-154.

Thus, here the law is clear -- the burden is one of complete and accurate disclosure, and lies with Defendants. Defendants, however, not only omitted the existence of the Guarantees and the Banks' purported "structural seniority" in the Prospectuses, but further affirmatively misled the Bondholders by stating that the Bond Debt would rank equally with the Bank Debt. (Complaint at ¶ 155-56, 163).

Apparently recognizing that Plaintiffs have met their pleading requirement, the Affiliate Non-Debtors argue that even if the Official Representatives' creditor constituency did rely on the statements in the Prospectuses, such reliance was not justified because the Prospectuses incorporated by reference the 1997 Form 10-K, which in turn incorporated by reference the July 1997 10-Q, which annexed a copy of the Credit Facility, thereby disclosing the existence of the Guarantees. (Non-Debtors' Br. at 15). The Banks similarly argue that the Complaint fails to allege

a material omission or false statement because the Guarantees were disclosed by incorporation by reference. (Banks' Br. at 21-24). But this is no more than a claimed defense to the allegation of reliance, and as such is a matter for trial. Indeed, the Untied States District Court for the District of Massachusetts already has addressed this precise issue and determined that questions of fact precluded dismissal. (Monaco Cert.[8] Ex. A).

Moreover, even if "incorporation by reference" was relevant to the adequacy of the Complaint, the doctrine would be inapplicable here. While SEC rules permit incorporation by reference of certain publicly available information, those very same rules forbid the incorporation by reference of information that is *specifically required* to be included in a registration statement. Because information relating to the Guarantees and the Credit Facility bear directly on the subordination rights and the priority of the Bond Debt, any attempt to defend their misleading public filings by invoking incorporation by reference fails as a matter of law.

As a general rule, SEC regulations provide that "information shall not be incorporated by reference in a prospectus." *See* 17 C.F.R. § 230.41(a). Information may be incorporated by reference only "in answer, or partial answer, to any item that calls for information *not required to be included in a prospectus . . . .*" 17 C.F.R. § 230.411(b) (emphasis added). Incorporation by reference thus expressly is disallowed for information which is *required* to be included in a registration statement, including information concerning subordination rights that is required by 17 C.F.R. §§ 229.202(b)(3), (b)(8), Instruction 1 and § 230.408.

There can be no dispute that information relating to the Credit Facility and the Guarantees affect "the subordination of the rights" of the holders of the Bonds and the "priority" of those Bonds. *See* 17 C.F.R. § 229.202(b)(3) and Instruction 1. The undisclosed information would

---

[8]    "Monaco Cert." refers to the accompanying Certification of Francis A. Monaco, dated April 17, 2006.

have "enabled [the Bondholders] to understand" how their rights to recover on their debt securities could be limited by the rights of the holders of the Bank Debt. *See* 17 C.F.R. § 229.202(b)(8). Moreover, because this information was "required" to be included in the Prospectuses, it could not be incorporated by reference. *See* 17 C.F.R. § 230.411(b).

The SEC draws a clear distinction between general financial information (such as that provided in a Form 10-K) and information regarding the relative priority of the offered securities to other corporate indebtedness, distinctions Defendants were obligated to follow. *Compare* 17 C.F.R. § 229.300 (requiring disclosure of financial information) *with* 17 C.F.R. § 229.200 (requiring disclosure of information describing the registered securities, including their relative priority as to other indebtedness of the registrant). Indeed, the disclosure requirements for an annual Form 10-K or a quarterly Form 10-Q are far less stringent than the specific disclosure requirements for a public offering. *See Shaw*, 82 F.3d at 1208. Thus, while registrants are authorized to refer investors to the Form 10-K for relevant information relating to their financial condition, *the Form 10-K cannot be used as a substitute for all of the other information that is required to be included in the Registration Statement, including information concerning the subordination rights of the debt securities*. *Id.* (emphasis added).

Even if incorporation by reference of the Guarantees had been permissible (and it most assuredly was not), the manner in which the Guarantees were incorporated by reference was inconsistent with controlling SEC regulations. In particular, SEC regulations provide that when a document is incorporated by reference, the relevant information "*shall be clearly identified in the reference by page, paragraph, caption, or otherwise.*" *See* 17 C.F.R. § 230.411(d) (emphasis added). In this case, the Prospectuses did not incorporate the Guarantees by a direct reference to those documents themselves, but rather the incorporation by reference was highly attenuated, performed through a chain of descending levels of incorporation akin to "six degrees" of

incorporation.[9] Furthermore, even if one were able to navigate effectively through the various degrees of incorporation to locate the discussion of the Guarantees in the Credit Facility, it merely notes the existence of the Guarantees, and is devoid of any information indicating the value, if any, of the Subsidiary Guarantors.[10] (Complaint ¶ 46).

In sum, the Credit Facility and the Guarantees could not have been incorporated by reference because doing so makes the "ranks equally" provision incomplete, unclear and confusing. *See* 17 C.F.R. § 230.411(d); *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).

## D. The Complaint Alleges That The Affiliate Non-Debtors And Banks Made Material Misrepresentations or Omissions

Defendants further argue that Plaintiffs have failed to allege a material misrepresentation or omission because Plaintiffs' reading of the "ranks equally" language in the Prospectuses is unreasonable and therefore cannot sustain the equitable subordination claims. (Banks' Br. at 25; Non-Debtors' Br. at 15). This argument is incorrect and must fail.

The language used in the Prospectuses is clear, defined, and unambiguous:

Unless otherwise specified in a Prospectus Supplement, the Debt Securities, when issued, will be unsecured and *will rank equally with all other unsecured and unsubordinated indebtedness of the Company.*

Unless the context indicates otherwise, references in this Prospectus to the 'Company' include Owens Corning *and its consolidated subsidiaries*."

---

[9]    Starting at the beginning of this chain, the Guarantees were attached to the Credit Facility, which was incorporated by OCD's July 1997 Form 10-Q, where it was embedded as one of many exhibits listed in fine print at the end of the 10-Q. This list of exhibits was voluminous, disclosing every material contract to which the Debtors were a party. The Form 10-Q, in turn, was incorporated in the company's 1997 Form 10-K. The Form 10-K subsequently was incorporated by reference into the April 3, 1997 Prospectus, which in turn was incorporated by reference into the May 1, 1997 Note Prospectus Supplement issued for the Bonds. (Complaint at ¶¶ 155, 156). In blatant disregard of the disclosure requirements under 17 C.F.R. § 230.411(d), none of these 10-Qs, 10-Ks or Prospectuses so much as mention the Guarantees. The conclusion thus is inescapable that Defendants intended to hide the Guarantees, and they succeeded only too well.

[10]    To this day, Debtors have not disclosed the value of the Subsidiary Guarantors.

(Complaint at ¶ 155) (emphasis added). A plain reading of the Prospectus language expressly provides that the Bonds were not "structurally subordinated" and would rank "equally" with all other unsecured debt of *the entire Owens Corning enterprise*. Indeed, nothing in the "ranks equally" provision indicates that the term "Company" should not be read to include the consolidated subsidiaries of OCD. Indeed, in light of the fact that the only financial information available to the Bonds/Trade was on a consolidated basis is evidence that the context actually required that the term "Company" should include OCD and its consolidated subsidiaries.

Accordingly, Plaintiffs' reading of the ranking provisions ascribes to those provisions their plain and ordinary meaning, namely that the Bond Debt will *not* be structurally subordinated to any other unsecured and unsubordinated indebtedness of OCD and its subsidiaries, including the Bank Debt. At an absolute minimum, even if this Court were to determine that the definition of "Company" (or any other language contained in Prospectuses) was ambiguous, construing the facts in a light most favorable to Plaintiffs, it should conclude that Plaintiffs' interpretation of this language is not so unreasonable as to justify dismissal.

### E.   Each Current Bank Debt Holders' Claims Can And Should Be Equitably Subordinated

The Banks assert that 50 out of 60 named Bank Defendants no longer hold Bank Debt claims against OCD or any of its subsidiaries. (Banks' Br. at 9). But the Banks offer no proof to support this assertion. Regardless, Plaintiffs' counsel intend to work with counsel for the Banks in order to dismiss without prejudice those named Bank Defendants who can prove that they no longer hold any Bank Debt, and substitute in their place the current holders of OCD's bank debt claims (the "Current Holders"). Plaintiffs' counsel will endeavor to complete this process before the May 10, 2006 hearing on these motions.

The Banks further argue that none of the Current Holders' claims can be subordinated because, with the exception of CSFB, the Official Representatives' fail to plead

specific allegations that Current Holders or their predecessors had any connection to the underwriting or sale of the Bonds and therefore did not engage in any inequitable conduct. (Banks' Br. at 11). Each of the Current Holders stand to benefit handsomely from the frauds committed upon the Bonds/Trade. Indeed, the stated purpose of the Bond Offerings was to raise capital to pay down the Bank Debt, and, in fact, over $500 million of the proceeds from the Bond Offerings were used for that purpose. (Complaint ¶¶ 182-83). Moreover, the Fifth Amended Plan proposes to pay the Current Holders 152% of their allowed claims, at the expense of the Bonds/Trade. It is these beneficiaries of the frauds who now seek to escape subordination. Basic tenets of equity alone should preclude this from occurring. *See Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 562 (Bankr. S.D.N.Y. 2002) ("*Adler*") ("Even assuming, arguendo, that Mr. Siclari were a wholly unknowing beneficiary of the succession of fraudulent transactions that caused him to profit so handsomely, this case would likewise present 'circumstances . . . under which the law . . . . may still impose liability . . . for reasons of equity or policy, by imputing to the apparent bystander the misconduct of a sufficiently related wrongdoer.'") (citation omitted). Additionally, several other factual and legal reasons exist as to why, based on Plaintiffs' allegations in the Complaint, the Current Holders' claims can and should be equitably subordinated.

*First*, at least four holders of Bank Debt claims at the time of the Bond underwritings (the "Original Holders") actually underwrote the Bond Offerings. Indeed, the Prospectuses prominently display as underwriters: (i) "Credit Suisse First Boston;" (ii) Merrill Lynch, Pierce Fenner & Smith, Inc.;" (iii) NationsBanc Montgomery Securities, LLC; and (iv) "BancAmerica Robertson Stephens."[11] (A.612, 680, 687).[12] Each of these four Underwriters are Original Holders

_____

[11]      CSFB was an original participant in the 1997 Credit Agreement in the amount of $100 million. Plaintiffs have alleged, on information and belief, that Merrill Lynch, Pierce Fenner & Smith, Inc.; NationsBanc Montgomery Securities, LLC; and BancAmerica Robertson Stephens "were the holders of the Banks' claims as of October 31, 2001, as original lenders or assignees under the 1997 Credit Agreement." *Footnote continued*

and have been named as Bank Defendants in the Complaint. (Complaint Caption, ¶¶ 25(g), (mm), (rr)). As such, there can be no doubt that their bankruptcy claims, or those of their successors and assigns, clearly are subject to equitable subordination. *See Enron Corp. v. Bear, Stearns, & Co., (In re Enron Corp.)*, Adv. No. 05-01105, 2005 WL 3832053, at *1 (Bankr. S.D.N.Y. Nov. 28, 2005) ("The transfer of a claim subject to equitable subordination does not free such claim from subordination in the hands of a transferee."). The Banks may argue that, even though the names of these entities appear identically in both the Prospectuses and the Credit Facility, they are not in fact the same entity. Whether such a statement is true or not is an issue for discovery, not a motion to dismiss. Even if true, however, equity may still impose subordination of their claims by imputing to them the misconduct of their affiliates. *See Mishkin, supra*.

Plaintiffs also sufficiently have pleaded that the Underwriters, and especially CSFB, acted as agents for each of the Original Holders when making the misrepresentations in the Prospectuses:

> ***Eleven of the Bank Defendants and/or their affiliates acted as statutory underwriters*** for $1.5 billion of OCD's public bond offerings made during 1998, approximately one year after the Credit Facility was put into place (the "Bond Offerings").
>
> CSFB, which was and still is the Agent for the participating banks in the 1997 Credit Facility, also was the lead underwriter for the Bond Offerings, and at least two CSFB officers were deeply involved in both the negotiation and creation of the Credit Facility and the underwriting of Owens Corning's Bond Debt.
>
> Moreover, three of the five other co-lead underwriters -- BNY Capital Markets, Inc., RBC Dominion Securities Corporation, and Scotia Capital Markets -- also were affiliates of Bank Defendants Bank of

(Complaint ¶¶ 25(g), (mm), (rr)). From this the Court can reasonably infer that the these entities held Bank Debt claims at the time of the Bond Offerings.

[12]   "A.___" refers to the corresponding page of the Banks' Appendix submitted in connection with their motion to dismiss (D.I. 36, 37).

New York, Royal Bank of Canada, and Bank of Nova Scotia, original lenders under the Credit Facility.

A total of eleven Banks or their affiliates participated in the Bond Offering underwriting syndicate: (i) CSFB; (ii) Bank of New York; (iii) Royal Bank of Canada; (iv) Bank of Nova Scotia; (v) Societe Generale; (vi) Barclays Bank PLC; (vii) Chase Manhattan Bank; (viii) Citibank, N.A.; (ix) First National Bank of Chicago; (x) NationsBanc Montgomery Securities LLC; and (xi) BancAmerica Robertson Stephens.

*As such, the Banks* had knowledge of the undisclosed Guarantees but failed to disclose them or their financial import to the purchasers and holders of the Bond Debt.

(Complaint ¶¶ 167-71) (emphasis added).

For purposes of these motions to dismiss, this Court must "accept as true [these allegations] and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *In re Coram Res. Network, Inc.*, 305 B.R. at 388. Under this standard, Plaintiffs have alleged sufficient facts for this Court to conclude that the Underwriters acted as the agents for all Original Holders when they defrauded the Bonds/Trade.[13]  Establishing this agency relationship will, of course, be a fact-intensive exercise and is not an appropriate issue for a motion to dismiss.

These pleaded agency relationships among the Underwriters and the Current Holders (or their predecessors) are sufficient grounds to equitably subordinate the Current Holders' claims and defeat the motions to dismiss. *See Adler*, 277 B.R. at 566. In *Adler*,[14] the SIPA trustee of a bankrupt brokerage firm sought to equitably subordinate the claims of an investor to the claims of other creditors based on the fraudulent and/or inequitable conduct of the underwriter of certain

---

[13]     *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)* 247 B.R. 51, 98 (Bankr. S.D.N.Y. 1999) ("A principal is liable for the frauds and misrepresentations of his agent within the scope of the authority or employment of the agent, even though he had no knowledge thereof and intended no fraud.").

[14]     *Adler* is a case under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa through lll (1970) ("SIPA").

initial public offerings in which the investor had participated and "benefited handsomely." Finding that the underwriter acted as the investor's agent in committing the alleged inequitable conduct, the court imputed the inequitable conduct of the underwriter to the investor and equitably subordinated the investor's claims. *See id.* at 566.

The principles announced in *Adler* apply squarely to the facts as alleged here and thus the motions to dismiss must be denied.

Similarly, Defendants state that the Complaint must attribute each specific fraudulent statement to a specific defendant. But this overly simplistic argument ignores that, as pleaded, each of the fraudulent statements were made by each of the Defendants either directly or through their agents. *See* Section I.B., *infra*.

### F. The Complaint States A Claim For Equitable Subordination Of The Affiliate Non-Debtors' Claims To The Claims Of The Bonds/Trade

The Affiliate Non-Debtors argue that "the Complaint does not (and cannot) accuse the Defendant Subsidiaries of any affirmative 'bad acts.'" (Non-Debtors' Br. at 18). Yet, the Affiliate Non-Debtors contradict themselves and concede that the "Complaint alleges that the [Affiliate Non-Debtors] 'knowingly and intentionally made false statements of material fact' and 'omitted material facts' in the Prospectuses." *Id.* (citing Complaint ¶¶ 221, 225). Even so, the Affiliate Non-Debtors contend that the inequitable conduct (as evinced by the Prospectuses) fails to support an equitable subordination claim against the Affiliate Non-Debtors because "the Prospectuses related to bonds issued by Owens Corning and were filed with the SEC by Owens Corning, not the [Affiliate Non-Debtors]." *Id.* This argument fails.

Plaintiffs explicitly allege that "the [Affiliate Non-Debtors] falsely stated, in Prospectuses in connection with the Bond Offerings, that OCD's Bond Debt would 'rank equally with other unsecured and unsubordinated obligations of the Company.'" (Complaint ¶ 219). Plaintiffs also allege that the Affiliate Non-Debtors intentionally and misleadingly omitted material

facts regarding the existence of the Guarantees. (Complaint at ¶ 221). Therefore, the Complaint clearly states the "affirmative 'bad acts'" performed by the Affiliate Non-Debtors.

Also, the Complaint alleges that the Affiliate Non-Debtors were sham affiliates that were so dominated by OCD as to be mere alter egos of OCD and that OCD's corporate form resulted in a fraud. (Complaint ¶¶ 48-147). As a result, in Count III of the Complaint, Plaintiffs seek to pierce the corporate veils of the Affiliate Non-Debtors such that OCD and the Affiliate Non-Debtors are treated as one entity. (Complaint ¶¶ 58-59). It follows that, as a single entity, any intentional misstatements and omissions of material fact by OCD are attributable to, and binding on, the Affiliate Non-Debtors. Accordingly, the equitable subordination claims against the Affiliate Non-Debtors should be not dismissed for failure to state a claim.

G. **Plaintiffs' Claim For Equitable Subordination Of The Affiliate Non-Debtors' Claims Is Ripe**

The Affiliate Non-Debtors allege that their claims against OCD are not yet allowed and thus any attempt to equitably subordinate such claims is not yet ripe. (Non-Debtors' Br. at 21). For this proposition, the Affiliate Non-Debtors rely solely on a 22-year-old case from the Northern District of Iowa -- *In re Rath Packing Co.*, 38 B.R. 552 (Bankr. N.D. Iowa 1984) ("*Rath*"). The Affiliate Non-Debtors' argument is contrary to both the operation of the Bankruptcy Code and the holding in *Rath*.

Pursuant to Bankruptcy Code Section 502(a), once a claim is filed, it is deemed allowed unless objected to. "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. §502(a); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000) ("*Hartford Underwriters*"). Accordingly, the claims of the Affiliate Non-Debtors which Plaintiffs seek to subordinate are allowed unless and until they are disallowed.

In *Rath*, a debtor sought to enjoin the National Labor Relations Board from pursuing an action for unfair labor practices and to equitably subordinate any claim which may result from such an action. The court held that because no action had in fact been filed and, therefore, no claims yet existed, it would be premature to rule on whether to equitably subordinate the claims. "[O]nly after damages, if any, had been assessed would there arise, if at all, a subordination issue under § 510(c)." *Id.* at 557. In other words, the court held that it is appropriate to determine first whether a claim exists at all before it determines whether to equitably subordinate the claim. *See id.* Contrary to the Affiliate Non-Debtors' contention, *Rath* does not state that a claim is not allowed until after confirmation and, therefore, equitable subordination is not ripe until that time. (Debtors' Br. at 21). Accordingly, Plaintiffs' claim is ripe for this Court to adjudicate.

**H.  Plaintiffs Have Standing To Subordinate The Banks' Claims Against The Subsidiary Guarantors To Those Of OCD**

Affiliate Non-Debtors argue that Plaintiffs do not have direct standing to equitably subordinate the Banks' claims against the Subsidiary Guarantors to those of OCD because Plaintiffs have not alleged any direct injury. (Debtors' Br. at 8-9). To the contrary, even a cursory reading of the Complaint indicates that Defendants' inequitable conduct resulted in direct and substantial injury to the Bonds/Trade and that the Bonds/Trade will benefit directly from such subordination. (Complaint ¶¶ 183-92, 202, 208-14, 218-27).

Under Delaware law, Plaintiffs have a direct claim if (i) they (not OCD) suffered harm as a result of the inequitable conduct alleged; and (2) equitably subordinating the Banks' claims against the Affiliate Non-Debtors to those of OCD will benefit them. *See Tooley v. Donaldson, Lufkin, Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) ("*Tooley*").

Claims have been deemed derivative under the standard set forth in *Tooley* and its progeny when a shareholder alleges harm that the Court determines all shareholders suffered collectively or that the debtor company itself suffered. *See, e.g., Gatz v. Ponsoldt*, No. Civ.A. 174-

N, 2004 WL 3029868, *7-8 (Del. Ch. Nov. 5, 2004); *In re Enron Corp. Sec. Deriv. & "ERISA" Litig..*, Nos. MSL-1446, Civ.A.H-01-3624, Civ.A.H-01-3645, Civ.A.H-03-862, 2005 WL 2230169 (S.D. Tex. Sept. 12, 2005). Here, however, Plaintiffs allege that the misrepresentations and non-disclosures in the Prospectuses, public reports and consolidated financial statements of the OCD enterprise, harmed only the Bonds/Trade who relied on the misstatements and non-disclosures to their detriment. (Complaint ¶¶ 222, 224, 226). Accepting these allegations as true, Plaintiffs clearly have suffered direct injury under *Tooley.*

Moreover, generally, "non-disclosure" claims are direct claims. *Albert v. Alex. Brown Mgmt. Serv., Inc.*, Nos. Civ A 762-N, Civ. A 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005). The allegations in Plaintiffs' Complaint are analogous to a non-disclosure claim. Here, Defendants misrepresented to the Bonds/Trade that their debts would rank equally with the Bank Debt and failed to disclose the material information which would have alerted the Bonds/Trade to the falsity of this statement. (Complaint ¶¶ 220-27). In *Albert*, as here, the businesses themselves were not harmed by the alleged disclosure violations. *Id.* at *12.

Likewise, as required under *Tooley*, Plaintiffs have alleged that they will benefit from the equitable subordination of the Banks' claims against the Affiliate Non-Debtors to those of OCD by virtue of their increased recovery against OCD. (Complaint ¶ 227). This Court should therefore reject the Affiliate Non-Debtors' standing argument.

## II.     THE VEIL PIERCING AND EQUITABLE SUBORDINATION CLAIMS ARE NOT SUBJECT TO *RES JUDICATA* OR COLLATERAL ESTOPPEL

Affiliate Non-Debtors argue that, based on the Third Circuit's observations regarding the purported separateness of certain OCD subsidiaries in connection with its substantive consolidation decision (the "Substantive Consolidation Decision"), the Veil Piercing and Equitable Subordination Claims should be dismissed under the doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion). (Non-Debtors' Br. at 22-34). While the Banks also urge

this Court to dismiss the Veil Piercing Claims on these grounds, tellingly, they do *not* contend that the Equitable Subordination Claims should be subjected to the same fate. (Banks' Br. at 31-40).

At their core, the doctrines of *res judicata* and collateral estoppel prohibit the relitigating of claims or issues that have been adjudicated in a prior lawsuit. *See, e.g., Pic, Inc. v. Prescon Corp.*, 485 F. Supp. 1302, 1308 (D. Del. 1980). In addition to the numerous reasons stated below, one overriding circumstance prohibits the application of these doctrines here: in the very decision upon which Defendants base their *res judicata* and collateral estoppel defenses, the Third Circuit invited the Official Representatives to bring the Veil Piercing and Equitable Subordination Claims at this time.

During the Third Circuit oral argument in connection with the Banks' substantive consolidation appeal, the Third Circuit made apparent that it was acutely aware of the fact that reversal of the District Court's grant of substantive consolidation would open the litigation "flood gates," specifically referencing claims for veil piercing, fraudulent conveyance, and claims in connection with the misrepresentations in the Prospectuses. (Monaco Cert. Ex. B at 23, 31, 76). Had the Third Circuit wanted to foreclose these claims, it would have done so explicitly. Instead, it virtually instructed that they go forward:

> If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to the finish in that arena.

> \*     \*     \*     \*     \*

> The same sentiment applies to the argument of the bondholders that, subsequent to the 1997 loan to OCD, the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks. If the bondholders have a valid claim, they need to prove it in the District Court . . . .

*In re Owens Corning*, 419 F.3d 195, 215 (3d Cir. 2005). Accordingly, for this and other reasons described below, the Substantive Consolidation Decision is no bar to the Veil Piercing or Equitable Subordination Claims.

**A.    The Veil Piercing And Equitable Subordination Claims Are Not Subject To *Res Judicata***

The Third Circuit in *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337 (3d Cir. 2000) comprehensively addressed the standard for claim preclusion in the context of an "expansive and complex chapter 11 bankruptcy case." Addressing the topic generally, the *Mahan* court stated that: "Under the doctrine of claim preclusion, a final judgment on the merits of an action involving the same parties (or their privies) bars a subsequent suit based on the same cause of action."[15] *Id.* at 336. The *Mahan* court noted that the "essential similarity" test is not ideal where "the claim at risk of being precluded is based on conduct that allegedly took place over the course of several years," and that claim preclusion "is typically invoked when issues surrounding a *discrete incident or transaction* have been litigated previously in a civil action." *Id.* (emphasis added). It concluded that "*a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.*" *Id.* at 337-38 (finding theory of case and relief sought between equitable subordination and veil piercing claims "markedly different").

The claim "actually litigated" in these bankruptcy cases was substantive consolidation, not veil piercing or equitable subordination. Under the Third Circuit's substantive

---

[15]    The Official Representatives do not dispute that the Substantive Consolidation Decision was a final judgment on the merits or that it involved the same parties to this adversary proceeding. The Official Representatives *do* dispute, however, that their Veil Piercing and Equitable Subordination Claims are based on the same cause of action as substantive consolidation.

consolidation standard, proponents of substantive consolidation were required to demonstrate that, prepetition, the OCD enterprise disregarded corporate separateness in such a way as to "creat[e] contractual expectations of creditors that they were dealing with [the OCD enterprise] as *one indistinguishable entity*." *In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005). Creditor proponents of substantive consolidation also had to show their actual and reasonable reliance on the Debtors' supposed unity. *See id.* Even if this was demonstrated, however, opponents of substantive consolidation could nonetheless defeat consolidation if they could prove that they were adversely affected and actually relied on the debtors' separate existence. *See id.* Thus, the "theory" of the Owens Corning substantive consolidation litigation was focused virtually entirely on creditors' reliance/non-reliance on the separateness of the OCD enterprise.[16]

In contrast, creditor reliance on separateness does not play *any* role in veil piercing or equitable subordination claims. Courts will pierce a subsidiaries' corporate veil under Delaware state law where (i) there is fraud, *or* (ii) the subsidiary is a mere instrumentality or alter ego of its parent.[17] *See Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (citing *Mabon, Nugent & Co. v. Texas American Energy Corp.*, Civ. A. No. 8578, 1990 WL 44267, *5 (Del. Ch. Apr. 12, 1990).

Here, Plaintiffs seek to "reverse" pierce the corporate veils of the Affiliated Non-Debtors in order to hold them liable for the debts of OCD. Similar to traditional veil piercing, a court will only disregard corporate formalities in "reverse" if doing so "will prevent fraud,

---

[16]     Counsel for Affiliate Non-Debtors represented to the Third Circuit during oral argument of the substantive consolidation appeal that "if you look at *World Access* and you look at some of the other cases where courts have said substantive consolidation is not appropriate, *they look to the reliance point as the key decision maker*." (Monaco Cert. Ex. B at 57) (emphasis added).

[17]     In seeking to bar the Veil Piercing Claims under the doctrines of *res judicata* and collateral estoppel, the Affiliate Non-Debtors and Banks improperly focus only on the "alter ego" theory for veil piercing, ignoring the other grounds, such as fraud or the like, which are sufficient to pierce the corporate veil under Delaware law.

illegality, injustice, [or] a contravention of public policy . . . ." *Mass v. Bell Atlantic Tricon Leasing Corp. (In re Mass)*, 178 B.R. 626, 629 (M.D. Pa. 1995). Be it "traditional" or in "reverse," courts will not pierce the corporate veil absent evidence of "fraud or something like it" which resulted from an abuse of corporate form. *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 267-68 (D. Del. 1989). Thus, the central "theory" of any veil piercing case, unlike substantive consolidation in the Third Circuit where the focus is on creditors' reliance on separateness, is that the corporate form was used to perpetrate a fraud or injustice. *See id.* at 269 ("The law requires that fraud or injustice be found in the defendants' use of the corporate form."); *Brown v. Gen. Elec. Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229 (Bankr. D. Del. 2003) (same); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice.").

Courts across the nation have noted this and other material differences between the doctrines. *See Reider v. Fed. Deposit Ins. Corp. (In re Reider)*, 31 F.3d 1102, 1105-06 (11th Cir. 1994) (comparing alter ego/veil piercing-based substantive consolidation standards employed in the 1940's and 1950's with those employed in modern times); *Federal Deposit Ins. Corp. v. Colonial Realty Co.*, 966 F.2d 57, 60-61 (2d Cir. 1992) ("The focus of piercing the corporate veil is the limited liability afforded to a corporation, and '[l]iability therefore may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties.' Substantive consolidation, on the other hand, has a narrower focus: 'the equitable treatment of all creditors . . . .'") (citations omitted); *Kroh Bros. Dev. Co. v. Kroh Bros. Mgmt. Co. (In re Kroh Bros. Dev. Co.)*, 117 B.R. 499, 501 (W.D. Mo. 1989) (citing *In re Gluckin Co., Ltd.*, 457 F. Supp. 379 (S.D.N.Y.1978)) ("[S]ubstantive consolidation does not require piercing the corporate veil."); *In re Huntco Inc.*, 302 B.R. 35, 40 n.2 (Bankr. E.D. Mo. 2003) ("Veil piercing

is used to defeat a corporation's limited liability when it[s] shareholders dominate[ ] and control[ ] the corporation's activities while substantive consolidation is intended to redistribute two or more debtors' collective assets when creditors detrimentally relied on the debtors' interconnectedness. Therefore, veil piercing and substantive consolidation are utilized to remedy two different problems and any analogy between the two is misplaced."); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, Nos. 01-30135, 01-3065, 2001 WL 1598178 (Bankr. D.N.J. April 6, 2001) ("For purposes of substantive consolidation the courts must also consider whether any creditors relied on the corporate form or corporate separateness, whereas other courts are not typically required to consider the interest of creditors other than plaintiffs for purposes of piercing the corporate veil."); *In re Cooper*, 147 B.R. 678, 683-84 (Bankr. D.N.J. 1992) (contrasting veil piercing with substantive consolidation on grounds that "piercing the corporate veil is a remedy employed under nonbankruptcy law to remedy fraud or other injustice."); *White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.)*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996) ("Piercing the corporate veil . . . is not a prerequisite to the utilization of the bankruptcy law remedy of substantive consolidation.") (citations omitted). Moreover, the Third Circuit itself (in the Substantive Consolidation Decision) has distinguished these claims:

> Each of these remedies has subtle differences. "Piercing the corporate veil" makes shareholders liable for corporate wrongs. Equitable subordination places bad-acting creditors behind other creditors when distributions are made. * * * Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies . . . .

*In re Owens Corning*, 419 F.3d at 206.

As pleaded, the OCD enterprise's abuse of its corporate form resulted in the Bonds/Trade being deceived into believing that OCD's Bond and Trade Debt would rank equally and ratably with the Bank Debt and that OCD possessed more assets than it did. (Complaint ¶¶ 234, 235). As further pleaded:

> Piercing the corporate veils of the [Affiliate Non-Debtors] and
> making the assets which they nominally hold available to the creditors
> of OCD thus is necessary in order to prevent the unjust result of the
> Banks sustaining a greater recovery than the Bondholders and Trade
> Creditors in these Bankruptcy Cases by virtue of the Banks obtaining
> Guarantees from the [Affiliate Non-Debtors] -- OCD alter egos which
> deceived the Bondholders and Trade Creditors.

(Complaint ¶ 235).

Similarly, the theory behind equitably subordinating the bankruptcy claims of the

Affiliate Non-Debtors and Banks is based upon their inequitable conduct; namely, their

misrepresentations in the Prospectuses, public reports and consolidated financial statements as

described above. (Complaint ¶¶ 63-86, 177, 185-92, 209-13, 216-228).

Thus, the theories and corresponding factual underpinnings of the Veil Piercing and

Equitable Subordination Claims simply are not "so close" to the substantive consolidation dispute

that it was "unreasonable" not to have brought them at the same time as the substantive

consolidation litigation. *Mahan*, 225 F.3d at 337-38.

Indeed, in deciding the substantive consolidation dispute, the Third Circuit simply

was not focused on whether the corporate structure of the OCD enterprise resulted in a "fraud or the

like." Rather, its entire focus was on the Banks' reliance on the supposed separateness of the OCD

enterprise evidenced solely by virtue of their obtaining the Guarantees. *See In re Owens Corning*,

419 F.3d at 212-13 (discussing Banks' reliance on separateness and corresponding factual

underpinnings). The Third Circuit certainly did not consider the key component of the Official

Representatives' Veil Piercing and Equitable Subordination Claims -- the misrepresentations in the

Prospectuses -- when deciding the substantive consolidation dispute. *See In re Owens Corning*, 419

F.3d at 213 n.27 (insisting that if the Bondholders have valid claims in connection with the

misrepresentations contained in the Prospectuses, they would have to prove them outside of the

substantive consolidation litigation).

But perhaps the best evidence as to why the Third Circuit's substantive consolidation opinion cannot serve to preclude the Veil Piercing and Equitable Subordination Claims is the Third Circuit's statement that, "[e]ven assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms," it still would have found that the Banks' relied on the separateness of the Subsidiary Guarantors and reversed the District Court's grant of substantive consolidation. *Id.* at 213. This statement not only underscores the differing theories and factual underpinnings involved in the substantive consolidation litigation on the one hand, and the Veil Piercing and Equitable Subordination Claims on the other, but also makes explicit that the Third Circuit's observations regarding the purported separateness of certain OCD subsidiaries were not essential to its substantive consolidation determination and amounted to nothing more than dicta.

Finally, because the Veil Piercing and Equitable Subordination Claims likely would have been stayed had the Official Representatives attempted to bring them at the time of the substantive consolidation dispute, it was not "unreasonable" for the Official Representatives not to do so. As this Court may recall, in October 2002, Debtors initially commenced certain fraudulent conveyance, preference and other claims against the Banks (the "Bank Adversary Action").[18] (Bank Adv. D.I. 1). Less than three months later, Debtors and other plan proponents proposed a Plan of Reorganization (the "Plan") that provided for the substantive consolidation of the Debtors' estates. (Bankr. D.I. 6756). (The Debtors simultaneously filed a motion for substantive consolidation of the Debtors' estates, to which the Banks objected.) If the Plan had been confirmed, it would have eliminated the effect of the Guarantees and thereby also eliminated the need to litigate the claims asserted in the Bank Adversary Action. Accordingly, prosecution of the claims asserted in the Bank Adversary Action was stayed -- initially by this Court and thereafter by the District

---

[18]    Adversary Proceeding Number 02-5829 (JPF) on this Court's docket.

Court -- pending the outcome of the Debtors' substantive consolidation motion. (Bank Adv. D.I. 27, 44). Because a grant of substantive consolidation similarly would have mooted the Veil Piercing and Equitable Subordination Claims, it is reasonable to conclude that they too would have been stayed in favor of substantive consolidation.

Thus, it was not "unreasonable" for Plaintiffs not to have brought the Veil Piercing and Equitable Subordination Claims at the same time as the substantive consolidation litigation and thus these claims should not be barred by the doctrine of *res judicata*.

**B. The Veil Piercing And Equitable Subordination Claims Are Not Subject To Collateral Estoppel**

Based on the same Third Circuit dicta regarding the purported separateness of certain OCD subsidiaries discussed above, Defendants argue that the Veil Piercing and Equitable Subordination Claims should be dismissed on the basis of collateral estoppel or issue preclusion.[19] (Non-Debtors' Br. at 28-34; Banks' Br. at 36-40).

For a party to be estopped from relitigating an issue, the following elements must be present: (i) the issue sought to be precluded must be the same as the one involved in the prior action; (ii) the issue must have been actually litigated; (iii) the issue must have been determined by a valid and final judgment; and (iv) the determination must have been essential to the prior

---

[19]    It is difficult to ascertain whether the Affiliate Non-Debtors also seek to dismiss the Equitable Subordination Claims on the basis of collateral estoppel. In the introduction to Affiliate Non-Debtors' "collateral estoppel" argument, they state that: "The Plaintiffs are also barred from asserting a claim for *substantive consolidation* or veil piercing under the doctrine of collateral estoppel." (Non-Debtors' Br. at 28) (emphasis added). The text of the Affiliate Non-Debtors' "collateral estoppel" argument section does not reference equitable subordination except for the last sentence in that section, which summarily accuses the Equitable Subordination Claims of being disguised substantive consolidation claims without any explanation or support. *See id.* at 28-34. In any event, there can be no doubt that the Equitable Subordination Claims are not subject to collateral estoppel. The Third Circuit, in its Substantive Consolidation Decision, neither addressed nor decided the issue of whether the bankruptcy claims of the Affiliate Non-Debtors and Banks should be subordinated by virtue of their misrepresentations in the Prospectuses. In fact, the Third Circuit instructed that if this was the case, the Official Representatives "need to prove it in the District Court." *In re Owens Corning*, 419 F.3d at 215 n.27. This fact precludes dismissal of the Equitable Subordination Claims on the basis of collateral estoppel.

judgment. *Wolstein v. Docteroff (In re Dockteroff)*, 133 F.3d 210, 214 (3d Cir. 1997). None of these elements are satisfied here.

### 1. The Issues Sought To Be Precluded Here Were Neither Litigated Nor Determined By The Third Circuit In Its Substantive Consolidation Decision

As addressed in detail above, the issue previously litigated and decided by the Third Circuit in the Substantive Consolidation Decision was whether the Banks' relied on the supposed separateness of the OCD enterprise when extending credit under the Credit Facility. *See In re Owens Corning*, 419 F.3d at 212-13. That is not the issue to be decided in connection with either the Veil Piercing or Equitable Subordination claims.

The relevant inquiry for veil piercing purposes is whether (i) OCD's corporate structure resulted in fraud or the like, or (ii) the Affiliate Non-Debtors are mere instrumentalities or alter egos of their parent OCD. *See Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (citing *Mabon, Nugent & Co. v. Texas American Energy Corp.*, Civ. A. No. 8578, 1990 WL 44267, *5 (Del. Ch. Apr. 12, 1990). As explained above, the Third Circuit has never addressed at least the first of these grounds.

Moreover, with respect to the "alter ego" test, it has been recognized that, in "reverse" veil piercing cases such as this one, "to accommodate the differences between the traditional and non-traditional veil piercing situations, the domination requirement of the traditional test needs to be relaxed in favor of finding a control relationship between the parent and the subsidiary." *Securities Investor Prot. Corp. v. Stratton Oakmont*, 234 B.R. 293, 323 (Bankr. S.D.N.Y. 1999). The Third Circuit's "separateness" observations were made in the context of deciding whether the OCD enterprise disregarded separateness to such an extent as to "creat[e] contractual expectations of creditors that they were dealing with [the OCD enterprise] as one indistinguishable entity." *In re Owens Corning*, 419 F.3d at 212. Clearly, this "one

indistinguishable entity" requirement cannot be compared to the lesser "control relationship" burden applicable to the Veil Piercing Claims. Thus, the issues sought to be precluded in connection with the Veil Piercing Claims have not been previously litigated or decided.

### 2. The Third Circuit's "Separateness" Observations Were Not Essential To Its Substantive Consolidation Decision

Assuming *arguendo* that the Third Circuit previously decided the issue of whether OCD's subsidiaries are alter egos of OCD, it cannot be disputed that such a decision was *not* "essential" to the Substantive Consolidation Decision. Indeed, the Third Circuit made explicitly clear that, "[e]ven assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms," it still would have found that the Banks' relied on the separateness of the Subsidiary Guarantors and reversed the District Court's grant of substantive consolidation. *In re Owens Corning*, 419 F.3d at 213. In light of this statement, there can be no doubt that the Third Circuit's "separateness" observations were not essential to its substantive consolidation decision. Accordingly, the doctrine of collateral estoppel cannot serve to bar the Veil Piercing or Equitable Subordination Claims. *See Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 853 (3d Cir. 1996) (noting that findings not necessary to a decision are mere dictum and do not give rise to *res judicata* or collateral estoppel).

### III. THE CLAIMS ASSERTED IN THE EQUITABLE SUBORDINATION ACTION MUST PROCEED AS A SEPARATE ADVERSARY PROCEEDING THAT SHOULD BE FULLY ADJUDICATED ON ITS MERITS AND SHOULD NOT BE CONSOLIDATED INTO CONFIRMATION HEARINGS

Alternatively, the Affiliate Non-Debtors request that the Equitable Subordination and Veil Piercing Claims that survive these motions to dismiss either be completely stayed or considered only in conjunction with the hearing on confirmation of the Fifth Amended Plan. (Non-Debtors' Br. at 34, 35). The Affiliate Non-Debtors argue that the Court has authority to "enter a complete stay of this adversary proceeding" or consolidate the proceeding into the plan

confirmation hearing pursuant to Section 105(a) of the Bankruptcy Code. *Id.* at 35.[20] It is well established, however, that a court cannot use Section 105(a) to act in contravention of other provisions of the Bankruptcy Code or established law. *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 n.4 (2d Cir.1994) ("This power is not unlimited . . . a bankruptcy court may not exercise this power in contravention of the provisions of the Code.") (citation omitted); *see also Joubert v. ABN AMRO Mortgage Group, Inc. (In re Joubert)*, 411 F.3d 452, 455 (3d Cir. 2005) (Section 105(a) has a "limited scope" and does not create substantive rights not available under the Bankruptcy Code).

Absent a waiver, an adversary proceeding cannot be considered in the course of a confirmation hearing without potentially violating due process rights. *Irby v. Mr. Money Finance Co. (In re Irby)*, 321 B.R. 468, 470 (Bankr. N.D. Ohio 2005) ("delineation between . . . adversary proceedings and contested matters has, as its underpinnings, concerns over due process;" thus while party may waive right to have dispute heard as an adversary proceeding, such waiver will not be presumed). Indeed, the Bankruptcy Rules draw a distinction between disputes that must be resolved by adversary proceeding, requiring more formal procedures to ensure due process, as opposed to those that merely constitute contested matters, that lack certain procedural safeguards. *See* Bankruptcy Rules 7001(1) and (8) (mandating that proceedings to recover money or property and proceedings to subordinate any allowed claim or interest be brought by adversary proceeding) and Bankruptcy Rule 9014 (governing contested matters).

---

[20] This argument comports with Debtors' previously revealed intent to pursue an overall strategy to consolidate all adversary claims propounded by the Official Representatives into plan confirmation proceedings, where the Debtors have asserted that they will only need to prove to the Court that the adversary claims are not substantial enough to hold up confirmation of the Fifth Amended Plan, thereby effectively barring full adjudication of the merits of the Equitable Subordination and Veil Piercing Claims. (Bank Adv. D.I. 70 at 12-13). Should this occur, the Official Representatives will be relegated to an appeal of the confirmation order of a substantially consummated plan and, under the doctrine of equitable mootness, may never have the opportunity to have the merits of their claims fully adjudicated, effectively depriving them of their due process rights.

Accordingly, those disputes which must be commenced by adversary proceeding, including equitable subordination actions, are not the kinds of issues that may be "resolved by the less formal procedures applicable to contested matters." *In re Beard*, 112 B.R. 951, 955 (Bankr. N.D. Ind. 1990). Thus, while many issues may be subsumed in the confirmation process, "that process does not encompass all possible issues." *Id.* Since the plan confirmation process, "at best[, constitutes] a contested matter, the only questions which are properly before the court in the context of confirmation are those which can be raised as contested matters." *Id.*; *see also Sunrise Energy Co. v. Maxus Gas Mktg. (In re Sunpacific Energy Mgmt., Inc.)*, 216 B.R. 776, 779 (Bankr. N.D. Tex. 1997) ("Simply put, the preference claim, requiring an adversary proceeding, could not have been brought as part of the confirmation proceeding, a contested matter.").

Therefore, any issue that "must be raised through an adversary proceeding [ ] is not part of the confirmation process." *In re Beard*, 112 B.R. at 956; *see also Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280 B.R. 573, 587 (Bankr. D. Del. 2002) ("a preference action is not one that 'could have been brought at the same time as' a prior confirmation hearing for the purposes of *res judicata* because the confirmation process constitutes a contested matter under the Bankruptcy Rules, whereas a preference action must be commenced as an adversary proceeding under Fed.R.Bankr.P. 7001.").

The Third Circuit itself, as well as courts within the Third Circuit, have held that the actions set forth in Rule 7001 must be brought by adversary proceeding and, further, that it constitutes reversible error for a bankruptcy court to adjudicate such claims during plan confirmation hearings. *See In re McKay*, 732 F.2d 44, 45 (3d Cir. 1984) (reversing orders of the bankruptcy and district court confirming plan which contained a list of liens to be avoided and holding that an action to avoid a lien under § 522(f) had to be brought by way of adversary proceeding rather than merely being listed in the plan); *In re USN Commc'ns, Inc.*, 280 B.R. at 587;

*see also In re Indri*, 126 B.R. 443, 445 (Bankr. D.N.J. 1991) (bankruptcy court refused to rule on substance of debtor's motion to avoid lease termination as preference or fraudulent transfer because such avoidance action had to be brought through separate adversary proceeding).

Consequently, the Affiliate Non-Debtors' attempt to have the Equitable Subordination and Veil Piercing Claims either completely stayed or consolidated into the confirmation hearings would deprive the Official Representatives of their due process rights and further lacks legal foundation and is improper. Accordingly, these claims should be expeditiously and fully adjudicated in the context of this adversary proceeding.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss. To the extent that the Court determines that any of the claims contained in the Complaint fail to state a claim, Plaintiffs respectfully request the opportunity to amend the Complaint in order to cure any perceived defect.

Dated: April 17, 2006

MONZACK & MONACO, P.A.          -and-          ANDERSON KILL & OLICK, P.C.

By: _____

Francis A. Monaco, Jr. (#2078)
1201 Orange Street, Suite 400
Wilmington, DE 19811
Telephone: 302-656-8162
Fax: 302-656-2769

J. Andrew Rahl, Jr.
John B. Berringer
Howard D. Ressler
Mark Weldon
Dennis J. Artese
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-278-1000
Fax: 212-278-1233

Counsel for the Official Representatives of the
Bondholders and Trade Creditors of Debtors Owens Corning, *et al.*

53994                                    38